UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-20954-CIV-MORENO/SIMONTON

STEVEN M. BIRCOLL,

               Plaintiff,

vs.

MIAMI-DADE COUNTY,

               Defendant.

_____/

## DEFENDANT'S MOTION TO DISMISS THE
## COMPLAINT ON THE BASIS OF FRAUD ON THE COURT

       Pursuant to this Court's inherent authority, Defendant Miami-Dade County (the "County") files this motion to dismiss Plaintiff Steven M. Bircoll's complaint (DE # 1) on the basis of fraud on the Court. In support thereof the County states as follows.

### INTRODUCTION

       In this case Plaintiff claims that the County violated Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* (count I), section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794 (count III), and the Civil Rights Act, 42 U.S.C. § 1983 (count II) when it arrested and detained him for driving while under the influence ("DUI") on April 7, 2001. Complaint. More specifically, Plaintiff alleges, *inter alia*, that he suffered damages as a result of the police's deliberate failure to accommodate his hearing impairment in accordance with the ADA and RA when at the police station he was not provided any form of written communication explaining that he had been arrested for a DUI and his license to drive would be suspended if he refused to take a test that would have determined the content of alcohol on his breath. *Id.* at ¶ 26-30, 37-39, 43-44; Response in Opposition to the Summary Judgment Motion ("Response")(DE # 59) at 8, 13, 15, 18; Plaintiff's Answers to Defendant's First Set of Interrogatories at answer to interrogatory 8, attached as Exhibit A.

       At Plaintiff's deposition in this case, Plaintiff, under oath, repeatedly asserted that the officers present at the police station never gave him any written materials explaining his rights with respect to the DUI and the breath test. *See* Bircoll's Dep. at 59, 66-67, 70. In describing the complete factual basis of his contention that the County violated his rights, Plaintiff also stated in

*Bircoll v. Miami-Dade County*, Case No. 05-20954 Civ-Moreno/Simonton

his answer to the County's eighth interrogatory that he suffered damages as a result of the police's "failure to provide effective communication through the use of auxiliary aids." Ex. A at answer 8. Upon further investigation and preparation for trial, however, on December 15, 2005, undersigned counsel received a transcript of a deposition of Plaintiff dated July 17, 2003, which was taken in the malpractice lawsuit Plaintiff filed against his former attorney Brian Leifert.[1] Bircoll's Malpractice Dep., attached as Exhibit B.  The recent review of the malpractice deposition revealed that Plaintiff plainly admitted, *inter alia*, that the police provided him with written material that told him he was under arrest for DUI, explained his options with respect to the breath test, and that he understood the process of being arrested and taking a breath test prior to his DUI arrest.  Bircoll's Malpractice Dep. at 71-73, 76.  As outlined below, Plaintiff's testimony in this case goes to the heart of this action, is directly contradictory to his prior testimony, and was specifically designed to illicitly prosecute this lawsuit and commit a fraud on the Court. As Plaintiff's contradictory testimony belies and subverts the integrity of the action, the complaint should be dismissed with prejudice and the costs and attorney's fees incurred in defending this lawsuit be awarded to the County.

## ARGUMENT

In the malpractice deposition Plaintiff admitted that at the police station his hearing impairment was accommodated by the provision of written material explaining the content of the implied consent form:[2] that Plaintiff was under arrest for DUI and his refusal to take the offered breath test would result in the suspension of his license.

> Q. Did the officer read the language that in the top where it starts, "You are under the [sic] arrest for driving under the influence of alcohol"?
> [Bircoll] A. Top of this?
> Q. Yes.
> A. He was trying to talk to me.  I couldn't understand him. I was trying. He had a piece of paper. He was trying to read it. He was telling me look up. It was confusing. I couldn't read it. He handed me the piece of paper and I was trying to read it and he was trying to talk to me.
> Q. Was this piece of paper given to you either before you were arrested or after you were arrested for you to read along?

---

[1] Plaintiff filed a lawsuit against attorney Brian Leifert claiming that Leifert committed malpractice in representing Plaintiff in (1) the May 17, 2001 administrative hearing, which was held to determine whether Plaintiff's driver's license would continue to be suspended, and (2) the related criminal case where Plaintiff was charged for driving while under the influence. *Bircoll v. Leifert*, Case No. 02-18132 CA 04 (11th Jud. Cir. Fla.).

[2] The implied consent form that Everett Townsend provided to Plaintiff at the police station is included in Exhibit 5 to the County's statement of material facts (DE # 51).  This implied consent form was also included in composite exhibit 1 to Plaintiff's deposition in this case (Bircoll's Dep. at 58-59), which is attached to this motion as Exhibit C.

2

*Bircoll v. Miami-Dade County*, Case No. 05-20954 Civ-Moreno/Simonton

A. After I was arrested.
Q. It was given to you, this Exhibit B?
A. He gave it to me after I was arrested.
Q. At the police station?
A. At the police station.
Q. Did you read this form this, Exhibit B?
A. No.
Q. Why not?
A. Because he didn't give me a chance to. He was trying to talk to me.  I can't read and talk at the same time.
Q. What did you do when the officer was trying to give you this Exhibit B?
A. He was talking to me, asking me questions. I got to the point, look, I'm not a lawyer, let me go. He was asking more questions. That's when I got my wallet out and gave him the card and that stopped it.
Q. Other than this paper, this Exhibit B, was any other paperwork shown to you at the police station?
A. I don't remember, no.
Q. Excuse me?
A. As far as I remember, no.

Bircoll's Malpractice Dep. at 71-73. Plaintiff's admission corroborates the County's position that the officers at the police station effectively communicated verbally and in writing. Defendant's Motion for Summary Judgment (DE # 50). Plaintiff's admission also directly contradicts his testimony in the deposition in this case, that no one tried to communicate with him in writing at the police station and that he was not provided any written material at the police station.

Q. Can you read what it says there on this page?
[Bircoll] A. Where?
Q. Up top where it says ["Y]ou are under arrest["]. Can you read that?
A. Yes, I can read it.
Q. Do you understand what it is communicating to you?
A. Yes. They never showed it to me.
Q. So did the officer ever show this to you?
A. No.
Q. So the only way he tried to communicate to you was verbally?
A. Right. I remember him handing me a piece of paper. He was standing next to me. I was handcuffed to the bench, and he was reading something facing forward, and I was trying to understand him.  I couldn't understand him.
Q. So he never handed you anything to read along with him?
A. No.

Bircoll's Dep. at 59.

Q. Did he hand you any papers?
A. No. He was reading off the papers.

*Id.* at 67.

3

*Bircoll v. Miami-Dade County*, Case No. 05-20954 Civ-Moreno/Simonton

> Q. Did anybody ever write any notes to you?
> A. No.
> Q. Even before this at this at the police substation, nobody attempted to write notes?
> A. No, no. There was no written communication, no. If that's what you are asking me, no.

*Id.* at 70; Response at 8, 13, 15, 18 (Plaintiff argues that the police deliberately failed to provide any written material to aid communications). Plaintiff also contradicts the malpractice deposition testimony in his answers to the County's interrogatories. Ex. A.

> 8. Please state the complete factual basis for your contention that the Defendant violated Title II of the American with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12101 *et seq.*, the Rehabilitation Act of 1973, as amended, or the Civil Rights Act, 42 U.S.C. § 1983.
>
> [Response] 8. Defendant, Miami-Dade County is a public entity.  At the time of the incident complained of, I was a qualified individual with a disability in that I was almost totally deaf.  At the time of my arrest, I was not provided with a sign language interpreter, real time captioning, **or any other auxiliary aid which would facilitate communication with Sergeant Trask and the other officers.** My [sic] believe that the entire serious [sic] of unfortunate events that occurred on April 7, 2001 was a result of my inability to understand the officers **which was the result of the failure to provide effective communication through the use of auxiliary aides** [sic].

Ex. A at answer 8 (emphasis added).

At the malpractice deposition, Plaintiff also admitted that he knew before the DUI arrest on April 7, 2001, that the police administer a test to determine the amount of alcoholic beverage on a DUI arrestee's breath.

> Q. Did you know that one of the things that officers do, if they stop you, is they give you a breathalyzer test?
> A. If they stop me? I know that if you fail the sobriety test, you have to do the breathalyzer test, yes.
> Q. You knew when you got a Florida driver's license, if you're stopped and suspected of drinking alcohol, that the officers will give you a breathalyzer test, and if you refuse it, you'll lose your license for a year?
> A. I know that but, I don't take the test. I'll lose it.
> Q. You were aware of that before you were stopped?
> A. Yes.

Bircoll's Malpractice Dep. at 76. This admission supports the County's position that Plaintiff understood that he could have taken the breath test, but simply refused.  In addition, Plaintiff's

4

*Bircoll v. Miami-Dade County*, Case No. 05-20954 Civ-Moreno/Simonton

admission belies his later deposition testimony that he did not understand his situation at the police station.

> Q. Are you aware that when you sign your driver's license, you give what they call an implied consent to a sobriety test and to taking an Intoxilyzer test?
> A. I do now.
> Q. You did not know that then?
> A. At that time, no.

Bircoll's Dep. at 66-67.

In the malpractice deposition, Plaintiff also admitted that he can hear if the volume is loud over the telephone and that he did not always use a "relay telephone."

> Q. At home, do you use a telephone?
> A. Yes.
> Q. How are you able to converse on the telephone?
> A. With a special phone, amplified phone. I have a hard time on the phone.
> Q. You are able to talk on the telephone?
> A. Am I able to?
> Q. Yes.
> A. Not very well.
> Q. You say it's a special phone. It means it's just louder than a normal phone?
> A. Yes.
> Q. Do you have anything on your phone that prints anything out so you can read what people say?
> A. I have a phone, a relay, where you call the operator and the operator types out what the other person says.
> Q. Do you use that relay?
> A. I have that at home now.
> Q. That comes out on your computer?
> A. No. It's a separate phone.
> Q. How long have you been using that with the relay.
> A. Since it came out a couple of years ago.
> Q. Do you ever talk on the phone without using the relay?
> A. There are times, but I have a hard time talking on the phone.
> Q. Are you able to hear anything when you talk to somebody on the telephone?
> A. A little bit. You have to scream. You have to keep repeating over and over until I get it right.

Bircoll's Malpractice Dep. at 51-52. This admission supports the County's position and corroborates Plaintiff's own testimony that he could hear some on the night of the DUI arrest. Transcript of May 17, 2001 Admin. Hearing at 43-44 (Plaintiff admitted that he could hear as much as twenty percent of what was said when wearing hearing aids). Plaintiff's admission also

contradicts his testimony in this case, "I could never hear anything on the telephone." Bircoll's Dep. at 57.

Plaintiff should not be allowed to contradict his prior testimony to concoct facts that allow him to prosecute this case against the County. *See, e.g., Van T. Jenkins & Assoc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). Indeed, Plaintiff's allegations and arguments, answer to interrogatory 8, and deposition testimony in this case is so directly contradictory to his prior deposition testimony that the only explanation is that his testimony and statements are a sham fabricated to prosecute this lawsuit against the County. *See Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335-36 (11th Cir. 2002)(affirmed dismissal of action where during discovery evidence emerged that plaintiff was not the owner of the defective car sued about and that the lawsuit was filed in bad faith); *Metropolitan Dade County v. Martinsen*, 736 So. 2d 794 (Fla. 3d DCA 1999)(dismissing personal injury action on the basis of fraud on the court where plaintiff made material misrepresentations and omissions about her accident and medical history); *Aoude v. Mobile Oil Corp.*, 892 F.2d 1115, 1118-19 (1st Cir. 1989)(affirming dismissal of action for fraud on the court where plaintiff filed a complaint based on a fabricated purchase agreement). As such, Plaintiff's new testimony is nothing short of a fraud on the Court that subverts the integrity of this action and requires dismissal of his complaint. *See id.; see also Hanono v. Murphy*, 723 So.2d 892, 895 (Fla. 3d DCA 1998)("party who has been guilty of fraud or misconduct in the prosecution or defense of a civil proceeding should not be permitted to continue to employ the very institution it has subverted to achieve her ends"); *Cox v. Burke*, 706 So.2d 43, 47 (Fla. 5th DCA 1998)("[W]here a party lies about matters pertinent to his own claim ... and perpetrates a fraud that permeates the entire proceeding, dismissal of the whole case is proper.").

## CONCLUSION

Plaintiff's perpetration of fraud on this Court requires dismissal of this action and award of the attorney's fees and costs incurred by the County in defending this case.

Respectfully submitted,

MURRAY A. GREENBERG
Miami-Dade County Attorney
111 N.W. 1st Street, Suite 2810
Miami, Florida  33128

6

*Bircoll v. Miami-Dade County*, Case No. 05-20954 Civ-Moreno/Simonton

Tel: (305) 375-5151
Fax:  (305) 375-5634
E-mail:  eah@miamidade.gov

By: _____
Eric A. Hernandez
Assistant County Attorney
Florida Bar No. 340730

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed via U.S. Mail this 23rd day of December, 2005 to: Jay M. Levy, Esq., 9130 S. Dadeland Blvd., Suite 1510, Two Datran Tower, Miami, Florida 33156.

_____
Assistant County Attorney

7

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

STEVEN M. BIRCOLL,                          CASE NO: 05-20954-CIV-MORENO
                                            MAGISTRATE JUDGE SIMONTON

      Plaintiff,

vs.

MIAMI-DADE COUNTY, et. al.,

      Defendants.
_____/

### Answers to Defendant's First Set of Interrogatories

COMES NOW the Plaintiff, STEVEN M. BIRCOLL, by and through his undersigned

attorneys, and hereby files this his Answers to Defendant's First Set of Interrogatories propounded

on June 16, 2005.

I HEREBY CERTIFY that a true and correct copy of the foregoing instrument was faxed and

mailed to Eric A. Hernandez, Assistant County Attorney, Miami-Dade County Attorney, 111 NW 1st

Street, Suite 2810, Miami, Florida, 33128, this 1͟8͟͟ day of August, 2005.

                       JAY M. LEVY, P.A.
                       9130 South Dadeland Boulevard
                       Two Datran Center, Suite 1510
                       Miami, Florida  33156
                       Telephone No: (305) 670-8100
                       Facsimile No:  (305) 670-4827

                     BY: _____
                          JAY M. LEVY, ESQUIRE
                          FLORIDA BAR #: 219754

<div align="center">1</div>

                                            EXHIBIT A

*Bircoll v. Miami-Dade County, et al.,*
Case No. 05-20954-Civ-Moreno/Simonton
Page 6

## DEFENDANT MIAMI-DADE COUNTY'S FIRST SET
## OF INTERROGATORIES TO PLAINTIFF STEVEN M. BIRCOLL

1.      Please provide the name, address, telephone number, place of employment and job title of any person who has, claims to have or whom you believe may have knowledge or information pertaining to any fact alleged in the pleadings filed in this action, or any fact underlying the subject matter of this action.

SEE ATTACHED

2.      Please state the specific nature and substance of knowledge that you believe the person(s) identified in your response to Interrogatory No. 1 may have.

SEE ATTACHED

*Bircoll v. Miami-Dade County, et al.,*
Case No. 05-20954-Civ-Moreno/Simonton
Page 7

3.    Please provide the name of each person whom you may use as an expert witness at trial.

SEE ATTACHED

4.    Please state in detail the substance of the opinions to be provided by each person whom you may use as an expert witness at trial.

SEE ATTACHED

5.      Please state each item of damages that you claim, whether as an affirmative claim or as a setoff, and include in your answer: the count or defense to which the item of damages relates; the category into which each item of damages falls, *i.e.* general damages, special or consequential damages (such as lost profits), interest, and any other relevant categories; the factual basis for each item of damages; and an explanation of how you computed each item of damages, including any mathematical formula used.


SEE ATTACHED


6.      Please identify each document pertaining to each item of damages stated in your response to Interrogatory No. 5 above.


SEE ATTACHED

*Bircoll v. Miami-Dade County, et al.,*
Case No. 05-20954-Civ-Moreno/Simonton
Page 9

      7.    Please identify each document (including pertinent insurance agreements) pertaining to any fact alleged in any pleading filed in this action.

    SEE ATTACHED

      8.    Please state the complete factual basis for your contention that the Defendant violated Title II of the American with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12101 *et seq.*, the Rehabilitation Act of 1973, as amended, or the Civil Rights Act, 42 U.S.C. § 1983.

    SEE ATTACHED

9.      Please provide the name, address, telephone number, place of employment and job title of the person who posted your bond so that you could be released on April 7, 2001.


SEE ATTACHED


10.     Please provide the name, address, telephone number, place of employment and job title of the person who picked you up from the Turner Gulford Knight Correctional Facility on April 7, 2001.


SEE ATTACHED

*Bircoll v. Miami-Dade County, et al.,*
Case No. 05-20954-Civ-Moreno/Simonton
Page 11

     11.    Please provide the name, address, telephone number, place of employment and job title of the person(s) you called from the Turner Gulford Knight Correctional Facility on April 7, 2001.

SEE ATTACHED

<u>Answers</u>

1.     A.     Dr. Herbert Bircoll, 3332 Parkland Drive, West Bloomfield, Michigan, 48322. Dr. Bircoll is my father and has knowledge of my emotional condition subsequent to Defendant's violation of my civil and ADA rights.

       B.     Mrs. Patricia Bircoll, 3332 Parkland Drive, West Bloomfield, Michigan, 48322. Mrs. Bircoll is my mother and has knowledge of my emotional condition subsequent to Defendant's violation of my civil and ADA rights.

       C.     Laura Spencer, 4161 Barbossa Avenue, Coconut Grove, Florida, 33133. Ms. Spencer is my attorney and she has complete knowledge of my emotional condition subsequent to Defendant's violation of my civil and ADA rights.

       D.     Iris Bruel, PsyD, 7800 Red Road, Penthouse 310, South Miami, Florida, 33133. Dr. Bruel is treating me for Post Traumatic Stress Disorder incurred by Defendant's violation of my civil and ADA rights and has treated me for approximately the past 3 years.

       E.     Dr. McCay Vernon, PhD, 313 Ebb Tide Court, South Ponta Vedra Beach, Florida, 32082. Dr. Vernon is a licensed psychologist and an expert on deaf people. He has evaluated me and also has determined that I am suffering for Post Traumatic Stress Disorder incurred by Defendant's violations of my civil and ADA rights.

2.     See Answer to Interrogatory No. 1.

3.     I have not yet determined precisely which experts I intend to call on my behalf at trial, however as soon as such a determination has been made, I will supplement my answer accordingly.

4.     I have not yet determined precisely which experts I intend to call on my behalf at trial therefore I cannot state in detail the substance of the opinions provided by each person at this point.

5.     I am claiming that as a result of Defendant's gross abuse, indifference and willful disregard, I suffered from insomnia, migraine headaches and stomach and digestive problems. These would constitute the list of physical injuries for which I am seeking compensation.

       I am also seeking compensation for emotional injuries which I sustained as a result of Defendant's gross abuse, indifference and willful disregard. Those injuries would include night terrors, delusional paranoia, mental pain, anguish, anxiety, embarrassment, humiliation and shame, loss of concentration and focus, fatigue and infliction of and/or exacerbation of for Post Traumatic Stress Disorder.

       I am also seeking damages for my wrongful arrest and incarceration as well as being placed in isolation while in jail. I have miscellaneous out of pocket damages such as the bail bond, car

2

storage and towing charges etc.. I also lost my driving privileges as a result of the incident for which I seek compensation.

6.    See documents produced in response to Request for Production and the records of my therapist, Dr. Iris Bruel.

7.    A.    Tape of Administrative Hearing;
      B.    Tape of Hardship Hearing;
      C.    Report of Vocational Rehabilitation dated September 11, 2001.
      D.    Metropolitan Dade County Department of Corrections and Rehabilitation Memo with regard to Americans with Disabilities Act.
      E.    The arrest form for Steven Mitchell Bircoll.
      F.    The Jail Booking Record.
      G.    Florida Uniform Traffic Citations 6595ASV and 6596ASV dated April 7, 2001.
      H.    Metro-Dade Police Department DUI Test Report for Steven Mitchell Bircoll dated April 7, 2001.
      I.    Breath Test Result Affidavit for Steven Mitchell Bircoll dated April 7, 2001.
      J.    Rights Card provided police officers by Steven Mitchell Bircoll on April 7, 2001.
      K.    Bond Receipt for Steven Mitchell Bircoll in the amount of $1,500.
      L.    Property Receipt for Steven Mitchell Bircoll.
      M.    Picture of the intersection at which Steven Mitchell Bircoll was arrested on April 7, 2001.
      N.    Turner Guilford Knight Correction Center Roster for April 7, 2001.
      O.    Audiology Reports for Steven Mitchell Bircoll.
      P.    Nol prosse of traffic court case.
      Q.    Correspondence from Dr. Balkany relating to the cochlear implant.
      R.    Car storage receipt.
      S.    Deposition of Sergeant Trask taken in DUI case.
      T.    Deposition of Officer Faustin taken in DUI case.
      U.    Deposition of Officer Townsend taken in DUI case.

8.    Defendant, Miami-Dade County is a public entity. At the time of the incident complained of, I was a qualified individual with a disability in that I was almost totally deaf. At the time of my arrest, I was not provided with a sign language interpreter, real time captioning, or any other auxiliary aide which would facilitate communication with Sergeant Trask and the other officers. My believe that the entire serious of unfortunate events that occurred on April 7, 2001 was a result of my inability to understand the officers which was the result of the failure to provide effective communication through the use of auxiliary aides. In addition, although I requested the use of a TTY at the jail, I was deprived of the right to a TTY. My understanding is that all of the foregoing is a violation of the Americans with Disabilities Act.

9.    Please see bond previously provided.

3

10.     Jim Huard, address currently unknown, employee of United Parcel Service, supervisor. picked me up from the Turner Guilford Knight Correctional Facility on April 7, 2001.

11.     I called my home telephone number, but since I have asked for and been denied access to a TTY, TTD or any hearing assisting telephone devices, I was ordered to use one of the public pay phones. I just called my home number repeatedly and yelled into the phone that I am in jail, hoping someone would answer and hear me or that the answering machine would record it and eventually someone would hear it.

4

 

_____

I HEREBY CERTIFY that on this day, before me, an officer duly authorized to administer oaths and take acknowledgments, personally appeared _Steven Bracco_, known to me to be the person described in and who executed the foregoing instrument, who acknowledged before me that he/she executed the same and that I relied upon the following form of identification of the above-named person: _personally known_.

WITNESS my hand and official seal in the County and State last aforesaid this _15_ day of _August_, 2005.

```
OFFICIAL NOTARY SEAL
WENDY L SCHUBERT
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. DD106251
MY COMMISSION EXP. APR. 25,2006
```

_____
NOTARY PUBLIC

_____
PRINTED NOTARY SIGNATURE

```
 1                          IN THE CIRCUIT COURT OF THE
                            11TH JUDICIAL CIRCUIT, IN AND
 2                          FOR MIAMI-DADE COUNTY, FLORIDA
 3   STEVEN M. BIRCOLL,          )
                                 )
 4            Plaintiff,         )
     vs                          ) CASE NO:
 5                               ) 02-18132 CA (04)
     BRIAN S. LEIFERT, AN        )
 6   INDIVIDUAL AND BRIAN S.     )
     LEIFERT, P.A.,              )
 7   a professional association,)
                                 )
 8            Defendants.        )
     _____)
 9
10
11                          North Miami, Florida
                            July 17, 2003
12                          9:30 o'clock A.M.
13
14                  _____
15                    DEPOSITION OF
16                  STEVEN M. BIRCOLL
                    _____
17
18
19   APPEARANCES:
20        LAW OFFICES OF HOGG, RYCE & SPENCER
          By:  LAURA E. SPENCER, ESQUIRE
21        Appearing on behalf of the Plaintiff.
22        LAW OFFICES OF BERNSTEIN & CHACKMAN
          By:  STEVEN J. CHACKMAN, ESQUIRE
23        Appearing on behalf of the Defendant.
24
25
                                        EXHIBIT B
```

Page 2

```
1              I N D E X
2   WITNESS              DIRECT
3   STEVEN M. BIRCOLL          3
4        E-X-H-I-B-I-T-S
5
6   DEFENDANT'S EX. A    CARD        64
    DEFENDANT'S EX. B    IMPLIED CONSENT    72
7   DEFENDANT'S EX. C    AGREEMENT     82
    DEFENDANT'S EX. D    LETTER     94
8   DEFENDANT'S EX. E    LETTER     95
    DEFENDANT'S EX. F    LETTER     95
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1   Deposition of STEVEN M. BIRCOLL, a witness of lawful
2   age, taken by the Defendant, for the purpose of
3   discovery and for use as evidence in the
4   above-entitled matter, wherein STEVEN M. BIRCOLL, is
5   the Plaintiff and BRIAN S. LEIFERT, AN INDIVIDUAL
6   AND BRIAN S. LEIFERT, P.A., is the Defendant,
7   pending in the Circuit Court of the 11th Judicial
8   Circuit, in and for Dade County, Florida, Pursuant
9   to notice heretofore filed, before LEW BALABAN, a
10  Notary Public in and for the State of Florida at
11  Large, taken at 1021 Ives Dairy Road, Building 3,
12  Suite 214, in the City of Fort Lauderdale, County of
13  Broward, State of Florida, on the 17th day of July
14  2003, commencing at 9:30 o'clock a.m.
15            * * *
16  THEREUPON:
17        STEVEN M. BIRCOLL
18  a witness of lawful age, being called as a witness
19  by the Defendant, having been first duly
20  sworn, testified under oath as follows:
21        EXAMINATION BY
22  BY MR. CHACKMAN:
23    Q.  Would you like something to drink?  Will
24  you raise your right hand?  Do you swear to tell the
25  truth?
```

Page 4

```
1    A.  Yes.
2    Q.  Please state your name?
3    A.  Steven Bircoll.
4    Q.  My name is Steve Chackman.  I represent
5   Brian Leifert.  We scheduled this deposition with a
6   realtime reporter.  You have in front of you a Sony
7   Vaio.  My questions are being printed out as words
8   on the computer screen; is that correct?
9    A.  That's correct.
10   Q.  Are the words being printed out?  Can you
11  read them?
12   A.  Yes.
13   Q.  Are you comfortable with the way the
14  screen is?  I want a make sure it's good for you.
15   A.  Yes.
16   Q.  I'll ask you certain questions about the
17  claim in the lawsuit.  Since we have a realtime
18  reporter, what I'd like you to do is please, after I
19  ask my question, make sure you read it on the
20  computer so there is no misunderstanding.
21   A.  Okay.
22   Q.  Will you agree to do that?
23   A.  Yes.
24   Q.  I'll ask you certain questions about the
25  lawsuit that's been filed and what happened and your
```

Page 5

```
1   contact with Mr. Leifert.  Let me finish my question
2   before you start to answer.
3    A.  Okay.
4    Q.  If you don't understand any of my
5   questions, let me know and I will rephrase the
6   question so you do understand.
7    A.  Okay.
8    Q.  If you need a break at anytime for any
9   reason, you let us know and we'll give you that
10  opportunity.
11   A.  Okay.
12   Q.  Do you understand all those instructions?
13   A.  Yes.
14   Q.  Where do you live, currently?
15   A.  Pembroke Pines.
16   Q.  What is your address?
17   A.  10121 Northwest 21st Court.  Pembroke
18  Pines.
19   Q.  How long have you lived at that address?
20   A.  I lived at that address since 1993.
21   Q.  Who lives there with you?
22   A.  Nobody.
23   Q.  Has anyone lived there with you?
24   A.  Yes.
25   Q.  Who?
```

2 (Pages 2 to 5)

Page 6

1    A.  My ex-girlfriend.
2    Q.  What is your ex-girlfriend's name?
3    A.  Darlene.
4    Q.  Her last name, if you can spell that for
5    us?
6    A.  Deis.
7    Q.  Deis?
8    A.  Yes.
9    Q.  During what periods of time was she your
10   girlfriend?
11   A.  From 2000, for a year.  I think May of
12   2000, for about a year.
13   Q.  She lived with you for one year?
14   A.  Yes.
15   Q.  Where does she live now?
16   A.  Where is she at now?
17   Q.  Yes.
18   A.  I have no idea.
19   Q.  Do you know if she still lives in town?
20   A.  No.
21   Q.  You don't know or she doesn't?
22   A.  No.
23   Q.  Where did she go to?
24   A.  I don't know.  She went to New York
25   somewhere.  I have no idea.

Page 7

1    Q.  Does she have any family in town?
2    A.  I believe so.
3    Q.  What family does she have in town?
4    A.  Her family?
5    Q.  Yes.
6    A.  I know she has a mom and dad.
7    Q.  Does she have any family in this town?
8    A.  No.
9    Q.  Where does her family live?
10   A.  Upstate New York.
11   Q.  Do you know what town or what city?
12   A.  No, New York.
13   Q.  Do you know what her date of birth was?
14   A.  Date of birth?
15   Q.  Yes.
16   A.  I don't remember.
17   Q.  Where did she work when she lived there?
18   A.  She didn't work.
19   Q.  Do you know if she has any family members
20   here in South Florida?
21   A.  No, she doesn't.
22   Q.  Do you know if she works?
23   A.  No.  I have no idea what she does.  I have
24   not heard from her in two years.
25   Q.  Do you have her -- did she leave a

Page 8

1    forwarding address?
2    A.  No.  She used my address.
3    Q.  When she got mail after she left, what
4    would you do with that mail?
5    A.  Throw it away.
6    Q.  How long have you lived in Pembroke Pines?
7    A.  Since 1986.
8    Q.  What is your date of birth?
9    A.  12/26/63.
10   Q.  What is your social security number?
11   A.  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.
12   Q.  Where did you live moving to Pembroke
13   Pines?
14   A.  I lived in my parent's house before I
15   moved here in Davie.
16   Q.  What year did you move to Florida?
17   A.  '94.
18   Q.  1984?
19   A.  '84.
20   Q.  Where do your parents live, currently?
21   A.  Michigan.
22   Q.  Where in Michigan?
23   A.  West Bloomfield.
24   Q.  What are your parent's names?
25   A.  Patricia and Herb.

Page 9

1    Q.  Bircoll?
2    A.  Yes.
3    Q.  Do you have any other family members here
4    in South Florida?
5    A.  Immediate family, no.
6    Q.  Where did you live before moving to South
7    Florida?
8    A.  Michigan.
9    Q.  Is that in West Bloomfield?
10   A.  Yes.
11   Q.  You were born and raised there?
12   A.  I was born in Detroit.
13   Q.  What is the extent of your educational
14   background?
15   A.  I have a Bachelor's from college.
16   Q.  You have a Bachelor's.  You have gone back
17   to school?
18   A.  I'm going now.
19   Q.  What school do you go to now?
20   A.  BCC.
21   Q.  When did you start going to BCC?
22   A.  August, 2001.
23   Q.  Since August of 2001, have you been going
24   full-time?
25   A.  I'm going part-time.

Page 10

1    Q.  And do you intend -- you're going now in
2    the summer session?
3    A.  No, I took the summer off.
4    Q.  Right now you're not in school?
5    A.  I'm not in school, no.
6    Q.  But next fall you'll restart?
7    A.  Yes.
8    Q.  Full-time or part-time?
9    A.  Part-time.  I can't handle full-time.
10   Q.  Why can't you handle full-time?
11   A.  Too much money for me, too stressful.
12   Q.  Too hard for you?
13   A.  It's too much.
14   Q.  What are you studying at BCC?
15   A.  Primarily computers.
16   Q.  Since August of 1991, have you worked?
17   A.  No.
18   Q.  I'm sorry, did I say 1991?  I keep going
19   back to the '90's.  Since August of 2001, have you
20   worked?
21   A.  No.
22   Q.  Why not?
23   A.  Because I wasn't mentally stable to work.
24   Q.  Why are you not mentally stable to work?
25   A.  Depression, anxiety.

Page 11

1    Q.  When have you last worked?
2    A.  Well, I used to own a gym for twelve
3    years.
4    Q.  You'll let me know if you don't get
5    anything because -- You indicated in Answers to
6    Interrogatories it was the Powerhouse Gym?
7    A.  That's correct.
8    Q.  You owned and operated that from February
9    of 1986 to June of 1998?
10   A.  That's correct.
11   Q.  Then from June of 1998, to July of 1999,
12   did you work?  Did you do any work?
13   A.  I did some.
14   Q.  I didn't hear what you said.
15   A.  I did some on-line trading.
16   Q.  In your Answers to Interrogatories you did
17   on-line training?
18   A.  Around that date, yes.
19   Q.  What I'm asking, in your Answers to
20   Interrogatories, you say in June of 1998, was your
21   last involvement with the Powerhouse Gym; is that
22   true?
23   A.  Yes.
24   Q.  What I'm asking is, between June of 1998
25   and July of 1999, when you started the on-line

Page 12

1    trading, what did you do during those eleven months?
2    A.  What did I do those eleven months?
3    Q.  Yes.
4    A.  Between 1998 -- I think was -- well I went
5    to school.  I took a seminar.  I took a seminar.
6    Q.  You took a seminar from --
7    A.  -- before I started I went.
8    Q.  You took a seminar for on-line trading?
9    A.  Before I took a seminar.
10   Q.  How long was the seminar for?
11   A.  I don't know.
12   Q.  What seminar did you take?  What is the
13   name of it?
14   A.  I don't remember.
15   Q.  What happened with the gym business that
16   you had?
17   A.  My lease was up.  My landlord didn't want
18   to renew my lease.
19   Q.  You closed the gym or sold it?
20   A.  I sold parts of it, and I had to close it
21   up.
22   Q.  Who was your lease with for the Powerhouse
23   Gym?
24   A.  Who was the lease with?
25   Q.  Yes.

Page 13

1    A.  The landlord?
2    Q.  Yes.
3    A.  Rand Industries.
4    Q.  Would it be fair to say you just closed
5    that business?
6    A.  Well, yes.
7    Q.  You indicated in Answers to
8    Interrogatories you made about $35,000 per year in
9    that business?
10   A.  Right.
11   Q.  Did you use an accountant for that
12   business?
13   A.  Yes.
14   Q.  Who was the accountant?
15   A.  Harry Samuels.
16   Q.  Where is he located?
17   A.  He is in Hollywood.
18   Q.  Do you use him for your personal
19   accounting also?
20   A.  Yes, I do.
21   Q.  Before going back to school and BCC, how
22   far had you gone in school?
23   A.  Have far have I gone?  I went to trade
24   school in Michigan.
25   Q.  Before going to trade school, how far had

4 (Pages 10 to 13)

Page 14

```
1    you gone in school?
2        A.  Before, high school.
3        Q.  Did you graduate high school?
4        A.  Yes.
5        Q.  What school was that?
6        A.  West Bloomfield High.
7        Q.  Then what trade school did you go to?
8        A.  Motech.
9        Q.  Where is Motech located?
10       A.  In Detroit.
11       Q.  What did you study?
12       A.  Diesel mechanics.
13       Q.  And then what type of work did you do
14   before starting the Powerhouse Gym?
15       A.  I was a diesel mechanic.
16       Q.  For how many years did you work as a
17   diesel mechanic?
18       A.  Two or three years.
19       Q.  Where did you work as a diesel mechanic?
20       A.  Where?
21       Q.  Yes.
22       A.  In Detroit.
23       Q.  Who was your employer?
24       A.  I don't remember.
25       Q.  Remember the names of any of your
```

Page 15

```
1    employers?
2        A.  Do I remember the names?  It's 25 years.
3        Q.  After working as a diesel mechanic, what
4    type of work did you do?
5        A.  I was -- I opened the Powerhouse Gym.
6        Q.  What did you do in the -- wait a second.
7    You graduated high school when; what year?
8        A.  '82.
9        Q.  Okay.  You worked as a diesel mechanic and
10   then in '86 you opened the Powerhouse Gym?
11       A.  '86, yes.
12       Q.  Was there some period during that time you
13   didn't do any work?
14       A.  Before I opened it up, yes.  We were
15   looking for locations.  We were looking into the
16   business.  I went back and forth to Michigan with
17   Powerhouse and their headquarters is in Michigan.
18   It was a lot of time involved before we opened up.
19       Q.  Is that like a franchise?
20       A.  It's a franchise.
21       Q.  It's centered in Michigan?
22       A.  Headquarters is in Michigan, yes.
23       Q.  You had a licensing agreement to open one
24   here in town?
25       A.  At that time, yes.
```

Page 16

```
1        Q.  Then when you opened the Powerhouse Gym,
2    how many employees did you have there?
3        A.  When I first opened?
4        Q.  Generally, during the twelve years you
5    owned and operated that, how many employees did you
6    have?
7        A.  I started with one or two employees and
8    when I closed, we ended up with about 18, 20 -- not
9    employees.  I would say five or six, but I had, what
10   do you call it; instructors.  They were not
11   employees.
12       Q.  Instructors are like independent
13   contractors?
14       A.  Right, correct.
15       Q.  Now, you mentioned in your Answers to
16   Interrogatories that you did on-line foreign
17   currency trading.  Did you do that out of your home?
18       A.  Yes, I did.
19       Q.  You did that for three months?
20       A.  Three to five months, about that, yeah.
21       Q.  Then, according to your Answers to
22   Interrogatories, you stopped doing that in October
23   of 1999?
24       A.  Approximately, yes.
25       Q.  Did you set up a corporation to do that or
```

Page 17

```
1    did you do that under your individual name?
2        A.  I did it myself, no corporation.
3        Q.  It says in your Answers that you owned --
4    strike that.  It says in the Answers to
5    Interrogatories that you opened up the Gourmet
6    Jerkee Cafe?
7        A.  Which we were in the process opening up a
8    web site, yes.
9        Q.  What did you do between October of 1999
10   and July of 2000?
11       A.  I think I did mostly research looking for
12   work.  I think I did research before I opened up.
13   That's what I did.
14       Q.  What type of research did you do during
15   that time?
16       A.  Talking to people, learning how to start a
17   website, find a web designer.  We had to negotiate
18   terms and deals.  Finances.
19       Q.  Did you start a business called the
20   Gourmet Jerkee Cafe, Inc?
21       A.  We were in the process of opening it, yes.
22   It didn't go through.
23       Q.  Was that ever placed into business?
24       A.  No it was never officially opened.  We
25   were in the process of opening.  We had a
```

5 (Pages 14 to 17)

Page 18

1 corporation going. We were working on doing the
2 website going. We were doing inventory, in the
3 process.
4 Q. Why didn't it open?
5 A. We were in the process to open it.
6 Q. Why didn't it open?
7 A. We never opened up.
8 Q. Why didn't you open?
9 A. Why? Because I lost my license.
10 Q. How did your losing your license prevent
11 you from opening the Gourmet Jerkee Cafe Inc?
12 A. Because, how do I say it? Because I
13 lost -- I was more concentrating on what happened to
14 me. I was in shock. I was appalled at what
15 happened to me. I thought I was mistreated and I
16 didn't do anything. I thought I was innocent. I
17 wanted to concentrate and prove my innocence before
18 opening the business.
19 Q. In the Answers to Interrogatories you say
20 Gourmet Jerkee from July 20, 2000 to 2001. What did
21 you do during that eleven month period?
22 A. Primarily bringing information to the
23 website, calling, inventory, determining which
24 inventory we wanted to put in. We were looking for
25 a subcontractor and talking to the web designer. It

Page 19

1 takes time. It's a lot of work involved. It's not
2 just putting information in the computer. It's not
3 like that.
4 Q. What was the business that you were trying
5 to start?
6 A. Gourmet Jerkee. What it is, is selling
7 beef jerky. It's beef jerkey.
8 Q. The project, the business was selling beef
9 jerky on the Internet?
10 A. Beef and game, like Bison, elk,
11 rattlesnake, kangaroo, and so on.
12 Q. Were you planning on having a physical
13 location, like a store retail store?
14 A. No. It was going to be out of my garage.
15 Q. It would be strictly on-line sales?
16 A. Correct.
17 Q. Did you have any partners in that?
18 A. Yes.
19 Q. Who?
20 A. My dad, my accountant and -- it was going
21 to be people would get a percentage.
22 Q. Your father, your accountant and web
23 designers?
24 A. Yes.
25 Q. The accountant, is that Mr. Samuels?

Page 20

1 A. Right.
2 Q. Who was the web designers that you were
3 using?
4 A. I don't know his name, It's Justin.
5 Q. What company is Justin with?
6 A. I don't know. He moved.
7 Q. What is Justin's last name?
8 A. I have no idea.
9 Q. Do you have documentation that would
10 reflect who the web designer was, his name?
11 A. Yes, I have documents at home.
12 Q. How much money had you invested into this
13 Gormet Jerkee Cafe, Inc?
14 A. My accountant put the money up. I had a
15 credit line set up.
16 Q. Did you put any money into it?
17 A. My accountant put money in it.
18 Q. Your accountant, but did you personally
19 put money into it?
20 A. We put a $10,000 credit line.
21 Q. You had $10,000 in a credit line?
22 A. Correct.
23 Q. Did you lose that money or was it not
24 used?
25 A. We used parts of it.

Page 21

1 Q. Did you lose any money as a result of not
2 being able to start the Gormet Jerkee Cafe?
3 A. We lost some money.
4 Q. How much did you lose?
5 A. I have to ask my accountant.
6 Q. Who was your credit line with?
7 A. It was with a credit card.
8 Q. Which credit card company?
9 A. My father's credit card.
10 Q. So as a result of not starting the Jerkee
11 Cafe, have you had to personally pay any money to
12 anybody?
13 A. Pay any money to anybody?
14 Q. Has it cost you any money?
15 A. Yes we had another phone line we had to
16 pay and start-up costs.
17 Q. You paid what costs?
18 A. Start-up costs.
19 Q. How much did you personally pay in
20 start-up costs?
21 A. I have to ask my accountant. I don't
22 remember.
23 Q. The business was going to be out of your
24 garage?
25 A. Out of the garage. Then we would move to

6 (Pages 18 to 21)

Page 22

1 a larger space afterwards.
2     Q.  Would it be fair to say, because of the
3 fact you lost your license, it wasn't not being able
4 to drive that prevented you from starting the
5 business, but rather you were emotionally upset
6 because of it?
7     A.  Correct, yes.  That's correct.
8     Q.  Anyone else, other than your father, your
9 accountant and the web designer that was involved in
10 trying to start that business with you?
11     A.  My ex-girlfriend since.
12     Q.  Since June 2001, have you applied for
13 employment anywhere?
14     A.  Yes.
15     Q.  Where?
16     A.  A lot of things, like Motorola, Dominoes.
17 A lot of small businesses that I can't remember.
18     Q.  Motorola?
19     A.  Yes.
20     Q.  In Boca?
21     A.  Sunrise.
22     Q.  Were any positions offered to you?
23     A.  Offered to me, no.
24     Q.  These are places you applied.  No one
25 offered?

Page 23

1     A.  Just applied.
2     Q.  Other than Motorola, you said Dominoes?
3     A.  Correct.
4     Q.  Where else have you applied for work since
5 2001?
6     A.  FedEx and small businesses.
7     Q.  Did any of these places tell you why they
8 were not offering you the position?
9     A.  No.
10     Q.  What position did you apply for at
11 Motorola?
12     A.  I don't remember.
13     Q.  What about at FedEx?
14     A.  I believe it was driver.
15     Q.  Driving?
16     A.  Driver.
17     Q.  How far are you along in getting your
18 college degree?
19     A.  About halfway.
20     Q.  How many credits do you have?
21     A.  I think 30, I think.  I have to look it
22 up.
23     Q.  Who would you consider currently your
24 closest friends?
25     A.  Friends?

Page 24

1     Q.  Yes.
2     A.  A lot of them moved away.
3     Q.  Now, today, do you have any close friends
4 here living in town?
5     A.  Not really.
6     Q.  What type of things do you do for
7 entertainment activity?
8     A.  Not much.
9     Q.  Do you have any hobbies or interests?
10     A.  No, not anymore.
11     Q.  You work out?
12     A.  I try to.
13     Q.  Where do you work out?
14     A.  Club Fit.
15     Q.  Club Fit?  Where is that located?
16     A.  In Cooper City.
17     Q.  What is the extent of your hearing loss?
18     A.  What is the extent?
19     Q.  Yes.
20     A.  90 percent.
21     Q.  As I'm talking now, can you actually hear
22 any of my voice; my words?
23     A.  I hear sounds.
24     Q.  Is the volume of my speaking less than
25 what you understand to be normal?

Page 25

1     A.  Less than normal.
2     Q.  You say you hear sounds.  Can you make out
3 the words by hearing them as I'm speaking?
4     A.  Not without lip reading.
5     Q.  When people speak to you, without looking
6 at my lips, would you be able to understand any of
7 the words that I speak?
8     A.  No.
9     Q.  How would you describe your ability as a
10 lip reader?
11     A.  What do you mean, what is my ability?  I'm
12 doing it 35, 39 years.
13     Q.  If you're standing with someone and
14 talking with them, are you able to understand
15 everything they say by reading their lips?
16     A.  Everything?  No, not everything.
17     Q.  Can you describe for me generally, what
18 your ability is to communicate with someone with lip
19 reading?
20     A.  It's very difficult for me.
21     Q.  If you were talking with someone in light
22 in front of them, you're looking at each other, what
23 percentage of the words would you say you're able to
24 understand through lip reading?
25     A.  Fifty percent.

7 (Pages 22 to 25)

Page 26

1    Q.  And then what do you do when you're
2  speaking with someone when you're lip reading if you
3  don't understand something that somebody is telling
4  you?
5    A.  Well, a lot of times try using my past
6  experience and I assume to know what they're saying
7  and I would answer it.  But sometimes I make a
8  mistake and answer it wrong because I don't want to
9  make people repeat themselves.
10    Q.  I didn't hear what you said at the end.
11    A.  I don't want to make people repeat
12  themselves all the time.
13    Q.  If it's an important discussion and you
14  don't understand do you tell them you don't
15  understand it?
16    A.  If it's important, yes.
17    Q.  Do you use anything to assist you in
18  hearing?
19    A.  I wear hearing aids.
20    Q.  In each area?
21    A.  Yes.
22    Q.  Are you wearing those hearing aids now?
23    A.  Yes.
24    Q.  What can you describe for me the -- I
25  apologize, but I'm not proficient in hearing devices

Page 27

1  or assistance.  What type of hearing aids do you
2  wear?
3    A.  The behind the ears.
4    Q.  Is there a certain power or degree of
5  volume?
6    A.  Different powers and degrees.
7    Q.  What type do you wear?
8    A.  The most powerful they have.
9    Q.  What brand is it and what power is it?
10    A.  Phnak. (phonetic)
11    Q.  What degree or model do you wear?
12    A.  High power.
13    Q.  You turn it up?  Does it have a volume
14  control?
15    A.  Yes.
16    Q.  You turn it up all the way?
17    A.  I can't do it all the way up.
18    Q.  When you say with the hearing aids, can
19  you actually understand the words or not?
20    A.  No.  It helps me here the sounds better,
21  but without lip reading you can't.
22    Q.  You told me before you can hear sounds but
23  can't make out the words.  That's with your hearing
24  aids?
25    A.  Right.

Page 28

1    Q.  Then without the hearing aids, what do you
2  hear?
3    A.  Forget it.
4    Q.  Would you hear any sounds without hearing
5  aids?
6    A.  Nothing.
7    Q.  What happened that caused you to have the
8  hearing problems?
9    A.  From what I was told, I had The measles.
10    Q.  When you were young?
11    A.  Yes.
12    Q.  How long have you been wearing hearing
13  aids?
14    A.  Since I was an infant.
15    Q.  Do you actually remember being able to
16  hear normally or not?
17    A.  I don't remember.
18    Q.  Other than hearing aids, do you use
19  anything else to assist you in communicating,
20  hearing, conversing?
21    A.  Anything else like what?  What do you
22  mean?
23    Q.  Any devices?
24    A.  Communicating like you and me?
25    Q.  Yes.

Page 29

1    A.  I use the same thing, realtime, like this.
2  Other than that I need you to talk slower.
3  Different criteria, like lip reading.
4    Q.  When you go to BCC now, what set up do
5  they have for you?
6    A.  Just like this.
7    Q.  They have a realtime set up?
8    A.  She sits next to me with a projection.
9    Q.  The school provides that?
10    A.  Yes.
11    Q.  That's part of the benefit of the school,
12  or do you have to pay extra for that?
13    A.  The school pays.
14    Q.  As you go to a lecture, you have a
15  realtime reporter taking down what is said and it's
16  printed on a computer?
17    A.  Right.
18    Q.  Do they do that for you at -- have they
19  always done that for you at BCC?
20    A.  Well, I had to go through the Disability
21  Department.  They provide someone at Disability
22  Services.  They provide it.
23    Q.  What about when you went to high school;
24  did they do anything to assist you?
25    A.  No.  When I was young, I went to special

8 (Pages 26 to 29)

Page 30

1  Ed.
2      Q.  Would you sit through lectures and
3  basically learn by lip heeding?
4      A.  We have smaller classes.
5      Q.  How would you learn?
6      A.  I learned through special Ed.  They taught
7  me.
8      Q.  What would they teach you in special Ed?
9      A.  Been a long time ago.  I was young.
10     Q.  I'm curious.  Without using realtime, how
11  they would teach you and how they would communicate
12  with you so you can learn?
13     A.  I forgot about that.  How did they teach
14  me?  It been a long time ago.  I was a kid.  I guess
15  I just learned a lot on my own.  I learned mostly on
16  my own.
17     Q.  When you went to trade school, how were
18  you taught?
19     A.  Mostly hands-on training.
20     Q.  How did you learn how to lip read?
21     A.  I think I taught myself.  I've been doing
22  it for 35 years.
23     Q.  Do you receive any benefits from the
24  government or the state?
25     A.  Yes, I do.

Page 31

1      Q.  What do you receive?
2      A.  I get social security disability.
3      Q.  That would be the federal government?
4      A.  Yes.
5      Q.  What did you have to do to qualify for
6  social security disability?
7      A.  Just show them my disability.
8      Q.  Did you have to have an examination,
9  submit --
10     A.  I showed them documents of my disability.
11  It was sufficient.
12     Q.  How long have you been on social security
13  disability?
14     A.  It started about two and a half years ago.
15     Q.  Why did you just -- why did you first
16  start getting it two and a half years ago and not
17  earlier?
18     A.  I never thought I can get it.  So somebody
19  told me I can get it.
20     Q.  What did you have to do two and a half
21  years ago to quality for social security disability?
22     A.  I just went to the Social Security Office
23  and applied for it and I asked them, and they said I
24  qualified.  I gave them the paperwork and they
25  approved it.

Page 32

1      Q.  Which office did you go to?
2      A.  Hollywood.
3      Q.  Any other benefits that you receive?
4      A.  For disability; no.
5      Q.  Do you know what was required for you to
6  quality for social security disability benefits?
7  What did have to show or establish?
8      A.  I just had to show them my audiogram and
9  my doctor's note.  I think maybe, I'm not sure,
10  maybe go see a doctor.  I'm not sure.  I gave
11  them -- I gave my audiogram.  I think that was
12  sufficient.  I guess the person there could tell.
13     Q.  You're hearing, is it, I think you
14  indicated before it happened when you were five
15  years old?
16     A.  Sorry?
17     Q.  You lost your hearing when you were five
18  years old?
19     A.  Around there; five, six years old, yeah.
20     Q.  Since then, has there been any change in
21  your ability to hear, or is it always the same?
22     A.  To tell you the truth, since you brought
23  that up, it changed two years ago.
24     Q.  I didn't understand what you said.  Sorry.
25  What happened?

Page 33

1      A.  It hasn't changed.  It stayed the same
2  until about two years ago.
3      Q.  What happened two years ago?
4      A.  After all this happened, when I lost my
5  license and everything, I had depression.  I think
6  it caused more damage to lose my hearing.
7      Q.  Did you go to a doctor and discuss that
8  your hearing you felt dropped?
9      A.  I haven't gone recently, no.
10     Q.  Do you treat with anybody for your
11  hearing?
12     A.  Do I treat with anybody?
13     Q.  Do you see a doctor to check your hearing?
14     A.  Not now.
15     Q.  Since you lived in Florida, who was
16  examining your hearing?
17     A.  A couple of them.  I went to one in Nova
18  and one in Michigan.
19     Q.  Since you've been in Florida you went to
20  Nova?
21     A.  Yes.
22     Q.  To get the hearing aids?
23     A.  Yes.
24     Q.  When did you do that?
25     A.  I think a year ago.

Page 34

1    Q.   One year ago.  After this incident or
2  before this incident?
3    A.   Yes.
4    Q.   After?
5    A.   It was after the incident, yes.  I thought
6  I was -- I thought my hearing was going bad.  It's
7  not the hearing aids.
8    Q.   How long have you been wearing hearing
9  aids?
10    A.   Since I was probably five or six.
11    Q.   You always wear the hearing aids?
12    A.   I don't now how long I have been wearing
13  hear aids for.
14    Q.   Do you wear them everyday, all day?
15    A.   From the time I get up until the time I go
16  to bed.  I can't hear without them.
17    Q.   The benefit the hearing aids give you is
18  what?
19    A.   Helps me hear sounds.
20    Q.   Since you've been in Florida, have you had
21  your hearing checked anywhere other than Nova?
22    A.   I went to one of the doctors.  I went to
23  University of Miami.
24    Q.   Which --
25    A.   It was awhile back.  I talked to a doctor

Page 35

1  to help me with my hearing.
2    Q.   Which doctor; do you remember?
3    A.   I don't remember.
4    Q.   Do you remember which hospital?  It was
5  down by Jackson?
6    A.   Yes.
7    Q.   Anywhere else since you lived in Florida
8  that you had your hearing examined?
9    A.   Michigan.
10    Q.   Where in Michigan did you have your
11  hearing examined?
12    A.   I don't know.
13    Q.   This traffic stop that led to your hiring
14  Mr. Brian Leifert, is it true that it occurred on
15  April 7, 2001?
16    A.   Yes.
17    Q.   Before that traffic stop of April 7, 2001,
18  have you ever been stopped and questioned for a
19  possible driving under the influence?
20    A.   Never.
21    Q.   Have you ever been given a traffic
22  citation or ticket before April 7, 2001?
23    A.   Yes, tickets.
24    Q.   How many times had you gotten tickets?
25    A.   In how long?  A couple.  The last one was

Page 36

1  four years ago.
2    Q.   What did you get a ticket for?
3    A.   Speeding.
4    Q.   Do you have any -- strike that.  Since you
5  lived in Florida, have you had any physical or
6  health problems?
7    A.   Since I lived in Florida?  To the best of
8  my memory, no.
9    Q.   I think you indicated in Answers to
10  Interrogatories you wear a contact in one eye?
11    A.   Yes.
12    Q.   Which eye do you wear a contact?
13    A.   Right eye.  Right eye.
14    Q.   Where have you had your eyes examined in
15  Florida?
16    A.   The eye doctor in Pembroke Pines.
17    Q.   Which doctor?
18    A.   I don't know the doctor's name.
19    Q.   Do you remember the name of the office?
20    A.   No.
21    Q.   How long have you worn a contact in your
22  right eye?
23    A.   I think about five, six years.
24    Q.   Other than the doctor in Pembroke Pines
25  that you can't remember the name of, any other

Page 37

1  doctors you've seen in Florida?
2    A.   I went to one other doctor.  I remember
3  the other one, Dr. Morris.
4    Q.   Where is he located?
5    A.   He is in Pembroke Pines.
6    Q.   What is his first name?
7    A.   I don't know.
8    Q.   You know what group he is with?
9    A.   No.
10    Q.   The contact you wear in your right eye, is
11  that for reading or distance?
12    A.   For distance.  Maybe both; I don't know.
13    Q.   You always wear the contact?
14    A.   Yes.
15    Q.   Have you ever worn glasses?
16    A.   No.
17    Q.   When the doctor told you you needed
18  something.  You just got the one contact in the
19  right eye?
20    A.   Correct.
21    Q.   Before April 7, 2001, have you ever been
22  in a court or traffic type hearing?
23    A.   In Michigan, I went to court for a parking
24  ticket.
25    Q.   In Michigan?

10 (Pages 34 to 37)

Page 38

1    A.  Yes.
2    Q.  You went to court for a traffic ticket?
3    A.  Yes.
4    Q.  How many times have you done that in
5  Michigan?
6    A.  Did it once, twice.  I was young.
7    Q.  When you went to court for a traffic
8  ticket in Michigan, which court was that; do you
9  know?
10    A.  In Michigan, Oakland County.
11    Q.  What county in Michigan?
12    A.  I think it's Oakland.
13    Q.  Did you when you went to court, did you
14  make arrangements to have your translator or
15  realtime or somebody there to assist you in
16  understanding it?
17    A.  No.  At that time we didn't have that kind
18  of stuff.
19    Q.  Did you make any effort to have any
20  assistance there?
21    A.  I was young.  I was 17.
22    Q.  17 at the time?
23    A.  I went there because it says to show up,
24  so I went to show up.
25    Q.  Then what happened when you showed up when

Page 39

1  you were 17 in traffic court?
2    A.  Confusion.  The found me guilty anyway.
3    Q.  What did you do at the time of the ticket
4  in Michigan that caused you to go to court?
5    A.  I don't remember.
6    Q.  When you went and applied for Social
7  Security, did you have any assistance to help you
8  communicate other than your hearing aids?
9    A.  No.  They don't have anything like that,
10  but I think they were more experienced dealing with
11  disabled people because they deal with it all day
12  long.
13    Q.  Other than the one or two times to traffic
14  court in Michigan, have you ever been in a court?
15    A.  No.
16    Q.  Have you ever been to any kind of a
17  traffic or administrative hearing?
18    A.  As far as I remember, no.
19    Q.  Before you using realtime in BCC, had you
20  ever used anything for anything you had to attend or
21  listen to or communicate at?
22    A.  For what; for school?
23    Q.  What I'm trying to ask; I don't want to
24  limit it to school.  What I'm curious about is, did
25  there ever come a time where you had to look in to

Page 40

1  see if there is something that can help you
2  understand what was occurring?
3    A.  If I need help with something.
4      MS. SPENCER:  Objection.  That's a little
5    vague.  I don't think he understands what
6    you're talking about.
7      MR. CHACKMAN:  You can object to the form,
8    if you have on objection.
9  BY MR. CHACKMAN:
10    Q.  What I'm curious about is; in other words,
11  for this deposition today, your attorney asked for
12  realtime and we have this gentleman here to assist
13  you.  What I want to know is; have you ever used
14  anything like realtime before you first started
15  using it at BCC?
16    A.  No.
17    Q.  Was there anything else available before
18  realtime that you could ask for, or would seek, or
19  would use to help you understand what was happening?
20    A.  Using on line e-mails.  I was using that
21  for the last seven years.
22    Q.  You use e-mail to communicate on line?
23    A.  Yes.
24    Q.  What I'm curious about is; when did you
25  first become aware there being a reporter that can

Page 41

1  take down things that are said and display it on a
2  computer like this?
3    A.  When did I know it was available?
4    Q.  Yes.
5    A.  I knew there was some kind of assistance,
6  you know.  I didn't now how it was set up.  But I
7  knew there was some kind of set-up, but I didn't
8  know what.
9    Q.  When did you first learn there was a
10  set-up and assistance for you to be a available and
11  read?
12    A.  When I hired my lawyer.
13    Q.  When you hired Miss Spencer?
14    A.  I knew there was some kind -- but I've
15  never been in court so I never knew how it was set
16  up.
17    Q.  Before hiring Miss Spencer, have you had
18  to yourself, seek out inquire whether there is some
19  set up that can be used so that you can read along?
20    A.  Sorry?
21    Q.  You want me to restate that?  Before you
22  hired Miss Spencer, did you yourself ever look into
23  to see whether if there is something that was
24  available that would allow you read along?
25    A.  I knew there was something out there, some

11 (Pages 38 to 41)

Page 42

1  kind of assistance, but I didn't know how.
2      Q.  Ever seen it used?
3      A.  No.
4      Q.  How did you know something was out there?
5      A.  I don't know.  On the Internet.  Just
6  reading the papers.
7      Q.  You do you belong to any kind of
8  organizations or groups for people with hearing
9  impairment?
10      A.  No.
11      Q.  Are your active in any such organizations?
12      A.  No.
13      Q.  Do you subscribe to any kind of magazines
14  or journals that deal with people --
15      A.  U.S. News and World Report.
16      Q.  Just a magazine?
17      A.  To deal with people --
18      Q.  Anything special for people with hearing
19  impairment?
20      A.  No.
21      Q.  Do you carry any kind card or information
22  to give to them to explain to them you're hearing
23  impaired?
24      A.  No.
25      Q.  Is it true you do not use sign language?

Page 43

1      A.  That's correct.
2      Q.  Is there any reason why specifically you
3  never learned that or never used that?
4      A.  I didn't want to.
5      Q.  Why not?
6      A.  Because I want to be normal.
7          MR. CHACKMAN:  If we can a two minute
8  break.
9          MS. SPENCER:  I think we can all stand to
10  relax a lit.
11      (Whereupon, a break was taken, after
12  which the following proceedings were held.)
13  BY MR. CHACKMAN:
14      Q.  Let's talk about April 7th, 2001.
15      A.  Are we going to be much longer?
16      Q.  Yeah.  I have to stop at 1:00.
17      A.  I'm getting a headache.
18          MS. SPENCER:  If he doesn't eat
19  something -- from not eating.
20          THE WITNESS:  No, from all this.
21  BY MR. CHACKMAN:
22      Q.  I'm here to accommodate you.  I don't
23  know.  I'd like to get done as much as I can.  If
24  you need to stop and start up another time, I can.
25      A.  Keep going.  I just want to let you know.

Page 44

1          MS. SPENCER:  If you need something to
2  eat.
3          THE WITNESS:  Anxiety.
4  BY MR. CHACKMAN
5      Q.  If you need to stop or you need a break,
6  you let us know.  It's not here to inconvenience
7  you.
8          April 7, 2001, what had you done that day
9  before you went out driving?
10      A.  What have I done that day?
11      Q.  Yes.
12      A.  Usual things.
13      Q.  Was it a weekend or weekday?
14      A.  I think that was a weekend.
15      Q.  You remember -- you were stopped at what
16  time in the morning?
17      A.  It was early morning.  I think it was like
18  2:00, 3:00, something like that.
19      Q.  A.M?
20      A.  Yes.
21      Q.  Was that on a Sunday morning or Saturday
22  morning that you were stopped?
23      A.  I think that was a Saturday morning, I
24  think.
25      Q.  The Friday before, what had you done in

Page 45

1  the day?
2      A.  In the day?
3      Q.  Yes.
4      A.  Just relax because I wasn't feeling that
5  well.
6      Q.  Why weren't you feeling that well.
7      A.  I just didn't feel right.
8      Q.  What was feeling bad?  You were having a
9  flu or cold?
10      A.  Maybe a cold virus or something.
11      Q.  Had you been to the doctor?
12      A.  No.
13      Q.  What had you done that evening, the Friday
14  evening before you were stopped?
15      A.  Just went out.
16      Q.  Who went out?
17      A.  Me and my ex-girlfriend, and then we got
18  in a fight.  We went home, and then I just got in
19  the car and I drove.
20      Q.  What time did you go out that evening with
21  your ex-girlfriend?
22      A.  Around 9:00.
23      Q.  Where did you go with your ex-girlfriend
24  that evening?
25      A.  We went to different places.  I forgot

Page 46

1   where it was.
2     Q.  You recall the name of the place?
3     A.  No.
4     Q.  What time did you return home with your
5   ex-girlfriend?
6     A.  I think it was like 12:00, 1:00, I think.
7     Q.  You had gone out to a club or dinner or
8   something else?
9     A.  We had dinner.  I think we had dinner.
10  Then we went out somewhere.  I forgot where it was.
11  We got in a fight.  We went home.  I got in the car.
12  I wanted to get away from her.
13    Q.  Where did you go for dinner?
14    A.  I don't remember.
15    Q.  After dinner, did you go right home or you
16  went to a club or bar?
17    A.  Went somewhere; a club, after dinner.
18    Q.  You went where?
19    A.  I forgot where.
20    Q.  When you say you went somewhere, what type
21  of establishment?
22    A.  It was just a local place or something.  I
23  don't know.
24    Q.  A bar?
25    A.  Something like that.

Page 47

1     Q.  Then you think you got home with your
2   ex-girlfriend at about 12:00 or 1:00 at night?
3     A.  Yeah.
4     Q.  Did you have anything alcoholic to drink
5   at dinner?
6     A.  Yes.
7     Q.  What?
8     A.  One drink -- half a drink.
9     Q.  What did you drink at dinner?
10    A.  I don't remember.
11    Q.  You said you had one drink?
12    A.  Half a drink.
13    Q.  You ordered one drink?
14    A.  Like I said, I wasn't feeling good.
15    Q.  You don't remember what the drink was?
16    A.  I don't remember.
17    Q.  The dinner; did you pay with a credit card
18  or cash?
19    A.  I don't remember.
20    Q.  At that time, in April, 2001, who did you
21  have credit cards with?
22    A.  Providian.
23    Q.  Do you still have that?
24    A.  Yes.
25    Q.  Any other credit cards you carried in

Page 48

1   April of 2001?
2     A.  No.
3     Q.  Who do you do your banking with?
4     A.  First Union.
5     Q.  That's who you were banking in April of
6   2001?
7     A.  Yes.
8     Q.  Then after you left dinner, you said you
9   went to a bar.  How long were you at the bar for?
10    A.  Couple of hours.
11    Q.  What did you have to drink at the bar?
12    A.  What I drink?
13    Q.  What did you drink at the bar?
14    A.  I don't remember.
15    Q.  You had the half a drink at dinner?
16    A.  No it was after dinner.
17    Q.  Let me go back then.  At dinner in the
18  restaurant, did you have anything alcoholic to
19  drink.
20    A.  No.
21    Q.  Then you went to the bar.  That's when you
22  had the half a drink?
23    A.  Right.
24    Q.  Did you have anything else to drink at the
25  bar?

Page 49

1     A.  No.
2     Q.  Then you went home.  Did you stay at home
3   before you went out again?
4     A.  No.  We got in a fight.  I wanted to get
5   away from her.
6     Q.  What were you fighting about?
7     A.  Everything.
8     Q.  Anything specifically?
9     A.  Just everything.  Her getting on any
10  nerves.
11    Q.  Have you ever had a problem with overuse
12  of alcohol?
13    A.  No.
14    Q.  How would you describe your drinking
15  habits?
16    A.  So so.
17    Q.  How often -- well, how often do you drink
18  over all?
19    A.  How often I drink?
20    Q.  Yes.
21    A.  Not often.
22    Q.  What does that mean?
23    A.  Sometimes I go a month without.  Sometimes
24  I have one a week.
25    Q.  What do you normally drink?

Page 50

1    A.   Beer.
2    Q.   On April 7, 2001, had you taken any
3  medication?
4    A.   No.
5    Q.   Did you do any drugs?
6    A.   No.
7    Q.   How about today, as I'm questioning you,
8  are you under the influence of any medication?
9    A.   Medication now?
10   Q.   Yes.
11   A.   No.
12   Q.   After you dropped your girlfriend off at
13  home, where did you go?
14   A.   I just drove.
15   Q.   Did you stop anywhere?
16   A.   No.
17   Q.   How long were you driving before you were
18  stopped by the police officer?
19   A.   I would say about an hour or so.  I was
20  just thinking.
21   Q.   Where did you drive?
22   A.   I took 75, went south.
23   Q.   How far south did you get?
24   A.   How far south?
25   Q.   Yes.

Page 51

1    A.   To Miami Lakes Drive.
2    Q.   So you left Pembroke Pines and you went to
3  Miami Lakes?
4    A.   I just went down, just drove down to Miami
5  Lakes Drive.
6    Q.   During the hour or two you were driving
7  around before the police officer stopped you, where
8  had you driven?
9    A.   I just drove around.  I was turning around
10  going back on I 75 to go back north.  That's when I
11  was pulled over.
12   Q.   At home, do you use a telephone?
13   A.   Yes.
14   Q.   How are you able to converse on the
15  telephone?
16   A.   With a special phone, amplified phone.  I
17  have a hard time on the phone.
18   Q.   You are able to talk on the telephone?
19   A.   Am I able to?
20   Q.   Yes.
21   A.   Not very well.
22   Q.   You say it's a special phone.  It means
23  it's just louder than a normal phone?
24   A.   Yes.
25   Q.   Do you have anything on your phone that

Page 52

1  prints anything out so you can read what people say?
2    A.   I have a phone, a relay, where you call
3  the operator and the operator types out what the
4  other person says.
5    Q.   Do you use that relay?
6    A.   I have that at home now.
7    Q.   That comes out on your computer?
8    A.   No.  It's a separate phone.
9    Q.   How long have you been using that with the
10  relay?
11   A.   Since it came out a couple of years ago.
12   Q.   Do you ever talk on the phone without
13  using the relay?
14   A.   There are times, but I have a hard time
15  talking on the phone.
16   Q.   Are you able to hear anything when you
17  talk to somebody on the telephone?
18   A.   A little bit.  You have to scream.  You
19  have to keep on repeating over and over until I get
20  it right.
21   Q.   Do you use a cell phone or not?
22   A.   I have a cell phone.
23   Q.   Do you have anything special with the cell
24  phone that allows you to read what people are
25  saying?

Page 53

1    A.   No.  I rarely use my cell phone because I
2  can't hear out of it.
3    Q.   What service is your cell phone with?
4    A.   Verizon.
5    Q.   What is your cell phone number?
6    A.   895-7400.
7    Q.   What is home telephone number?
8    A.   436-1054.
9    Q.   Do you use that with Bell South?
10   A.   Yes.
11   Q.   When you were driving around after you
12  dropped your girlfriend off, did you stop anywhere
13  for any reason?
14   A.   Stopped at one place.  I thought my friend
15  would be there.  He wasn't there, so I left.
16   Q.   What place did you stop at?
17   A.   On Miami --
18       MS. SPENCER:  You forgot what it's called?
19       THE WITNESS:  Yes, I forgot.  It's two
20  years ago.  Then at the gas station I asked how
21  to get back on 75.
22  BY MR. CHACKMAN:
23   Q.   You went to Miami Lakes Drive and what
24  type of establishment did you go to to see if your
25  friend was there?

14 (Pages 50 to 53)

Page 54

1  A. It was like a restaurant grill place.
2  Q. Where was that restaurant located?
3  A. On Miami Lakes Drive.
4  Q. Was it open?
5  A. Yes, it was open.
6  Q. This would have been in the middle of the
7  night? Was it also a bar?
8  A. There is a bar there.
9  Q. What was the name of the restaurant?
10  A. I forgot.
11  Q. Where on Miami Lakes Drive was it located?
12  A. I just know where it is. Right off --
13  that's the area I get confused, because Palmetto,
14  I-95, you get off, turn left and it's right there.
15  Q. It's still there now?
16  A. It's been two years. I don't know.
17  Q. Is it near the Palmetto?
18  A. Off the highway, yes.
19  Q. Is the east or west of the Palmetto?
20  A. I don't know. I wouldn't know.
21  Q. Did you have anything to drink or eat in
22  there?
23  A. I was in there, walked in there. It was
24  dead. I went to see if my friend was there. He
25  wasn't there. I left.

Page 55

1  Q. Anywhere else that you stopped?
2  A. No. Like I said, I went to the gas
3  station to get directions how to get back on the
4  highway. He spoke in Spanish, so I left.
5  Q. Where were you when you were stopped by
6  the police officer?
7  A. Miami Lakes Drive.
8  Q. Where, specifically?
9  A. Well, I was -- there was two ramps and I
10  was trying to figure out which ramp to take to get
11  to 75. I was confused. He pulled me over there by
12  the ramp.
13  Q. The officer pulled you over; where exactly
14  were you?
15  A. In the car.
16  Q. I mean where on the roadway?
17  A. Miami Lakes Drive.
18  Q. Where in relation to 75 and Miami Lakes
19  Drive were you located when the officer pulled you
20  over?
21  A. I was trying -- you have to go down the
22  Palmetto to get to 75. I was confused whether I was
23  to go north or south. You have to go south,
24  Palmetto go north on 75. I realized afterwards.
25  I wasn't sure. But it was Miami Lakes Drive.

Page 56

1  Q. Had you gotten on the Palmetto going
2  south?
3  A. No. I was trying to get on because there
4  were two ramps. I wasn't sure which ramp to take.
5  I was confused. By the time I'm trying to figure
6  out which ramp to take, the police officer pulled me
7  over.
8  Q. I believe the Police Report says that the
9  officer saw you leaving the gas station and you
10  stopped your car with the front of it into the
11  intersection when you left the gas station.
12  A. When I left the gas station, I pulled up,
13  stopped at the light. There was a buffer. I
14  couldn't see the cars coming. There was a flashing
15  red, and then I made my left turn and did not stop
16  in the middle of the intersection.
17  Q. Where was the gas station located that you
18  stopped at? Was it east or west of the Palmetto?
19  A. On Miami Lakes Drive.
20  Q. East or west of the Palmetto?
21  A. I don't remember, east or west.
22  Q. You had a make a left turn to get on what
23  street?
24  A. Miami Lakes Drive.
25  Q. You left the gas station, made a left to

Page 57

1  get on Miami Lakes Drive?
2  A. Right.
3  Q. Which way were you travelling when you got
4  on Miami Lakes Drive?
5  A. What?
6  Q. Which way were you traveling on Miami
7  Lakes Drive?
8  A. I was -- there are two ramps right in
9  front of it. I was making my left. There were two
10  ramps. I had to make a decision which one to go on
11  to. I decided to go on the next one, and that's
12  when I got pulled over.
13  Q. What I'm asking is; when you got on Miami
14  Lakes Drive, were you driving east or west?
15  A. I don't know my directions.
16  Q. What kind of car were you in?
17  A. '99 Sebring.
18  Q. What were you wearing at the time?
19  A. I don't remember. I didn't think about
20  that.
21  Q. How were you feeling at the time when the
22  officer pulled you over?
23  A. Fine.
24  Q. Any --
25  A. Before he pulled me over or after?

15 (Pages 54 to 57)

Page 58

1    Q.  Before he pulled you over, how were you
2  feeling?
3    A.  Upset.
4    Q.  Had you been crying at all?
5    A.  Crying?  No, just upset.  Confused.  I
6  didn't know what to do.
7    Q.  Up through the time that the officer
8  pulled you over, how many hours before had it been
9  that you had something alcoholic to drink?
10    A.  It had to be at least five hours, at
11  least.
12    Q.  You're sure that the five hours before,
13  the only thing alcoholic you had to drink was half a
14  drink?
15    A.  Yes.  I had a half a drink, right.
16    Q.  That's the extent of your alcohol you had
17  to drink that entire evening?
18    A.  Correct.
19    Q.  Tell me what happened when the officer
20  pulled you over.  Tell me what occurred.
21    A.  He pulled me over.  He opened my door and
22  he said something to me.  I reached to get my
23  wallet.  He was saying something to me.  I didn't
24  hear him.  I explained to the officer I had a
25  hearing and speech impairment and he told me to get

Page 59

1  out of the car.
2    Q.  He didn't hear what you said?  Slow down.
3    A.  He told me get out of the car.  I got out
4  of the car.  He told me what kind of drugs was I on,
5  and I said, I'm telling you I have a speech and
6  hearing impairment.  He didn't believe me.  I tried
7  to explain it to him.  He said if I do a sobriety
8  test, he'll let me go.  I said fine, no problem.  I
9  did everything fine, and the next thing I know, he
10  handcuffed me and brings me to jail.
11    Q.  Was it just one officer or more than
12  officer?
13    A.  One officer that pulled me over.  There
14  was another officer that came by later on, but he
15  just stopped there.  He stood there and watched.
16    Q.  When the officer pulled you over, were you
17  able to understand anything that the officer said?
18    A.  No.  I had a hard time.  It was dark.  He
19  had a mustache on him.  Anybody that has facial
20  hair, I have a hard time.  I tried to explain it to
21  him.  He didn't understand.  He didn't believe me.
22  I don't know why.
23    Q.  What makes you believe the officer didn't
24  believe you?
25    A.  Because he was saying I was being

Page 60

1  difficult.
2    Q.  He was telling you that at the time?
3    A.  Yes.
4    Q.  When the officer pulled you over, were
5  your eyes red in color?
6    A.  I don't know, no.
7    Q.  Did you have this odor of alcohol on your
8  breath?
9    A.  Odor of alcohol on your breath?
10    Q.  Did you have the odor of alcohol on your
11  breath?
12    A.  No.  I couldn't have.
13    Q.  What test did the officer ask you to do?
14    A.  He asked me to -- first he did the -- what
15  did he do?  He asked me to stand on one leg -- no
16  close my eyes and stand on one leg and count to 37
17  and stand on the other leg.  I did that fine.
18    Q.  Any problems doing that; standing on one
19  leg for 30 seconds?
20    A.  As far as I know, no.  He asked me to
21  stand up, close my eyes, and then put my head back.
22  I closed my eyes and put my head back.  He was
23  saying something.  I opened my eyes to read his lips
24  to see what he saying.  He told me no, close your
25  eyes and put my head back.  I put my head back.  He

Page 61

1  did it again.  I told him I can't talk to you
2  without my eyes open.  So he said I failed that
3  test.
4    Q.  What other tests did the officer do?
5    A.  He made, motioned to me to walk in a
6  straight line.  He did it.  He told me to do the
7  same thing.  I did that and turned around walked
8  back.
9    Q.  Any problems walking the straight line?
10    A.  No, I was fine.
11    Q.  Any other tests that the officer did?
12    A.  No.
13    Q.  How were you taken to the police station?
14    A.  He threw me in the back of the car and
15  took me to the police station.
16    Q.  When the officer stopped you, did you have
17  some sort of a card with you that you gave to the
18  officer?
19    A.  Yes.
20    Q.  How had you gotten that card?
21    A.  I had it a long time.  I had it in my
22  wallet.
23    Q.  We didn't hear what you said.
24    A.  I didn't give it to that officer.  I gave
25  it to the other officer.

Page 62

1      Q.  You had some contact with the other
2   officer?
3      A.  At the station.
4      Q.  At the scene, the officer that met you,
5   did you give that officer the card?
6      A.  No.
7      Q.  So the first time you showed anybody the
8   card was when you arrived at the police station?
9      A.  Correct.
10      Q.  Why, if you had a card for a traffic stop,
11   why would you have waited until the police station
12   to show the card to the officers?
13      A.  Because, number one; I was fine.  I
14   thought he told me if I do the test I can go home.
15   I didn't think about it.
16      Q.  What was the name of the officer that
17   stopped you on the road?
18      A.  What is the name?  What is the name?
19      MS. SPENCER:  I can't.
20   BY MR. CHACKMAN:
21      Q.  When you went to the Police Department,
22   who did you show the card to?
23      A.  There was another police officer there.
24   He was asking me all kinds of questions.  I couldn't
25   understand him.  He was asking me a lot of

Page 63

1   questions.  I told him I'm not a lawyer.  I had my
2   wallet in my hand.  That's when I gave it to him.
3      Q.  Let me show you what I'll mark as Exhibit
4   A.  I'll ask you if this is copy of the card you had
5   in your wallet before you were stopped on April 7,
6   2001.
7      A.  Sorry?
8      Q.  Is this a copy of the card you had in your
9   wallet?
10      A.  That's it.
11      (Defendant's Exhibit No. A was marked for
12      identification.)
13   BY MR. CHACKMAN:
14      Q.  How long had you been carrying this card
15   in your wallet?
16      A.  A long time.
17      Q.  How many years?
18      A.  I would say eight, ten years.
19      Q.  Who did you get the card from?
20      A.  I found it somewhere.
21      Q.  Sorry?
22      A.  I found it somewhere.  I forgot.
23   Somewhere I went, they had a whole stack of them.  I
24   took them.
25      Q.  You got them from a lawyer?

Page 64

1      A.  No, not a lawyer.  I got it from
2   somewhere.  I think it was a restaurant somewhere.
3      Q.  A restaurant?
4      A.  Yeah, or something.  There was a stack of
5   them.
6      Q.  Did you -- this card we marked, have you
7   ever used that before?
8      A.  Never had to.
9      Q.  Why did you carry the card?  When you saw
10   Exhibit A, the card, why did you decide to keep it
11   and carry it in your wallet?
12      A.  I had the card.  If I have any problem
13   with a police officer or anything, I thought let him
14   know that I need a lawyer.
15      Q.  You remember what restaurant it was you
16   got the card?
17      A.  No, I don't.  It was long ago.  Over 15
18   years ago.
19      Q.  I thought you said it was eight to ten
20   years ago.
21      A.  Sorry?
22      Q.  I thought you said you had the card for
23   eight to ten years.
24      A.  Right.  Fifteen years now.
25      Q.  Did you read that card before you decided

Page 65

1   to carry it with you?
2      A.  I glanced through it.
3      Q.  What did you understand it's purpose was?
4      A.  I thought my only thing was, I want a
5   lawyer.
6      Q.  What did you understand that the purpose
7   of you having the card and showing the card would
8   be?
9      A.  In case I have a problem communicating
10   with the police officer.  I thought the card would
11   let him know I want a lawyer.
12      Q.  That you want a lawyer?
13      A.  That I want a lawyer.
14      Q.  It's your testimony that this card that we
15   marked as Exhibit A, you didn't show that to the
16   officer when he stopped you out on the road?
17      A.  That's correct, no.
18      Q.  Are you sure of that?
19      A.  Yes.  I gave it to the officer at the
20   police station.
21      Q.  You're sure you didn't show this card that
22   we marked as Exhibit A to the officer when he
23   initially stopped you?
24      A.  I showed it to the officer at the police
25   station when I had my wallet in my hand.

Page 66

1   Q.  The first time?
2   A.  I didn't have the wallet.
3   Q.  You deny you didn't show that to the
4   police officer when he stopped you?
5   A.  I did not have my wallet when I did the
6   sobriety test on the road out of my car.  The card
7   was in my wallet in my car.  I didn't have my wallet
8   until I got to the police station when he gave me my
9   wallet.  That's when I had a chance to give it to
10   the other officer.
11   Q.  When you were arrested and taken to the
12   police station, was the first time you showed this
13   exhibit A, the card, to any officers; correct?
14   A.  I showed it to one police officer at the
15   station, yes.
16   Q.  That's the first time you showed it to any
17   police officers?
18   A.  Yes.
19   Q.  When you got your driver's license, did
20   you have any restrictions on your license?  Your
21   Florida driver's license, did it have any
22   restrictions on it?
23   A.  No.
24   Q.  When you got your Florida driver's
25   license, did you have to tell them you have a

Page 67

1   hearing impairment?
2   A.  They never asked.
3   Q.  Is there a place, when you get your
4   license, to disclose that, so it's clear if you get
5   stopped that you have this hearing impairment?
6   A.  On my license, no.
7   Q.  On April 7, 2001, did you carry any cards
8   or identification that indicated that you had a
9   hearing impairment?
10   A.  The only thing I had was my Medicaid card.
11   Q.  You had already been on Social Security
12   Disability when you were stopped on April 7, 2001?
13   A.  Right.
14   Q.  Did you show the officer your Medicaid
15   card?
16   A.  Yes.
17   Q.  I thought you didn't have your wallet
18   though.  How did you show your card?
19   A.  I showed it to them at the police station.
20   Q.  The Police Report indicates that you were
21   stopped on April 7, 2001 at 3:30 a.m. Is that
22   consistent with your recollection -- that's when you
23   were arrested, sorry.  It says that you were stopped
24   at 2:58 a.m. on April 7th.  Is that consistent with
25   your recollection?

Page 68

1   A.  About that, yeah.
2   Q.  The officer also said that when you were
3   on Miami Lakes Drive and you stopped at the
4   intersection of Northwest 77th Court, where there is
5   a red flashing signal, the end of your car was three
6   to five feet into the intersection.  Is that true or
7   not true?
8   A.  Like I said before, I told you that there
9   was a big buffer before the road.  I had to creep up
10   to make sure there were no cars coming, because I
11   can't hear cars coming, so I have to see.
12   Q.  Was there something blocking your vision?
13   A.  There was a row of trees, bushes.
14   Q.  When the police officer stopped you on the
15   road, did he ask you to take a breathalyzer test?
16   A.  No.
17   Q.  Did he bring out any kind of machines or
18   anything for you to to do a breathalyzer test?
19   A.  No.
20   Q.  How did the officer ask you to do the
21   sobriety tests that you did?
22   A.  One of them, he motioned to me to walk in
23   a straight line.  He went up and down.  I followed
24   him.
25       The other one I had a hard time with,

Page 69

1   because he told me to close my eyes, put my head
2   back.  Everytime he said something, I opened my
3   eyes.  I couldn't see his face.  I needed to see his
4   face.  I failed that one because I couldn't see.  I
5   might as well talk to him with my eyes closed.
6   Q.  Did you question the officer whether or
7   not you had to do the sobriety test?
8   A.  I told him before, and he just told me if
9   I do the sobriety test, he would let me go.
10   Q.  You told him before what?
11   A.  Before what?
12   Q.  Let me restate it.  What did the officer
13   tell you in terms of the sobriety tests?
14   A.  When he pulled me over, he asked me to get
15   out of the car.  I'm telling him that I had a speech
16   impairment and hearing impairment.  He didn't
17   believe me.  He told me to do the sobriety tests.
18   Q.  Did he tell you you needed to do the
19   sobriety tests?
20   A.  Yes.
21   Q.  Did you respond to him that no one told
22   you that you would have to take these tests when you
23   got your license?
24   A.  I told him it wasn't necessary, because I
25   was fine.  He said if I take the sobriety test, I'll

18 (Pages 66 to 69)

Page 70

1  let you go.
2      Q.  You agreed to take the sobriety test?
3      A.  Yes.
4      Q.  The did the police officer, when he
5  stopped you, tell you that you needed to take a
6  breathalyzer test?
7      A.  No.
8      Q.  Did the police officer tell you, when he
9  stopped you, if you did not take the breath test
10  that your license would be suspended for 12 months?
11     A.  No.
12     Q.  Did you ever tell the officer that you
13  understood what he was saying to you, but that you
14  didn't understand the law?
15     A.  No.  I told him, I told him I didn't
16  understand what he was saying.
17     Q.  Did you tell the officer at the scene that
18  you were not going to consent to anything?
19     A.  I never said that.
20     Q.  Did the officer ask you how far you went
21  in school?
22     A.  I don't remember.
23     Q.  Did you tell the officer that you had a
24  attended high school and finished the 12th grade?
25     A.  That was two years ago.  I don't remember

Page 71

1  that.
2      Q.  Let me show you what I marked as Exhibit
3  B.  Was this one of the documents that was shown to
4  you?
5      A.  I received this after I got arrested.  He
6  never showed it to me in between, no.
7          (Defendant's Exhibit No. B was marked for
8          identification.)
9  BY MR. CHACKMAN:
10     Q.  When were you first shown this?
11     A.  Earlier.  My lawyer showed it to me.
12     Q.  Was this form ever shown to you before you
13  were arrested, or after you were arrested at the
14  police station?
15     A.  No, not that form.
16     Q.  Did the officer read the language that in
17  the top where it starts, "You are under the arrest
18  for driving under the influence of alcohol"?
19     A.  Top of this?
20     Q.  Yes.
21     A.  He was trying to talk to me.  I couldn't
22  understand him.  I was trying.  He had a piece of
23  paper.  He was trying to read it.  He was telling me
24  look up.  It was confusing me.  I couldn't read it.
25  He handed me the piece of paper and I was trying to

Page 72

1  read it and he was trying to talk to me.
2      Q.  Was this piece of paper given to you
3  either before you were arrested or after you were
4  arrested for you to read along?
5      A.  After I was arrested.
6      Q.  It was given to you, this Exhibit B?
7      A.  He gave it to me after I was arrested.
8      Q.  At the police station?
9      A.  At the police station.
10     Q.  Did you read this form this, Exhibit B?
11     A.  No.
12     Q.  Why not?
13     A.  Because he didn't give me a chance to.  He
14  was trying to talk to me.  I can't read and talk at
15  the same time.
16     Q.  What did you do when the officer was
17  trying to give you this Exhibit B?
18     A.  He was talking to me, asking me questions.
19  I got to the point, look, I'm not a lawyer, let me
20  go.  He was asking me more questions.  That's when I
21  got my wallet out and gave him the card and that
22  stopped it.
23     Q.  Other than this paper, this Exhibit B, was
24  any other paperwork shown to you at the police
25  station?

Page 73

1      A.  I don't remember, no.
2      Q.  Excuse me?
3      A.  As far as I remember, no.
4      Q.  Were you asked to sign any paperwork at
5  the police station?
6      A.  No.
7      Q.  Did you refuse to sign any paperwork at
8  the police station?
9      A.  No.
10     Q.  What else happened after you were brought
11  to the police station?
12     A.  They put me in jail.
13     Q.  How long were you in jail for?
14     A.  I don't know.  There was no clock.  They
15  transferred me to a bigger place.
16     Q.  A bigger jail?
17     A.  Yes.
18     Q.  How many days were you in jail?
19     A.  All together?  I don't know, 15 hours.
20     Q.  What did you have to do to get out of
21  jail?
22     A.  What did I do?  I went home.
23     Q.  Did you have to -- so they just let you
24  out, or you had to go before a judge, or what?
25     A.  I got bailed out.

19 (Pages 70 to 73)

Page 74

1    Q.  Who bailed you out?
2    A.  A friend of mine.
3    Q.  Who?
4    A.  Must be -- I don't know how it works.  I
5  forgot.  My ex-girlfriend and my friend, they both
6  came and got me out.
7    Q.  What was the name of the friend that got
8  you out?
9    A.  Jim Huard.
10    Q.  Where does he live now?
11    A.  He moved on the west coast.
12    Q.  Where does he live now?
13    A.  On the west coast.
14    Q.  Of Florida or the U.S?
15    A.  In Florida.
16    Q.  What town?
17    A.  Fort Myers.
18    Q.  When you were let go from the jail, were
19  you given any paperwork by the police?
20    A.  They gave me -- I don't remember.  They
21  gave me -- wait, they gave me my boots back, my
22  wallet.  I think they gave me my tickets.  I don't
23  remember what else.  I don't remember.  I was mad.
24    Q.  When the police were talking to you, did
25  you ever tell the police officer that you understood

Page 75

1  what the officer was saying, but you didn't
2  understand the law?
3    A.  I said something that he was trying to
4  talk to me.  They hear me, but I don't understand
5  what you're saying.  That's what I mean.
6    Q.  Did you tell the police officer that
7  you're not going to consent to anything?
8    A.  I never said that.
9    Q.  Were you agreeable to do whatever test the
10  officer wanted to give you?
11    A.  Yeah, if they brought the thing in front
12  of me, I'd do it.
13    Q.  Excuse me?
14    A.  If they brought the machine in front of
15  me, I would have done it.  But I never saw the
16  machine.  I don't know what it looks like.
17    Q.  Have you ever been put through those tests
18  to see if you're drunk?
19    MS. SPENCER:  I'll object.
20    MR. CHACKMAN:  I'll restate it.  It's not
21    the greatest question.
22  BY MR. CHACKMAN:
23    Q.  Before April 7, 2001, had anyone ever
24  tested you?
25    A.  No.  I never seen that before.  I never

Page 76

1  done that before, no.
2    Q.  Did you know that one of the things that
3  officers do, if they stop you, is they gave you a
4  breathalyzer test?
5    A.  If they stop me?  I know that if you fail
6  the sobriety test, you have to do the breathalyzer
7  test, yes.
8    Q.  You knew when you got a Florida driver's
9  license, if you're stopped and suspected of drinking
10  alcohol, that the officers will give you a
11  breathalyzer test, and if you refuse it, you'll lose
12  your license for a year?
13    A.  I know that but, I don't take the test.
14  I'll lose it.
15    Q.  You were aware of that before you were
16  stopped?
17    A.  Yes.
18    Q.  So did you ever bring that issue up with
19  the officer, well what's up with the breathalyzer
20  test?
21    A.  No, because he never brought it up.
22    Q.  You knew when the officer stopped you he
23  suspecting you of driving under the influence of
24  alcohol?
25    A.  No, he thought I was on drugs.

Page 77

1    Q.  How do you know that?
2    A.  Because of the way I spoke.
3    Q.  You believe the officer suspected you of
4  being on drugs?
5    A.  He did accuse me.  He said what kind of
6  drugs are you on?  I said I'm not on any drugs.  I
7  have a speech impairment.  That was the first thing
8  that came out of his mouth.
9    Q.  How did you learn of the availability of
10  the attorney Brian Leifert?
11    A.  I looked in the phone book.  There is an
12  ad that says one hundred percent satisfaction
13  guaranteed.  He said seven, eight years of DUI.  He
14  was a former prosecutor.  Seven, eight, nine years
15  DUI experience.  He would be the man to help me.
16    Q.  Did you call any other attorneys before
17  you decide on speaking with Mr. Leifert?
18    A.  No.
19    Q.  Had you ever hired a lawyer before that,
20  before April 7, 2001?
21    A.  Have I hired another lawyer?
22    Q.  Before that.
23    A.  For my business.
24    Q.  What lawyer did you hire for your
25  business?

20 (Pages 74 to 77)

Page 78

1    A.  It was a corporate lawyer.
2    Q.  Who?
3    A.  I have to look it up.
4    Q.  That was through your gym business?
5    A.  For my gym business.
6    Q.  Had you ever hired any other lawyers for
7  any other reason before April 7th, except for the
8  gym?
9    A.  My divorce lawyer.
10    Q.  When were you divorced?
11    A.  '91.
12    Q.  Who was your divorce lawyer?
13    A.  I think it was Jacobi.
14    Q.  First name?
15    A.  I don't know.  I don't remember.
16    Q.  Where were you divorced; what county?
17    A.  Broward.
18    Q.  Was that a contested or uncontested
19  divorce?
20    A.  It was contested.
21    Q.  Did you have a hearing or trial?
22    A.  We had a hearing.
23    Q.  How many hearings?
24    A.  I don't remember.
25    Q.  Was it more than one hearing?

Page 79

1    A.  I don't remember.  It was back in 1991.
2    Q.  More than one hearing, or just one
3  hearing?
4    A.  I think one, maybe two.  He took care of
5  everything.
6    Q.  What did you use when you went to the
7  hearing to understand what was going on?
8    A.  Nothing, because I didn't have to talk.
9  He did all the talking.
10    Q.  Before you had to go in for your divorce,
11  didn't you ask to have something there so you can
12  understand what was being said by everybody else?
13    A.  No.  He took care of everything.
14    Q.  Did you ever testify at the hearing, the
15  divorce hearing?
16    A.  No.
17    Q.  Did your wife have to testify; your
18  ex-wife?
19    A.  I don't think so.
20    Q.  What is your ex-wife's name?
21    A.  Susan.  She remarried.
22    Q.  She remarried?
23    A.  She remarried.  I haven't talked to her in
24  15 years.
25    Q.  What was her maiden name?

Page 80

1    A.  It was Aiel.
2    Q.  Does she live here in town; do you know?
3    A.  I have no idea.  I have not seen or talked
4  to her.  I have no idea.  15 years ago.
5    Q.  Any other marriages you have been through?
6    A.  No.
7    Q.  Do you have any children?
8    A.  No.
9    Q.  Have you been involved in any other
10  lawsuits, other than this one and your divorce?
11    A.  No.
12    Q.  When did you first meet with Brian
13  Leifert?
14    A.  A few days after my arrest.  I don't
15  remember the date.
16    Q.  How many times did you meet with him
17  before you formally agreed too hire him?
18    A.  I think one time.
19    Q.  Did you speak with him over the phone
20  before you hired him?
21    A.  No, I didn't.  My girlfriend did.
22    Q.  Your girlfriend spoke with him over the
23  phone?
24    A.  She made the appointment.  I went down
25  there.

Page 81

1    Q.  This is your ex-girlfriend?
2    A.  Ex-girlfriend.
3    Q.  Let me show you Exhibit C and ask you if
4  this is the agreement you signed hiring Mr. Leifert?
5    A.  Correct.
6        (Defendant's Exhibit No. C was marked for
7        identification.)
8  BY MR. CHACKMAN:
9    Q.  When did you sign this?
10    A.  April 13th.
11    Q.  Is that when you first met with
12  Mr. Leifert?
13    A.  I think the way was, we first met; I came
14  in and spoke to him about it and then he wanted
15  $5,000.  He wanted money up front.  He wouldn't talk
16  to me anymore until I pay him.  So I had to go home,
17  get the money, and come back.  I gave him the money.
18  He threw up the contract.
19    Q.  How did you pay him?
20    A.  With my father's credit card.
21    Q.  What were you hiring Mr. Leifert to do?
22    A.  I was hiring him so he can get my license
23  back.
24    Q.  Understanding you were being criminally
25  charged for being under the influence?

21 (Pages 78 to 81)

Page 82

1      A.  Yes.  I was being wrongfully charged.
2      Q.  You understood you had to defend yourself
3  in court against the criminal charges of driving
4  under the influence?
5      A.  Yes.
6      Q.  You were hiring Mr. Leifert to handle
7  that, and also to try to get your license back for
8  you?
9      A.  He said he would get my license back.  He
10  didn't say he would try.  He said he was going to
11  get it.  He would get it back.
12      Q.  Is there anything else that you understood
13  or thought you were hiring Mr. Leifert to do other
14  than that?
15      A.  To get my license back.  He said -- if you
16  can restate.  Get your license back, get the case
17  back, he would talk to the State Attorney's Office
18  to get the charges dropped.
19      Q.  So when did you meet with Mr. Leifert and
20  explain everything that had happened?  What day was
21  that?
22      A.  Basically, I told him I was on 75.  I told
23  him that I pulled over.  The cop came to me.  There
24  was no communication.  I was wrongfully charged for
25  DUI because of my situation.  I was hard of hearing

Page 83

1  and I had a speech impairment.
2      Q.  My question is; when did you explain?
3  What day was that that you met and explained that to
4  him?
5      A.  I don't remember what day.  The day I went
6  in there.
7      Q.  Was it the day you signed this agreement
8  or the day before?
9      A.  I believe so.
10      Q.  Which day?
11      A.  The day I signed the contract, because he
12  said time is running out.  I'd better hurry up.  He
13  put pressure on me.  He said I only had three days
14  left.
15      Q.  Was anybody with you when you met with
16  Mr. Leifert?
17      A.  My ex-girlfriend.
18      Q.  Was she in the room when you spoke with
19  him?
20      A.  Yes.
21      Q.  How long did you spend speaking with
22  Mr. Leifert?
23      A.  About 30 minutes.
24      Q.  Did you explain to him what happened any
25  differently than the way you explained it to us in

Page 84

1  deposition?
2      A.  No.  He didn't care.  He didn't ask any
3  questions.  He didn't know anything about the case
4  at all.  He didn't know where I was and what
5  happened.  He didn't ask.  He didn't care.  All he
6  cared about was money, that's it.
7      Q.  Did you had ever explain to Mr. Leifert
8  what had happened to you?
9      A.  I gave him the basis.  I told him I was
10  wrongfully arrested for DUI, because of my speech
11  and hearing impairment.
12      Q.  Did you explain anything else about what
13  had happened to you other than that?
14      A.  All he said was pay him or plead guilty
15  and go to jail.  He explained he wanted $5,000.  I
16  told him to come down in price.  I'm on disability.
17  I can't afford it.  You have to no choice.  You can
18  pay him or plead guilty and go to jail.  I said I
19  can't afford it.  He said do you want to go to jail?
20  I said no.  He said, well, pay me.  I had no choice.
21  Time was running out.
22      Q.  Did you seek any other attorneys after
23  meeting with Mr. Leifert?
24      A.  No.
25      Q.  Why not?

Page 85

1      A.  Because I went home, got my money, and
2  came back.
3      Q.  You came back the next day or the same
4  day?
5      A.  The same day.
6      Q.  If you didn't like Mr. Leifert, you could
7  have looked for another lawyer, right?
8      A.  I didn't know until after we lost the
9  hearing.
10      Q.  Excuse me?
11      A.  I did not know until after we lost the
12  hearing.  He told me he would take care of
13  everything, don't worry.
14      Q.  When you met with Mr. Leifert, if you
15  didn't like him, you can get another lawyer if you
16  wanted.
17      A.  Well, it's not the point whether I liked
18  him or not.  I felt confident he had experience.  I
19  felt he knew what he was doing.
20      Q.  When you opened the phone book and found
21  his name in the yellow pages?
22      A.  Yes.
23      Q.  There is a zillion lawyers.
24      A.  He had the biggest ad.
25      Q.  That's why you used him?

A. Yes. He said one hundred percent satisfaction guaranteed. You can't beat that.
Q. So what else did you talk about with Mr. Leifert in the first meeting, during the half hour you met with him, other than what you told me?
A. That's about it. I gave him my audiogram showing I'm deaf. I gave him the ADA pages. I asked him if he was familiar with the ADA. He says he was. I gave him an x-ray for my knee. He didn't even look at it.
Q. You gave him an audiogram? You brought that with you at the first meeting?
A. Yes.
Q. What ADA cases had you given?
A. I found some off the Internet. I thought it would be helpful for him.
Q. Do you know which cases?
A. No.
Q. Why did you bring and x-ray of your knee?
A. I have a bad knee. I thought he might be able to use it.
Q. Do you think your knee had anything to do with the way you handled the sobriety test?
A. Yes.
Q. Why?

A. I thought maybe that's why the way I walk or something. I never got the Police Report, so how do I know?
Q. Did you know one of the sobriety tests said you were swaying and you weren't doing it properly?
A. Now I do, but at the time I thought I did them perfectly.
Q. How did you know to bring the x-ray of the knee with you?
A. Maybe he could come up -- he might need it for the disability.
Q. Did the officer tell you that you failed the sobriety test?
A. I don't remember. He arrested me. I assumed that.
Q. When you had to do the walking test, where you walk a straight line, were you able to do that?
A. I was able to do it.
Q. You couldn't do it?
A. I was able to do it.
Q. Did you have any problems doing the walking the straight line test?
A. No, that's the reason why I bring the x-rays, because he said I failed. I thought maybe

there is a reason for something; something I wasn't aware of.
Q. Is it true, when you met with Mr. Leifert, you didn't think you failed any of the tests that required you to walk?
A. I know I didn't fail. I'm saying the officer said I failed. I want to be able to prove him wrong.
Q. Did you tell Mr. Leifert you only had half a drink?
A. Yes.
Q. Did you tell him what happened when the police officer stopped you?
A. I told him. He didn't ask me any questions. He didn't care.
Q. Did you explain to him what you had done that evening?
A. Not the whole thing, no.
Q. Did you explain to him --
A. I explained to him what happened at the scene. That's it.
Q. Then did Mr. Leifert tell you what he would do, after you explained to him what had happened?
A. He said he would write a letter to the

State Attorney's Office explaining my disability situation and get the charge dropped and get my licence back. He was so confident.
Q. Did he say anything else to you, Mr. Leifert?
A. As far as I remember, no.
Q. Did he tell you what would need to be done to get your license back?
A. No.
Q. How were you able to communicate with Mr. Leifert?
A. When?
Q. When you met with him at his office.
A. At the office?
Q. Yes.
A. Anytime I don't understand, I ask my girlfriend to repeat what he said.
Q. You talked with him? You talked normally without any assistance?
A. Correct.
Q. Did your girlfriend have to repeat anything he said?
A. Yes.
Q. What?
A. What? I didn't understand.

Page 90

1 Q. What did she have to repeat?
2 A. I don't know.
3 Q. Did she repeat in front of Mr. Leifert or
4 after you left?
5 A. Right in front of him.
6 Q. Why did she have to repeat? Why didn't
7 you ask Mr. Leifert to repeat it?
8 A. Because she knows how to talk to me
9 better.
10 Q. What did she do special that allowed her
11 to speak you to better?
12 A. The way she talks slower. She knows how
13 to talk to me.
14 Q. Slower?
15 A. She knows how to talk to me, the way I
16 understand.
17 Q. How else does she do it that makes it
18 different, other than slower?
19 A. Because I'm used to that.
20 Q. Did you tell Mr. Leifert what the
21 situation was with your hearing?
22 A. Yes. I gave him my audiogram.
23 Q. What did you tell him your ability was for
24 hearing?
25 A. He didn't ask.

Page 91

1 Q. Did you tell him anything about your
2 hearing?
3 A. I told him I have a hearing and speech
4 impediment. He didn't ask me about it. All he
5 cared about was his fees.
6 Q. Did you had tell him what the extent of
7 your hearing impairment was?
8 A. Never asked.
9 Q. Did you explain anything about your
10 hearing?
11 A. He didn't show any interest.
12 Q. Did you ever tell Mr. Leifert you were
13 90 percent hearing impaired?
14 A. I told him I was deaf.
15 Q. Did Mr. Leifert explain to you what would
16 happen that would lead to your getting your license
17 back?
18 A. No, he didn't tell me. All he told me,
19 I'll write a letter to the State Attorney's Office
20 and he would -- he said I would get my license back.
21 Q. Was your father living here with you at
22 the time or no?
23 A. No.
24 Q. So you had your own car at the time?
25 A. Had my own car at the time? How do I

Page 92

1 answer that? Yes.
2 Q. It was your car you were driving on the
3 night of the incident?
4 A. Yes.
5 Q. Did your girlfriend also drive?
6 A. She drives; yes.
7 Q. Did she ever own a car?
8 A. No.
9 Q. After you were arrested you were given a
10 temporary 30 day Drive Permit?
11 A. Yes.
12 Q. Did Mr. Leifert explain to you when you
13 first met that you would have to have a hearing?
14 A. He said we have to have a hearing to get
15 my license back.
16 Q. What did Mr. Leifert tell you about that?
17 A. He didn't tell me much. He told me we
18 have to have a hearing.
19 Q. Did he tell you what would happen at the
20 hearing?
21 A. No.
22 Q. Did he tell you what you have to show to
23 get your license back?
24 A. No. He didn't tell me anything. He told
25 me he would take care of everything.

Page 93

1 Q. Is there anything else you discussed with
2 Mr. Leifert during the first meeting?
3 A. Not that I can recall.
4 Q. Do you remember the whole meeting?
5 A. It was only 30 minutes.
6 Q. Did you have any other meetings with
7 Mr. Leifert before the traffic hearing?
8 A. No.
9 Q. Did you have any discussions with
10 Mr. Leifert before the traffic hearing?
11 A. No.
12 Q. Speak with him over the phone?
13 A. I can't talk on the phone. The only thing
14 I got was a letter in the mail saying he wanted
15 another $2,500, and the date of the hearing.
16 Q. Let me show you Exhibit D, and ask you if
17 this is the letter, a letter you received from
18 Mr. Leifert on or about the date shown?
19 A. That's the letter he sent me.
20 (Defendant's Exhibit No. D was marked for
21 identification.)
22 BY MR. CHACKMAN:
23 Q. Let me show you what we'll mark as Exhibit
24 E; it's a letter dated April 17, 2001. I'll ask you
25 if this is also a letter you received from

Page 94

```
 1  Mr. Leifert.
 2      A.  That's the first time we met him.
 3      Q.  You received that after you first met?
 4      A.  At the first meeting.
 5      Q.  This letter was mailed to you?
 6      A.  Which one?
 7      Q.  E?
 8      A.  Yes, it was mailed to my me.
 9          (Defendant's Exhibit No. E was marked for
10      identification.)
11  BY MR. CHACKMAN:
12      Q.  Let me show you what I'll mark as Exhibit
13  F, and ask you if that is another letter Mr. Leifert
14  sent to you?
15      A.  I don't remember getting that.
16      Q.  Excuse me?
17      A.  I don't remember getting that one.
18          (Defendant's Exhibit No. F was marked for
19      identification.)
20  BY MR. CHACKMAN:
21      Q.  You never got that one?
22      A.  No, I just remember he gave me that one B.
23  I don't remember this one.
24          MS. SPENCER:  Can we clarify, Steve?  Are
25      you saying you didn't get it or you don't
```

Page 95

```
 1      remember getting it?
 2          THE WITNESS:  I didn't get it.
 3  BY MR. CHACKMAN:
 4      Q.  You're saying F you didn't get; correct,
 5  or that you don't recall?
 6      A.  I would rather say I don't remember.
 7      Q.  You do recall receiving D and E?
 8      A.  Yes.
 9      Q.  When was the hearing before the
10  Administrative Court?
11      A.  What?  When was it?
12      Q.  Yes.
13      A.  On that date.
14      Q.  What date?
15      A.  May 17th.
16      Q.  We'll talk about what happened at the
17  hearing; but when did you first learn that
18  as a result of the hearing you were not going to get
19  your license back?
20      A.  About two or three weeks later.
21      Q.  How did you learn that?
22      A.  They sent me a letter in the mail saying
23  that it was suspended.
24      Q.  The letter that was sent to you in the
25  mail said what?
```

Page 96

```
 1      A.  That I lost my license.
 2      Q.  What did you do when you received the
 3  letter in the mail saying you lost your license?
 4      A.  I was upset.
 5      Q.  What did you do about that?
 6      A.  I tried calling.  I had my girlfriend call
 7  the office, but he was unavailable.
 8      Q.  What else did you do; anything?
 9      A.  I had to wait for him to come back, and
10  when he came back I made an appointment and I went
11  to see him and I said what happened.  I told him I
12  wanted to appeal.  He wouldn't do it.
13      Q.  When did you see Mr. Leifert?
14      A.  I don't know the date.
15      Q.  Who was present when you met with him in
16  his office after the hearing?
17      A.  Me and him.
18      Q.  Did you have anything to assist you in
19  communicating with him?
20      A.  No.
21      Q.  What did you say to him and what did he
22  say to you when you met him in his office after the
23  hearing?
24      A.  I told him what happened.  I thought he
25  would get my license back, and he said something
```

Page 97

```
 1  that it was my fault.  I said it was not my fault.
 2  I told him I want to appeal, and he said it would be
 3  a waste of time and money it would take a year, and
 4  I left.
 5      Q.  Did he tell you that?  So you wanted to
 6  appeal and he told you?
 7      A.  He told me it would cost more money and a
 8  waste of his time.  I told him I want him to appeal.
 9  I told him I wanted my license back.
10          MS. SPENCER:  Excuse me.  He said a waste
11      of his time, not my time.
12          MR. CHACKMAN:  We'll clarify that.
13  BY MR. CHACKMAN:
14      Q.  What did he say specifically about the
15  idea of appealing?
16      A.  Like I said, he wanted more money.
17      Q.  He said it was a waste of --
18      A.  -- his time.  It was a waste of his time.
19      Q.  When you met with Mr. Leifert after the
20  hearing, did he tell you he was not interested in
21  handling the appeal?
22      A.  I never said that.  I told him I want him
23  to do an appeal.
24      Q.  Did he tell you he would do the appeal?
25      A.  No.  He said he would not do it.
```

Page 98

1    Q.  When you left the meeting with Mr.
2  Leifert, you knew that he was not interested in
3  handling the appeal?
4    A.  He said he wanted more money.
5    Q.  Didn't he tell you he would not do the
6  appeal?
7    A.  He told me, he said he wanted more money.
8  He knew I didn't have anymore money to hand him.
9    Q.  When you left that office, you knew
10  without more money, Mr. Leifert would not be
11  handling the appeal?
12    A.  Correct.
13    Q.  When you left the office after the meeting
14  with Mr. Leifert, after the hearing, did you contact
15  any other lawyers to handle the appeal?
16    A.  I looked for other attorneys.  When he
17  told me he wouldn't do the appeal, I was upset.  I
18  started researching.
19    Q.  Were you able to find an attorney to
20  handle the appeal for you?
21    A.  No.
22    Q.  Why weren't you able to find a lawyer to
23  handle the appeal?
24    A.  I spent two or three weeks looking and
25  researching.  The 30 days was up.

Page 99

1    Q.  How did you know you had 30 days to appeal
2  it?
3    A.  It says in the letter, right there,
4  because he responded to me two or three weeks.  He
5  waited two or three weeks in time.  I only had two
6  weeks left, not even.
7    Q.  How long after the decision did you meet
8  with Mr. Leifert?
9    A.  What do you mean?
10    Q.  You said you had 30 days from the decision
11  to appeal it.
12    A.  I had 30 days to appeal, right.
13    Q.  How long after the decision did you meet
14  with Mr. Leifert?
15    A.  Right when he came back from his vacation.
16  He didn't come back until two or three weeks after.
17    Q.  After he told you that you had a right to
18  appeal and he was not going to handle the appeal,
19  how many days did you have to either file an appeal
20  or --
21    A.  Not much.  I think I only had a week left.
22    Q.  What did you do to try to find a lawyer to
23  do it for you?
24    A.  I was upset.  I was looking.  I was
25  looking on the Internet, finding information.  I

Page 100

1  couldn't do anything.
2    Q.  Did you try to hire any lawyers to handle
3  it for you?
4    A.  I had hired another lawyer afterward.
5    Q.  After the 30 days had run; is that what
6  you're saying?
7    A.  I don't remember.  It was -- I think I
8  found somebody.  I didn't hire anybody.  I'm trying
9  to think.  I don't remember.
10    Q.  Did you make contact with lawyers before
11  the 30 days ran?
12    A.  I spoke to a couple of lawyers.
13    Q.  Who did you speak to?
14    A.  I don't remember; out of the phone book.
15    Q.  Do you remember the names of any of the
16  lawyers you spoke with?
17    A.  I don't remember.
18    Q.  Why didn't you hire a lawyer to appeal the
19  decision?
20    A.  What?  Money.
21    Q.  Because you didn't have money to pay a
22  lawyer?
23    A.  That's one reason.
24    Q.  Were there any other reasons why you
25  didn't hire a lawyer to appeal the decision?

Page 101

1    MS. SPENCER:  Excuse me.  I'm feeling a
2  little queasy.
3    MR. CHACKMAN:  Do you need to take a break
4    MS. SPENCER:  I don't know.
5    MR. CHACKMAN:  For scheduling?  Off the
6  record.
7    (Discussion held off the record.)
8  BY MR. CHACKMAN:
9    Q.  With the agreement of counsel and the
10  deponent, and also counsel indicates she doesn't
11  feel well, and I have to stop for an emergency jury
12  interview, we'll stop the deposition today.  I'll
13  reconvene it to conclude it at another day.  Is that
14  agreeable?
15    MS. SPENCER:  Fine.
16    MR. CHACKMAN:  This is going to be typed
17  up.  Do you want to read it?
18    MS. SPENCER:  Yes.
19    MR. CHACKMAN:  I'll order this.
20    THE COURT REPORTER:  Do you want a copy
21    MS. SPENCER:  Yes.
22    AND FURTHER DEPONENT SAITH NOT
23  (Deposition concluded at 12:45 o'clock, p.m.)
24
25

26 (Pages 98 to 101)

Page 102

```
 1
 2
 3
 4
 5
               --------------------
 6            Witness
 7    STATE OF FLORIDA
 8    COUNTY OF BROWARD
 9         SUBSCRIBED AND SWORN TO before
10    me on this _____ day of _____, 2003.
11
12               ----------------------
               NOTARY PUBLIC
13             Broward County, Florida
14    My Commission Expires on:
15
16
17
18
19
20
21
22
23
24
25
```

Page 104

```
 1              C E R T I F I C A T E
 2
 3    STATE OF FLORIDA,  )
 4    COUNTY OF BROWARD. )
 5
 6         I, LEW BALABAN, Registered Professional
 7    Reporter do hereby certify that the
 8    foregoing testimony was taken before me;
 9    that the witness was duly sworn
10    by me; and that the foregoing pages 1-104,
11    constitute a true record of the testimony
12    given by said witness.
13         I further certify that I am not a
14    relative or employee or attorney or
15    counsel of any of the parties, or a
16    relative or employee of such attorney
17    or counsel, nor financially interested in the
18    action.
19         Under penalties of perjury, I declare
20    that I have read the foregoing certificate
21    and that the facts stated herein are true.
22         Signed this 21st day of July, 2003.
23
24              _____
              LEW BALABAN
25              Registered Professional Reporter
```

Page 103

```
 1  DATE:       July 21, 2003
    TO:         Mr. Steven Bircoll c/o
 2              Laura E. Spencer, Esq.
                4161 Barbarrossa Avenue
 3              Coconut Grove, Florida 33133
 4
    IN RE:      Bircoll vs. Leifert
 5              Case Number: 02-18132 CA(04)
 6  Dear Mr. Bircoll,
 7      Please take notice that on July 17, 2003,
    you gave your deposition in the above-referred
 8  matter.  At that time, you did not waive
    signature. It is now necessary that you sign
 9  your deposition.
        Please call our office at the below listed
10  number to schedule an appointment between the
    hours of 9:00 a.m., and 4:30 p.m., Monday through
11  Friday at the Esquire office located nearest you.
        If you do not read and sign the deposition
12  within thirty (30) days, the original, which has
    already been forwarded to the ordering attorney,
13  may be filed with the Clerk of the Court. If you
    wish to waive your signature, sign your name in
14  the blank at the bottom of this letter and
    return it to us.
15
        Very truly yours,
16
17      By: Lew Balaban (RPR)
        Esquire Deposition Services
18      600 South Andrews Avenue
        Ft. Lauderdale, Florida 33301
19      954-331-4400
20  I do hereby waive my signature.
21
    _____
22  (Witness name)
23  cc: via transcript:    Laura Spencer, Esq.
24
25
```

27 (Pages 102 to 104)

**A**

ability 25:9,11,18 32:21 90:23
able 21:2 22:3 25:6,14 25:23 28:15 51:14,18 51:19 52:16 59:17 86:21 87:18,19,21 88:7 89:10 98:19,22
above-entitled 3:4
above-referred 103:7
accommodate 43:22
accountant 13:11,14 19:20,22,25 20:14,17 20:18 21:5,21 22:9
accounting 13:19
accuse 77:5
action 104:18
active 42:11
activity 24:7
ad 77:12 85:24
ADA 86:7,8,14
address 5:16,19,20 8:1 8:2
administrative 39:17 95:10
afford 84:17,19
afterward 100:4
age 3:18
age,taken 3:2
ago 30:9,14 31:14,16 31:21 32:23 33:2,3 33:25 34:1 36:1 52:11 53:20 64:17,18 64:20 70:25 80:4
agree 4:22
agreeable 75:9 101:14
agreed 70:2 80:17
agreement 2:7 15:23 81:4 83:7 101:9
aids 26:19,22 27:1,18 27:24 28:1,5,13,18 33:22 34:7,9,11,13 34:17 39:8
Aiel 80:1
alcohol 49:12 58:16 60:7,9,10 71:18 76:10,24
alcoholic 47:4 48:18 58:9,13
allow 41:24
allowed 90:10
allows 52:24
amplified 51:16
Andrews 103:18
answer 5:2 26:7,8 92:1
Answers 11:5,16,19 13:7 16:15,21 17:3,4 18:19 36:9

anxiety 10:25 44:3
anybody 21:12,13 33:10,12 59:19 62:7 83:15 100:8
anymore 24:10 81:16 98:8
anytime 5:8 89:16
anyway 39:2
apologize 26:25
appalled 18:14
appeal 96:12 97:2,6,8 97:21,23,24 98:3,6 98:11,15,17,20,23 99:1,11,12,18,18,19 100:18,25
appealing 97:15
APPEARANCES 1:19
Appearing 1:21,23
applied 22:12,24 23:1,4 31:23 39:6
apply 23:10
appointment 80:24 96:10 103:10
approved 31:25
Approximately 16:24
April 35:15,17,22 37:21 43:14 44:8 47:20 48:1,5 50:2 63:5 67:7,12,21,24 75:23 77:20 78:7 81:10 93:24
area 26:20 54:13
arrangements 38:14
arrest 71:17 80:14
arrested 66:11 67:23 71:5,13,13 72:3,4,5,7 84:10 87:15 92:9
arrived 62:8
asked 31:23 40:11 53:20 60:14,15,20 67:2 69:14 73:4 86:8 91:8
asking 11:19,24 57:13 62:24,25 72:18,20
assist 26:17 28:19 29:24 38:15 40:12 96:18
assistance 27:1 38:20 39:7 41:5,10 42:1 89:19
association 1:7
assume 26:6
assumed 87:16
attend 39:20
attended 70:24
attorney 40:11 77:10 98:19 103:12 104:14 104:16
attorneys 77:16 84:22

98:16
Attorney's 82:17 89:1 91:19
audiogram 32:8,11 86:6,11 90:22
August 9:22,23 10:16 10:19
availability 77:9
available 40:17 41:3,10 41:24
Avenue 103:2,18
aware 40:25 76:15 88:2
awhile 34:25
a.m 1:12 3:14 44:19 67:21,24 103:10

**B**

B 2:6 71:3,7 72:6,10,17 72:23 94:22
Bachelor's 9:15.16
back 9:16 10:19 13:21 15:16 34:25 48:17 51:10,10 53:21 55:3 60:21,22,25,25 61:8 61:14 69:2 74:21 79:1 81:17,23 82:7,9 82:11,15,16,17 85:2 85:3 89:3,8 91:17,20 92:15,23 95:19 96:9 96:10,25 97:9 99:15 99:16
background 9:14
bad 34:6 45:8 86:20
bailed 73:25 74:1
Balaban 3:9 103:17 104:6,24
banking 48:3,5
bar 46:16,24 48:9,9,11 48:13,21,25 54:7,8
Barbarrossa 103:2
basically 30:3 82:22
basis 84:9
BCC 9:20.21 10:14 13:21 29:4,19 39:19 40:15
beat 86:2
bed 34:16
beef 19:7,7,8,10
Beer 50:1
behalf 1:21,23
believe 7:2 23:14 56:8 59:6,21,23,24 69:17 77:3 83:9
Bell 53:9
belong 42:7
benefit 29:11 34:17
benefits 30:23 32:3,6
BERNSTEIN 1:22
best 36:7

better 27:20 83:12 90:9 90:11
big 68:9
bigger 73:15.16
biggest 85:24
Bircoll 1:3,16 2:3 3:1,4 3:17 4:3 9:1 103:1,4 103:6
birth 7:13,14 8:8
Bison 19:10
bit 52:18
blank 103:14
blocking 68:12
Bloomfield 8:23 9:9 14:6
Boca 22:20
book 77:11 85:20 100:14
boots 74:21
born 9:11,12
bottom 103:14
brand 27:9
break 5:8 43:8,11 44:5 101:3
breath 60:8,9,11 70:9
breathalyzer 68:15,18 70:6 76:4,6,11,19
Brian 1:5,6 3:5,6 4:5 35:14 77:10 80:12
bring 68:17 76:18 86:19 87:9,24
bringing 18:22
brings 59:10
brought 32:22 73:10 75:11,14 76:21 86:11
Broward 3:13 78:17 102:8,13 104:4
buffer 56:13 68:9
Building 3:11
bushes 68:13
business 12:15 13:5,9 13:12 15:16 17:19,23 18:18 19:4,8 21:23 22:5,10 77:23,25 78:4,5
businesses 22:17 23:6

**C**

C 2:7 81:3,6 104:1,1
CA 1:5
Cafe 17:6,20 18:11 20:13 21:2,11
call 16:10 52:2 77:16 96:6 103:9
called 3:18 17:19 53:18
calling 18:23 96:6
car 45:19 46:11 55:15 56:10 57:16 59:1,3,4 61:14 66:6,7 68:5

69:15 91:24,25 92:2 92:7
card 2:6 21:7,8,9 42:21 47:17 61:17,20 62:5 62:8,10,12,22 63:4,8 63:14,19 64:6,9,10 64:12,16,22,25 65:7 65:7,10,14,21 66:6 66:13 67:10,15,18 72:21 81:20
cards 47:21,25 67:7
care 79:4,13 84:2,5 85:12 88:15 92:25
cared 84:6 91:5
carried 47:25
carry 42:21 64:9,11 65:1 67:7
carrying 63:14
cars 56:14 68:10,11
case 1:4 65:9 82:16 84:3 103:5
cases 86:14,17
cash 47:18
caused 28:7 33:6 39:4
CA(04) 103:5
cc 103:23
cell 52:21,22,23 53:1,3 53:5
centered 15:21
certain 4:16,24 27:4
certificate 104:20
certify 104:7,13
Chackman 1:22,22 3:22 4:4 40:7,9 43:7 43:13,21 44:4 53:22 62:20 63:13 71:9 75:20,22 81:8 93:22 94:11,20 95:3 97:12 97:13 101:3,5,8,16 101:19
chance 66:9 72:13
change 32:20
changed 32:23 33:1
charge 89:2
charged 81:25 82:1,24
charges 82:3,18
check 33:13
checked 34:21
children 80:7
choice 84:17,20
Circuit 1:1,1 3:7,8
citation 35:22
city 3:12 7:11 24:16
claim 4:17
clarify 94:24 97:12
classes 30:4
clear 67:4
Clerk 103:13
clock 73:14

| | | | | |
|---|---|---|---|---|
| **close** 12:20 24:3 60:16 60:21,24 69:1 | 16:14 19:16 20:22 22:7,7 23:3 37:20 | **deaf** 86:7 91:14 | **distance** 37:11,12 | **eat** 43:18 44:2 54:21 |

**close** 12:20 24:3 60:16 60:21,24 69:1
**closed** 12:19 13:4 16:8 60:22 69:5
**closest** 23:24
**club** 24:14,15 46:7,16 46:17
**coast** 74:11,13
**Coconut** 103:3
**cold** 45:9,10
**college** 9:15 23:18
**color** 60:5
**come** 39:25 81:17 84:16 87:11 96:9 99:16
**comes** 52:7
**comfortable** 4:13
**coming** 56:14 68:10,11
**commencing** 3:14
**Commission** 102:14
**communicate** 25:18 30:11 39:8,21 40:22 89:10
**communicating** 28:19 28:24 65:9 96:19
**communication** 82:24
**company** 20:5 21:8
**computer** 4:8,20 19:2 29:16 41:2 52:7
**computers** 10:15
**concentrate** 18:17
**concentrating** 18:13
**conclude** 101:13
**concluded** 101:23
**confident** 85:18 89:3
**confused** 54:13 55:11 55:22 56:5 58:5
**confusing** 71:24
**Confusion** 39:2
**consent** 2:6 70:18 75:7
**consider** 23:23
**consistent** 67:22,24
**constitute** 104:11
**contact** 5:1 36:10,12,21 37:10,13,18 62:1 98:14 100:10
**contested** 78:18,20
**contract** 81:18 83:11
**contractors** 16:13
**control** 27:14
**converse** 51:14
**conversing** 28:20
**Cooper** 24:16
**cop** 82:23
**copy** 63:4,8 101:20
**corporate** 78:1
**corporation** 16:25 17:2 18:1
**correct** 4:8,9 11:7,10

16:14 19:16 20:22 22:7,7 23:3 37:20 43:1 58:18 62:9 65:17 66:13 81:5 89:20 95:4 98:12
**cost** 21:14 97:7
**costs** 21:16,17,18,20
**counsel** 101:9,10 104:15,17
**count** 60:16
**county** 1:2 3:8,12 38:10 38:11 78:16 102:8,13 104:4
**couple** 33:17 35:25 48:10 52:11 100:12
**court** 1:1 3:7 5:17 37:22,23 38:2,7,8,13 39:1,4,14,14 41:15 68:4 82:3 95:10 101:20 103:13
**credit** 20:15,20,21 21:6 21:7,8,9 47:17,21,25 81:20
**credits** 23:20
**creep** 68:9
**criminal** 82:3
**criminally** 81:24
**criteria** 29:3
**crying** 58:4,5
**curious** 30:10 39:24 40:10,24
**currency** 16:17
**currently** 5:14 8:20 23:23
**c/o** 103:1

**D**
**D** 2:1,7 93:16,20 95:7
**dad** 7:6 19:20
**Dade** 3:8
**Dairy** 3:11
**damage** 33:6
**dark** 59:18
**Darlene** 6:3
**date** 7:13,14 8:8 11:18 80:15 93:15,18 95:13 95:14 96:14 103:1
**dated** 93:24
**Davie** 8:15
**day** 3:13 34:14 39:11 44:8,10 45:1,2 82:20 83:3,5,5,7,8,10,11 85:3,4,5 92:10 101:13 102:10 104:22
**days** 73:18 80:14 83:13 98:25 99:1,10,12,19 100:5,11 103:12
**dead** 54:24

**deaf** 86:7 91:14
**deal** 39:11 42:14,17
**dealing** 39:10
**deals** 17:18
**Dear** 103:6
**decide** 64:10 77:17
**decided** 57:11 64:25
**decision** 57:10 99:7,10 99:13 100:19,25
**declare** 104:19
**defend** 82:2
**Defendant** 1:23 3:2,6 3:19
**Defendants** 1:8
**Defendant's** 2:6,6,7,7,8 2:8 63:11 71:7 81:6 93:20 94:9,18
**degree** 23:18 27:4,11
**degrees** 27:6
**Deis** 6:6,7
**deny** 66:3
**Department** 29:21 62:21
**deponent** 101:10,22
**deposition** 1:15 3:1 4:5 40:11 84:1 101:12,23 103:7,9,11,17
**depression** 10:25 33:5
**describe** 25:9,17 26:24 49:14
**designer** 17:17 18:25 20:10 22:9
**designers** 19:23 20:2
**determining** 18:23
**Detroit** 9:12 14:10,22
**devices** 26:25 28:23
**diesel** 14:12,15,17,19 15:3,9
**different** 27:6 29:3 45:25 90:18
**differently** 83:25
**difficult** 25:20 60:1
**dinner** 46:7,9,9,13,15 46:17 47:5,9,17 48:8 48:15,16,17
**DIRECT** 2:2
**directions** 55:3 57:15
**disability** 29:20,21 31:2,6,7,10,13,21 32:4,6 67:12 84:16 87:12 89:1
**disabled** 39:11
**disclose** 67:4
**discovery** 3:3
**discuss** 33:7
**discussed** 93:1
**discussion** 26:13 101:7
**discussions** 93:9
**display** 41:1

**distance** 37:11,12
**divorce** 78:9,12,19 79:10,15 80:10
**divorced** 78:10,16
**doctor** 32:10 33:7,13 34:25 35:2 36:16,17 36:24 37:2,17 45:11
**doctors** 34:22 37:1
**doctor's** 32:9 36:18
**documentation** 20:9
**documents** 20:11 31:10 71:3
**doing** 16:22 18:1,2 25:12 30:21 60:18 85:19 87:5,22
**Dominoes** 22:16 23:2
**door** 58:21
**Dr** 37:3
**drink** 3:23 47:4,8,8,9 47:11,12,13,15 48:11 48:12,13,15,19,22,24 49:17,19,25 54:21 58:9,13,14,15,17 88:10
**drinking** 49:14 76:9
**drive** 22:4 50:21 51:1,5 53:23 54:3,11 55:7 55:17,19,25 56:19,24 57:1,4,7,14 68:3 92:5 92:10
**driven** 51:8
**driver** 23:14,16
**driver's** 66:19,21,24 76:8
**drives** 92:6
**driving** 23:15 35:19 44:9 50:17 51:6 53:11 57:14 71:18 76:23 82:3 92:2
**dropped** 33:8 50:12 53:12 82:18 89:2
**drove** 45:19 50:14 51:4 51:9
**drugs** 50:5 59:4 76:25 77:4,6,6
**drunk** 75:18
**DUI** 77:13,15 82:25 84:10
**duly** 3:19 104:9

**E**
**E** 1:20 2:1,8 93:24 94:7 94:9 95:7 103:2 104:1,1
**earlier** 31:17 71:11
**early** 44:17
**ears** 27:3
**east** 54:19 56:18,20,21 57:14

**eat** 43:18 44:2 54:21
**eating** 43:19
**Ed** 30:1,6,8
**educational** 9:13
**effort** 38:19
**eight** 63:18 64:19,23 77:13,14
**either** 72:3 99:19
**eleven** 12:1,2 18:21
**elk** 19:10
**emergency** 101:11
**emotionally** 22:5
**employee** 104:14,16
**employees** 16:2,5,7,9 16:11
**employer** 14:23
**employers** 15:1
**employment** 22:13
**ended** 16:8
**entertainment** 24:7
**entire** 58:17
**Esq** 103:2,23
**Esquire** 1:20,22 103:11 103:17
**establish** 32:7
**establishment** 46:21 53:24
**evening** 45:13,14,20,24 58:17 88:17
**everybody** 79:12
**everyday** 34:14
**Everytime** 69:2
**evidence** 3:3
**EX** 2:6,6,7,7,8,8
**exactly** 55:13
**examination** 3:21 31:8
**examined** 35:8,11 36:14
**examining** 33:16
**Excuse** 73:2 75:13 85:10 94:16 97:10 101:1
**exhibit** 63:3,11 64:10 65:15,22 66:13 71:2 71:7 72:6,10,17,23 81:3,6 93:16,20,23 94:9,12,18
**experience** 26:6 77:15 85:18
**experienced** 39:10
**Expires** 102:14
**explain** 42:22 59:7,20 82:20 83:2,24 84:7 84:12 88:16,19 91:9 91:15 92:12
**explained** 58:24 83:3 83:25 84:15 88:20,23
**explaining** 89:1
**extent** 9:13 24:17,18

58:16 91:6
**extra** 29:12
**ex-girlfriend** 6:1 22:11
  45:17,21,23 46:5
  47:2 74:5 81:1,2
  83:17
**ex-girlfriend's** 6:2
**ex-wife** 79:18
**ex-wife's** 79:20
**eye** 36:10,12,13,13,16
  36:22 37:10,19
**eyes** 36:13,24 65:5,16,21
  60:22,23,25 61:2
  69:1,3,5
**e-mail** 40:22
**e-mails** 40:20
**E-X-H-I-B-I-T-S** 2:4

___ F ___

**F** 2:8 94:13,18 95:4
  104:1
**face** 69:3,4
**facial** 59:19
**fact** 22:3
**facts** 104:21
**fail** 76:5 88:6
**failed** 61:2 69:4 87:13
  87:25 88:4,7
**fair** 13:4 22:2
**fall** 10:6
**familiar** 86:8
**family** 7:1,3,4,7,9,19
  9:3,5
**far** 13:22,23,25 23:17
  39:18 50:23,24 60:20
  70:20 73:3 89:6
**father** 19:22 22:8 91:21
**father's** 21:9 81:20
**fault** 97:1,1
**February** 11:8
**federal** 31:3
**FedEx** 23:6,13
**feel** 45:7 101:11
**feeling** 45:4,6,8 47:14
  57:21 58:2 101:1
**fees** 91:5
**feet** 68:6
**felt** 33:8 85:18,19
**Fifteen** 64:24
**Fifty** 25:25
**fight** 45:18 46:11 49:4
**fighting** 49:6
**figure** 55:10 56:5
**file** 99:19
**filed** 3:9 4:25 103:13
**Finances** 17:18
**financially** 104:17
**find** 17:17 98:19,22
  99:22

**finding** 99:25
**fine** 57:23 59:8,9 60:17
  61:10 62:13 69:25
  101:15
**finish** 5:1
**finished** 70:24
**first** 3:19 16:3 31:15
  37:6 40:14,25 41:9
  48:4 60:14 62:7 66:1
  66:12,16 71:10 77:7
  78:14 80:12 81:11,13
  86:4,12 92:13 93:2
  94:2,3,4 95:17
**Fit** 24:14,15
**five** 16:9,20 32:14,17
  32:19 34:10 36:23
  58:10,12 68:6
**flashing** 56:14 68:5
**Florida** 1:2,11 3:8,10
  3:13 7:20 8:16 9:4,7
  33:15,19 34:20 35:7
  36:5,7,15 37:1 66:21
  66:24 74:14,15 76:8
  102:7,13 103:3,18
  104:3
**flu** 45:9
**followed** 68:23
**following** 43:12
**follows** 3:20
**foregoing** 104:8,10,20
**foreign** 16:16
**Forget** 28:3
**forgot** 30:13 45:25
  46:10,19 53:18,19
  54:10 63:22 74:5
**form** 40:7 71:12,15
  72:10
**formally** 80:17
**former** 77:14
**Fort** 3:12 74:17
**forth** 15:16
**forwarded** 103:12
**forwarding** 8:1
**found** 39:2 63:20,22
  85:20 86:15 100:8
**four** 36:1
**franchise** 15:19,20
**Friday** 44:25 45:13
  103:11
**friend** 53:14,25 54:24
  74:2,5,7
**friends** 23:24,25 24:3
**front** 4:6 25:22 56:10
  57:9 75:11,14 81:15
  90:3,5
**Ft** 103:18
**full-time** 9:24 10:8,9,10
**further** 101:22 104:13

___ G ___

**game** 19:10
**garage** 19:14 21:24,25
**gas** 53:20 55:2 56:9,11
  56:12,17,25
**generally** 16:4 25:17
**gentleman** 40:12
**getting** 23:17 31:16
  43:17 49:9 91:16
  94:15,17 95:1
**girlfriend** 6:10 50:12
  53:12 80:21,22 89:17
  89:21 92:5 96:6
**give** 5:9 34:17 42:22
  61:24 62:5 66:9
  72:13,17 75:10 76:10
**given** 35:21 72:2,6
  74:19 86:14 92:9
  104:12
**glanced** 65:2
**glasses** 37:15
**go** 6:23 9:19 14:7 17:22
  29:4,14,20 32:1,10
  33:7 34:15 39:4
  45:20,23 46:13,15
  48:17 49:23 50:13
  51:10 53:24 55:21,23
  55:23,24 57:10,11
  59:8 62:14 69:9 70:1
  72:20 73:24 74:18
  79:10 81:16 84:15,18
  84:19
**going** 9:18,21,23,25
  10:1,18 13:21,25
  18:1,2 19:14,20
  21:23 34:6 43:15,25
  51:10 56:1 70:18
  75:7 79:7 82:10
  95:18 99:18 101:16
**good** 4:14 47:14
**Gormet** 20:13 21:2
**gotten** 35:24 56:1
  61:20
**Gourmet** 17:5,20 18:11
  18:20 19:6
**government** 30:24 31:3
**grade** 70:24
**graduate** 14:3
**graduated** 15:7
**greatest** 75:21
**grill** 54:1
**group** 37:8
**groups** 42:8
**Grove** 103:3
**guaranteed** 77:13 86:2
**guess** 30:14 32:12
**guilty** 39:2 84:14,18
**gym** 11:2,6,21 12:15,19

12:23 14:14 15:5,10
  16:1 78:4,5,8

___ H ___

**habits** 49:15
**hair** 59:20
**half** 31:14,16,20 47:8
  47:12 48:15,22 58:13
  58:15 86:4 88:9
**halfway** 23:19
**hand** 3:24 63:2 65:25
  98:8
**handcuffed** 59:10
**handed** 71:25
**handle** 10:9,10 82:6
  98:15,20,23 99:18
  100:2
**handled** 86:23
**handling** 97:21 98:3,11
**hands-on** 30:19
**happen** 91:16 92:19
**happened** 4:25 12:15
  18:13,15 28:7 32:14
  32:25 33:3,4 38:25
  58:19 73:10 82:20
  83:24 84:5,8,13
  88:12,20,24 95:16
  96:11,24
**happening** 40:19
**hard** 10:12 51:17 52:14
  59:18,20 68:25 82:25
**Harry** 13:15
**head** 60:21,22,25,25
  69:1
**headache** 43:17
**headquarters** 15:17,22
**health** 36:6
**hear** 11:14 24:21,23
  25:2 26:10 27:22
  28:2,4,16 32:21
  34:13,16,19 52:16
  53:2 58:24 59:2
  61:23 68:11 75:4
**heard** 7:24
**hearing** 24:17 25:3
  26:18,19,22,25 27:1
  27:18,23 28:1,4,8,12
  28:18,20 32:13,17
  33:6,8,11,13,16,22
  34:6,7,8,11,17,21
  35:1,8,11 37:22 39:8
  39:17 42:8,18,22
  58:25 59:6 67:1,5,9
  69:16 78:21,22,25
  79:2,3,7,14,15 82:25
  84:11 85:9,12 90:21
  90:24 91:2,3,7,10,13
  92:13,14,18,20 93:7
  93:10,15 95:9,17,18

**96**:16,23 97:20 98:14
**hearings** 78:23
**heeding** 30:3
**held** 43:12 101:7
**help** 35:1 39:7 40:1,3
  40:19 77:15
**helpful** 86:16
**helps** 27:20 34:19
**Herb** 8:25
**heretofore** 3:9
**he'll** 59:8
**high** 14:2,3,6 15:7
  27:12 29:23 70:24
**highway** 54:18 55:4
**hire** 77:24 80:17 100:2
  100:8,18,25
**hired** 41:12,13,22
  77:19,21 78:6 80:20
  100:4
**hiring** 35:13 41:17 81:4
  81:21,22 82:6,13
**hobbies** 24:9
**HOGG** 1:20
**Hollywood** 13:17 32:2
**home** 16:17 20:11
  45:18 46:4,11,15
  47:1 49:2,2 50:13
  51:12 52:6 53:7
  62:14 73:22 81:16
  85:1
**hospital** 35:4
**hour** 50:19 51:6 86:4
**hours** 48:10 58:8,10,12
  73:19 103:10
**house** 8:14
**Huard** 74:9
**hundred** 77:12 86:1
**hurry** 83:12

___ I ___

**idea** 6:18,25 7:23 20:8
  80:3,4 97:15
**identification** 63:12
  67:8 71:8 81:7 93:21
  94:10,19
**Immediate** 9:5
**impaired** 42:23 91:13
**impairment** 42:9,19
  58:25 59:6 67:1,5,9
  69:16,16 77:7 83:1
  84:11 91:7
**impediment** 91:4
**IMPLIED** 2:6
**important** 26:13,16
**incident** 34:1,2,5 92:3
**inconvenience** 44:6
**independent** 16:12
**indicated** 11:5 13:7
  32:14 36:9 67:8

**indicates** 67:20 101:10
**individual** 1:6 3:5 17:1
**Industries** 13:3
**infant** 28:14
**influence** 35:19 50:8
   71:18 76:23 81:25
   82:4
**information** 18:22 19:2
   42:21 99:25
**initially** 65:23
**innocence** 18:17
**innocent** 18:16
**inquire** 41:18
**instructions** 5:12
**instructors** 16:10,12
**intend** 10:1
**interest** 91:11
**interested** 97:20 98:2
   104:17
**interests** 24:9
**Internet** 19:9 42:5
   86:15 99:25
**Interrogatories** 11:6
   11:16,20 13:8 16:16
   16:22 17:5 18:19
   36:10
**intersection** 56:11,16
   68:4,6
**interview** 101:12
**inventory** 18:2,23,24
**invested** 20:12
**involved** 15:18 19:1
   22:9 80:9
**involvement** 11:21
**issue** 76:18
**Ives** 3:11
**I-95** 54:14

_____ **J** _____
**J** 1:22
**Jackson** 35:5
**Jacobi** 78:13
**jail** 59:10 73:12,13,16
   73:18,21 74:18 84:15
   84:18,19
**Jerkee** 17:6.20 18:11
   18:20 19:6 20:13
   21:2,10
**jerkey** 19:7
**jerky** 19:7,9
**Jim** 74:9
**journals** 42:14
**judge** 73:24
**Judicial** 1:1 3:7
**July** 1:11 3:13 11:11,25
   17:10 18:20 103:1,7
   104:22
**June** 11:9,11,20,24
   22:12

**jury** 101:11
**Justin** 20:4,5
**Justin's** 20:7

_____ **K** _____
**kangaroo** 19:11
**keep** 10:18 43:25 52:19
   64:10
**kid** 30:14
**kind** 38:17 39:16 41:5
   41:7,14 42:1,7,13,21
   57:16 59:4 68:17
   77:5
**kinds** 62:24
**knee** 86:9,19,20,22
   87:10
**knew** 41:5,7,14,15,25
   76:8,22 85:19 98:2,8
   98:9
**know** 5:5,9 6:19,21,24
   7:6,11,13,19,22 11:4
   12:11 20:4,6 26:6
   32:5 35:12 36:18
   37:7,8,12 38:9 40:13
   41:3,6,8 42:1,4,5
   43:23,25 44:6 46:23
   54:12,16,20,20 57:15
   58:6 59:9,22 60:6,20
   64:14 65:11 73:14,19
   74:4 75:16 76:2,5,13
   77:1 78:15 80:2 84:3
   84:4 85:8,11 86:17
   87:3,4,9 88:6 90:2
   96:14 99:1 101:4
**knows** 90:8,12,15

_____ **L** _____
**Lakes** 51:1,3,5 53:23
   54:3,11 55:7,17,18
   55:25 56:19,24 57:1
   57:4,7,14 68:3
**landlord** 12:17 13:1
**language** 42:25 71:16
**Large** 3:11
**larger** 22:1
**Lauderdale** 3:12
   103:18
**Laura** 1:20 103:2,23
**law** 1:20,22 70:14 75:2
**lawful** 3:1,18
**lawsuit** 4:17,25
**lawsuits** 80:10
**lawyer** 41:12 63:1,25
   64:1,14 65:5,11,12
   65:13 71:11 72:19
   77:19,21,24 78:1,9
   78:12 85:7,15 98:22
   99:22 100:4,18,22,25
**lawyers** 78:6 85:23

98:15 100:2,10,12,16
**lead** 91:16
**learn** 30:3,5,12,20 41:9
   77:9 95:17,21
**learned** 30:6,15,15
   43:3
**learning** 17:16
**lease** 12:17,18,22,24
**leave** 7:25
**leaving** 56:9
**lecture** 29:14
**lectures** 30:2
**led** 35:13
**left** 8:3 48:8 51:2 53:15
   54:14,25 55:4 56:11
   56:12,15,22,25,25
   57:9 83:14 90:4 97:4
   98:1,9,13 99:6,21
**leg** 60:15,16,17,19
**Leifert** 1:5,6 3:5,6 4:5
   5:1 35:14 77:10,17
   80:13 81:4,12,21
   82:6,13,19 83:16,22
   84:7,23 85:6,14 86:4
   88:3,9,22 89:5,11
   90:3,7,20 91:12,15
   92:12,16 93:2,7,10
   93:18 94:1,13 96:13
   97:19 98:2,10,14
   99:8,14 103:4
**letter** 2:7,8,8 88:25
   91:19 93:14,17,17,19
   93:24,25 94:5,13
   95:22,24 96:3 99:3
   103:14
**Let's** 43:14
**Lew** 3:9 103:17 104:6
   104:24
**licence** 89:3
**license** 18:9,10 22:3
   33:5 66:19,20,21,25
   67:4,6 69:23 70:10
   76:9,12 81:22 82:7,9
   82:15,16 89:8 91:16
   91:20 92:15,23 95:19
   96:1,3,25 97:9
**licensing** 15:23
**light** 25:21 56:13
**liked** 85:17
**limit** 39:24
**line** 20:15,20,21 21:6
   21:15 40:20,22 61:6
   61:9 68:23 87:18,23
**lip** 25:4,10,18,24 26:2
   27:21 29:3 30:3,20
**lips** 25:6,15 60:23
**listed** 103:9
**listen** 39:21
**lit** 43:10

**little** 40:4 52:18 101:2
**live** 5:14 6:15 7:9 8:12
   8:20 9:6 74:10,12
   80:2
**lived** 5:19,20,23 6:13
   7:17 8:6,14 33:15
   35:7 36:5.7
**lives** 5:21 6:19
**living** 24:4 91:21
**local** 46:22
**located** 13:16 14:9
   24:15 37:4 54:2,11
   55:19 56:17 103:11
**location** 19:13
**locations** 15:15
**long** 5:19 8:6 12:10
   28:12 30:9,14 31:12
   34:8,12 35:25 36:21
   39:12 48:9 50:17
   52:9 61:21 63:14,16
   64:17 73:13 83:21
   99:7,13
**longer** 43:15
**look** 23:21 39:25 41:22
   71:24 72:19 78:3
   86:10
**looked** 77:11 85:7
   98:16
**looking** 15:15,15 17:11
   18:24 25:5,22 98:24
   99:24,25
**looks** 75:16
**lose** 20:23 21:1,4 33:6
   76:11.14
**losing** 18:10
**loss** 24:17
**lost** 18:9,13 21:3 22:3
   32:17 33:4 85:8,11
   96:1,3
**lot** 15:18 19:1 22:16,17
   24:2 26:5 30:15
   62:25
**louder** 51:23

_____ **M** _____
**M** 1:3,16 2:3 3:1,4,17
**machine** 75:14,16
**machines** 68:17
**mad** 74:23
**magazine** 42:16
**magazines** 42:13
**maiden** 79:25
**mail** 8:3,4 93:14 95:22
   95:25 96:3
**mailed** 94:5,8
**making** 57:9
**man** 77:15
**mark** 63:3 93:23 94:12
**marked** 63:11 64:6

65:15,22 71:2,7 81:6
   93:20 94:9.18
**marriages** 80:5
**matter** 3:4 103:8
**mean** 25:11 28:22
   49:22 55:16 75:5
   99:9
**means** 51:22
**measles** 28:9
**mechanic** 14:15,17,19
   15:3,9
**mechanics** 14:12
**Medicaid** 67:10,14
**medication** 50:3,8,9
**meet** 80:12,16 82:19
   99:7,13
**meeting** 84:23 86:4.12
   93:2,4 94:4 98:1,13
**meetings** 93:6
**members** 7:19 9:3
**memory** 36:8
**mentally** 10:23,24
**mentioned** 16:15
**met** 62:4 81:11,13 83:3
   83:15 85:14 86:5
   88:3 89:13 92:13
   94:2,3 96:15,22
   97:19
**Miami** 1:11 34:23 51:1
   51:3,4 53:17,23 54:3
   54:11 55:7,17,18,25
   56:19,24 57:1,4,6,13
   68:3
**MIAMI-DADE** 1:2
**Michigan** 8:21,22 9:8
   13:24 15:16,17,21,22
   33:18 35:9,10 37:23
   37:25 38:5,8,10,11
   39:4,14
**middle** 54:6 56:16
**mine** 74:2
**minute** 43:7
**minutes** 83:23 93:5
**mistake** 26:8
**mistreated** 18:15
**misunderstanding** 4:20
**model** 27:11
**mom** 7:6
**Monday** 103:10
**money** 10:11 20:12,14
   20:16,17,19,23 21:1
   21:3,11,13,14 81:15
   81:17,17 84:6 85:1
   97:3,7,16 98:4,7,8,10
   100:20,21
**month** 18:21 49:23
**months** 12:1,2 16:19,20
   70:10
**morning** 44:16,17,21

44:22,23
**Morris** 37:3
**Motech** 14:8,9
**motioned** 61:5 68:22
**Motorola** 22:16,18
23:2,11
**mouth** 77:8
**move** 8:16 21:25
**moved** 8:15 20:6 24:2
74:11
**moving** 8:12 9:6
**mustache** 59:19
**Myers** 74:17

**N**

N 2:1
**name** 4:2,4 6:2,4 12:13
17:1 20:4,7,10 36:18
36:19,25 37:6 46:2
54:9 62:16,18,18
74:7 78:14 79:20,25
85:21 103:13,22
**names** 8:24 14:25 15:2
100:15
**near** 54:17
**nearest** 103:11
**necessary** 69:24 103:8
**need** 5:8 29:2 40:3
43:24 44:1,5,5 64:14
87:11 89:7 101:3
**needed** 37:17 69:3,18
70:5
**negotiate** 17:17
**nerves** 49:10
**never** 17:24 18:7 31:18
35:20 41:15,15 43:3
43:3 64:8 67:2 70:19
71:6 75:8,15,25,25
76:21 87:2 91:8
94:21 97:22
New 6:24 7:10,12
**News** 42:15
**night** 47:2 54:7 92:3
**nine** 77:14
**normal** 24:25 25:1 43:6
51:23
**normally** 28:16 49:25
89:18
**north** 1:11 51:10 55:23
55:24
**Northwest** 5:17 68:4
**Notary** 3:10 102:12
**note** 32:9
**notice** 3:9 103:7
**Nova** 33:17,20 34:21
**number** 8:10 53:5,7
62:13 103:5,10

**O**

**Oakland** 38:10,12
**oath** 3:20
**object** 40:7 75:19
**objection** 40:4.8
**occurred** 35:14 58:20
**occurring** 40:2
**October** 16:22 17:9
**odor** 60:7,9,10
**offered** 22:22,23,25
**offering** 23:8
**office** 31:22 32:1 36:19
82:17 89:1,13,14
91:19 96:7,16,22
98:9,13 103:9,11
**officer** 50:18 51:7 55:6
55:13,19 56:6,9
57:22 58:7,19,24
59:11,12,13,14,16,17
59:23 60:4,13 61:4
61:11,16,18,24,25
62:2,4,5,16,23 64:13
65:10,16,19,22,24
66:4,10,14 67:14
68:2,14,20 69:6,12
70:4,8,12,17,20,23
71:16 72:16 74:25
75:1,6,10 76:19,22
77:3 87:13 88:7,13
**officers** 62:12 66:13,17
76:3,10
**OFFICES** 1:20,22
**officially** 17:24
**Okay** 4:21 5:3,7,11
15:9
**old** 32:15,18,19
**once** 38:6
**on-line** 11:15,17,25
12:8 16:16 19:15
**open** 15:23 18:4,5,6,8
54:4,5 61:2
**opened** 15:5,10,14,18
16:1,3 17:5,12,24
18:7 58:21 60:23
69:2 85:20
**opening** 17:7,21,25
18:11,18
**operated** 11:8 16:5
**operator** 52:3,3
**opportunity** 5:10
**order** 101:19
**ordered** 47:13
**ordering** 103:12
**organizations** 42:8,11
**original** 103:12
**overuse** 49:11
**owned** 11:8 16:5 17:3
**o'clock** 1:12 3:14
101:23

**P**

**pages** 85:21 86:7
104:10
**paid** 21:17
**Palmetto** 54:13,17,19
55:22,24 56:1,18,20
**paper** 71:23,25 72:2,23
**papers** 42:6
**paperwork** 31:24
72:24 73:4,7 74:19
**parents** 8:20
**parent's** 8:14,24
**parking** 37:23
**part** 29:11
**parties** 104:15
**partners** 19:17
**parts** 12:20 20:25
**part-time** 9:25 10:8,9
**Patricia** 8:25
**pay** 21:11,13,16,19
29:12 47:17 81:16,19
84:14,18,20 100:21
**pays** 29:13
**Pembroke** 5:15,17 8:6
8:12 36:16,24 37:5
51:2
**penalties** 104:19
**pending** 3:7
**people** 17:16 19:21
25:5 26:9,11 39:11
42:8,14,17,18 52:1
52:24
**percent** 24:20 25:25
77:12 86:1 91:13
**percentage** 19:21 25:23
**perfectly** 87:8
**period** 15:12 18:21
**periods** 6:9
**perjury** 104:19
**Permit** 92:10
**person** 32:12 52:4
**personal** 13:18
**personally** 20:18 21:11
21:19
**Phnak** 27:10
**phone** 21:15 51:16,16
51:17,22,23,25 52:2
52:8,12,15,21,22,24
53:1,3,5 77:11 80:19
80:23 85:20 93:12,13
100:14
**phonetic** 27:10
**physical** 19:12 36:5
**piece** 71:22,25 72:2
**Pines** 5:15,18 8:6,13
36:16,24 37:5 51:2
**place** 46:2,22 53:14,16
54:1 67:3 73:15

**placed** 17:23
**places** 22:24 23:7 45:25
**Plaintiff** 1:4,21 3:5
**planning** 19:12
**plead** 84:14,18
**please** 4:2,18 103:7,9
**point** 72:19 85:17
**police** 50:18 51:7 55:6
56:6,8 61:13,15 62:8
62:11,21,23 64:13
65:10,20,24 66:4,8
66:12,14,17 67:19,20
68:14 70:4,8 71:14
72:8,9,24 73:5,8,11
74:19,24,25 75:6
87:2 88:13
**position** 23:8,10
**positions** 22:22
**possible** 35:19
**power** 27:4,9,12
**powerful** 27:8
**Powerhouse** 11:6,21
12:22 14:14 15:5,10
15:17 16:1
**powers** 27:6
**present** 96:15
**pressure** 83:13
**prevent** 18:10
**prevented** 22:4
**price** 84:16
**Primarily** 10:15 18:22
**printed** 4:7,10 29:16
**prints** 52:1
**probably** 34:10
**problem** 49:11 59:8
64:12 65:9
**problems** 28:8 36:6
60:18 61:9 87:22
**proceedings** 43:12
**process** 17:7,21,25 18:3
18:5
**professional** 1:7 104:6
104:25
**proficient** 26:25
**project** 19:8
**projection** 29:8
**properly** 87:6
**prosecutor** 77:14
**prove** 18:17 88:7
**provide** 29:21,22
**provides** 29:9
**Providian** 47:22
**Public** 3:10 102:12
**pulled** 51:11 55:11,13
55:19 56:6,12 57:12
57:22,25 58:1,8,20
58:21 59:13,16 60:4
69:14 82:23
**purpose** 3:2 65:3,6

**Pursuant** 3:8
**put** 18:24 20:14,16,17
20:19,20 60:21,22,25
60:25 69:1 73:12
75:17 83:13
**putting** 19:2
**P.A** 1:6 3:6
**p.m** 101:23 103:10

**Q**

**qualified** 31:24
**qualify** 31:5
**quality** 31:21 32:6
**queasy** 101:2
**question** 4:19 5:1,6
69:6 75:21 83:2
**questioned** 35:18
**questioning** 50:7
**questions** 4:7,16,24 5:5
62:24 63:1 72:18,20
84:3 88:15

**R**

R 104:1
**raise** 3:24
**raised** 9:11
**ramp** 55:10,12 56:4,6
**ramps** 55:9 56:4 57:8
57:10
**ran** 100:11
**Rand** 13:3
**rarely** 53:1
**rattlesnake** 19:11
**reached** 58:22
**read** 4:11,19 30:20
41:11,19,24 52:1,24
60:23 64:25 71:16,23
71:24 72:1,4,10,14
101:17 103:11
104:20
**reader** 25:10
**reading** 25:4,15,19,24
26:2 27:21 29:3
37:11 42:6
**realized** 55:24
**really** 24:5
**realtime** 4:6,17 29:1,7
29:15 30:10 38:15
39:19 40:12,14,18
**reason** 5:9 43:2 53:13
78:7 87:24 88:1
100:23
**reasons** 100:24
**recall** 46:2 93:3 95:5,7
**receive** 30:23 31:1 32:3
94:3 96:2
**receiving** 95:7
**recollection** 67:22,25

reconvene 101:13
record 101:6,7 104:11
red 56:15 60:5 68:5
reflect 20:10
refuse 73:7 76:11
Registered 104:6,25
relation 55:18
relative 104:14,16
relax 43:10 45:4
relay 52:2,5,10,13
remarried 79:21,22,23
remember 7:16 12:14
  14:24,25 15:2 21:22
  22:17 23:12 28:15,17
  35:2,3,4 36:19,25
  37:2 39:5,18 44:15
  46:14 47:10,15,16,19
  48:14 56:21 57:19
  64:15 70:22,25 73:1
  73:3 74:20,23,23
  78:15,24 79:1 80:15
  83:5 87:15 89:6 93:4
  94:15,17,22,23 95:1
  95:6 100:7,9,14,15
  100:17
renew 12:18
repeat 26:9,11 89:17
  89:21 90:1,3,6,7
repeating 52:19
rephrase 5:5
Report 42:15 56:8
  67:20 87:2
reporter 4:6,18 29:15
  40:25 101:20 104:7
  104:25
represent 4:4
required 32:5 88:5
research 17:11,12,14
researching 98:18,25
respond 69:21
responded 99:4
restart 10:6
restate 41:21 69:12
  75:20 82:16
restaurant 48:18 54:1
  54:2,9 64:2,3,15
restrictions 66:20,22
result 21:1,10 95:18
retail 19:13
return 46:4 103:14
right 3:24 10:4 13:10
  16:14 20:1 27:25
  29:17 36:13,13,22
  37:10,19 45:7 46:15
  48:23 52:20 54:12,14
  57:2,8 58:15 64:24
  67:13 85:7 90:5 99:3
  99:12,15,17
road 3:11 62:17 65:16

66:6 68:9,15
roadway 55:16
room 83:18
row 68:13
RPR 103:17
run 100:5
running 83:12 84:21
RYCE 1:20

_____ S _____

S 1:5,6 3:5,6
SAITH 101:22
sales 19:15
Samuels 13:15 19:25
satisfaction 77:12 86:2
Saturday 44:21,23
saw 56:9 64:9 75:15
saying 26:6 52:25
  58:23 59:25 60:23,24
  70:13,16 75:1,5 88:6
  93:14 94:25 95:4,22
  96:3 100:6
says 17:3,4 38:23 52:4
  56:8 67:23 77:12
  86:8 99:3
scene 62:4 70:17 88:21
schedule 103:10
scheduled 4:5
scheduling 101:5
school 9:17,19 10:4,5
  12:5 13:21,22,24,25
  14:1,2,3,5,7 15:7
  29:9,11,13,23 30:17
  39:22,24 70:21,24
scream 52:18
screen 4:8,14
Sebring 57:17
second 15:6
seconds 60:19
security 8:10 31:2,6,12
  31:21,22 32:6 39:7
  67:11
see 32:10 33:13 40:1
  41:23 53:24 54:24
  56:14 60:24 68:11
  69:3,3,4 75:18 96:11
  96:13
seek 40:18 41:18 84:22
seen 37:1 42:2 75:25
  80:3
selling 19:6,8
seminar 12:5,5,6,8,9,10
  12:12
sent 93:19 94:14 95:22
  95:24
separate 52:8
service 53:3
Services 29:22 103:17
session 10:2

set 16:25 20:15 29:4,7
  41:6,15,19
set-up 41:7,10
seven 40:21 77:13,14
shock 18:14
show 31:7 32:7,8 38:23
  38:24 62:12,22 63:3
  65:15,21 66:3 67:14
  67:18 71:2 81:3
  91:11 92:22 93:16,23
  94:12
showed 31:10 38:25
  62:7 65:24 66:12,14
  66:16 67:19 71:6,11
showing 65:7 86:7
shown 71:3,10,12
  72:24 93:18
sign 42:25 73:4,7 81:9
  103:8,11,13
signal 68:5
signature 103:8,13,20
signed 81:4 83:7,11
  104:22
sit 30:2
site 17:8
sits 29:8
situation 82:25 89:2
  90:21
six 16:9 32:19 34:10
  36:23
Slow 59:2
slower 29:2 90:12,14
  90:18
small 22:17 23:6
smaller 30:4
sobriety 59:7 66:6
  68:21 69:7,9,13,17
  69:19,25 70:2 76:6
  86:23 87:4,14
social 8:10 31:2,6,12,21
  31:22 32:6 39:6
  67:11
sold 12:19,20
somebody 26:3 31:18
  38:15 52:17 100:8
Sony 4:6
sorry 10:18 32:16,24
  41:20 63:7,21 64:21
  67:23
sort 61:17
sounds 24:23 25:2
  27:20,22 28:4 34:19
south 7:20 9:4,6 50:22
  50:23,24 53:9 55:23
  55:23 56:2 103:18
space 22:1
Spanish 55:4
speak 25:5,7 80:19
  90:11 93:12 100:13

speaking 24:24 25:3
  26:2 77:17 83:21
special 29:25 30:6,8
  42:18 51:16,22 52:23
  90:10
specifically 43:2 49:8
  55:8 97:14
speech 58:25 59:5
  69:15 77:7 83:1
  84:10 91:3
Speeding 36:3
spell 6:4
Spencer 1:20,20 40:4
  41:13,17,22 43:9,18
  44:1 53:18 62:19
  75:19 94:24 97:10
  101:1,4,15,18,21
  103:2,23
spend 83:21
spent 98:24
spoke 55:4 77:2 80:22
  81:14 83:18 100:12
  100:16
stable 10:23,24
stack 63:23 64:4
stand 43:9 60:15,16,17
  60:21
standing 25:13 60:18
start 5:2 9:21 17:16,19
  19:5 21:2 22:10
  31:16 43:24
started 11:25 12:7 16:7
  31:14 40:14 98:18
starting 14:14 21:10
  22:4
starts 71:17
start-up 21:16,18,20
state 3:10,13 4:2 30:24
  82:17 89:1 91:19
  102:7 104:3
stated 104:21
station 53:20 55:3 56:9
  56:11,12,17,25 61:13
  61:15 62:3,8,11
  65:20,25 66:8,12,15
  67:19 71:14 72:8,9
  72:25 73:5,8,11
stay 49:2
stayed 33:1
Steve 4:4 94:24
Steven 1:3,16,22 2:3
  3:1,4,17 4:3 103:1
stood 59:15
stop 35:13,17 43:16,24
  44:5 50:15 53:12,16
  56:15 62:10 76:3,5
  101:11,12
stopped 16:22 35:18
  44:15,22 45:14 50:18

51:7 53:14 55:1,5
  56:10,13,18 59:15
  61:16 62:17 63:5
  65:16,23 66:4 67:5
  67:12,21,23 68:3,14
  70:5,9 72:22 76:9,16
  76:22 88:13
store 19:13,13
straight 61:6,9 68:23
  87:18,23
street 56:23
stressful 10:11
strictly 19:15
strike 17:4 36:4
study 14:11
studying 10:14
stuff 38:18
subcontractor 18:25
submit 31:9
subscribe 42:13
SUBSCRIBED 102:9
sufficient 31:11 32:12
Suite 3:12
summer 10:2,3
Sunday 44:21
Sunrise 22:21
sure 4:14,19 32:9,10
  55:25 56:4 58:12
  65:18,21 68:10
Susan 79:21
suspected 76:9 77:3
suspecting 76:23
suspended 70:10 95:23
swaying 87:5
swear 3:24
sworn 3:20 102:9 104:9

_____ T _____

T 104:1,1
take 12:12 41:1 55:10
  56:4,6 68:15 69:22
  69:25 70:2,5,9 76:13
  85:12 92:25 97:3
  101:3 103:7
taken 3:11 43:11 50:2
  61:13 66:11 104:8
takes 19:1
talk 29:2 43:14 51:18
  52:12,17 61:1 69:5
  71:21 72:1,14,14
  75:4 79:8 81:15
  82:17 86:3 90:8,13
  90:15 93:13 95:16
talked 34:25 79:23
  80:3 89:18,18
talking 17:16 18:25
  24:21 25:14,21 40:6
  52:15 72:18 74:24
  79:9

talks 90:12
taught 30:6,18,21
teach 30:8,11,13
telephone 51:12,15,18
  52:17 53:7
tell 3:24 23:7 26:14
  32:12,22 58:19,20
  66:25 69:13,18 70:5
  70:8,12,17,23 74:25
  75:6 87:13 88:9,12
  88:22 89:7 90:20,23
  91:1,6,12,18 92:16
  92:17,19,22,24 97:5
  97:20,24 98:5
telling 26:3 59:5 60:2
  69:15 71:23
temporary 92:10
ten 63:18 64:19,23
terms 17:18 69:13
test 59:8 60:13 61:3
  62:14 66:6 68:15,18
  69:7,9,25 70:2,6,9
  75:9 76:4,6,7,11,13
  76:20 86:23 87:14,17
  87:23
tested 75:24
testified 3:20
testify 79:14,17
testimony 65:14 104:8
  104:11
tests 61:4,11 68:21
  69:13,17,19,22 75:17
  87:4 88:4
thing 29:1 58:13 59:9
  61:7 65:4 67:10
  75:11 77:7 88:18
  93:13
things 22:16 24:6 41:1
  44:12 76:2
think 6:11 12:4 17:11
  17:12 23:21,21 30:21
  32:9,11,13 33:5,25
  36:9,23 38:12 39:10
  40:5 43:9 44:14,17
  44:23,24 46:6,6,9
  47:1 57:19 62:15
  64:2 74:22 78:13
  79:4,19 80:18 81:13
  86:22 88:4 99:21
  100:7,9
thinking 50:20
thirty 103:12
thought 18:15,16 31:18
  34:5,6 53:14 62:14
  64:13,19,22 65:4,10
  67:17 76:25 82:13
  86:15,20 87:1,7,25
  96:24
three 14:18 16:19,20

68:5 83:13 95:20
  98:24 99:4,5,16
threw 61:14 81:18
Throw 8:5
ticket 35:22 36:2 37:24
  38:2,8 39:3
tickets 35:23,24 74:22
time 6:9 15:12,18,25
  17:15 19:1 26:12
  30:9,14 34:15,15
  38:17,22 39:3,25
  43:24 44:16 45:20
  46:4 47:20 51:17
  52:14 56:5 57:18,21
  58:7 59:18,20 60:2
  61:21 62:7 63:16
  66:1,12,16 68:25
  72:15 80:18 83:12
  84:21 87:7 91:22,24
  91:25 94:2 97:3,8,11
  97:11,18,18 99:5
  103:8
times 26:5 35:24 38:4
  39:13 52:14 80:16
today 24:3 40:11 50:7
  101:12
told 27:22 28:9 31:19
  37:17 58:25 59:3,4
  60:24 61:1,6 62:14
  63:1 68:8 69:1,8,8,10
  69:17,21,24 70:15,15
  82:22,22 84:9,16
  85:12 86:5 88:14
  91:3,14,18 92:17,24
  96:11,24 97:2,6,7,8,9
  97:22 98:7,17 99:17
top 71:17,19
town 6:19 7:1,3,7,11
  15:24 24:4 74:16
  80:2
trade 13:23,25 14:7
  30:17
trading 11:15 12:1,8
  16:17
traffic 35:13,17,21
  37:22 38:2,7 39:1,13
  39:17 62:10 93:7,10
training 11:17 30:19
transcript 103:23
transferred 73:15
translator 38:14
traveling 57:6
travelling 57:3
treat 33:10,12
trees 68:13
trial 78:21
tried 59:6,20 96:6
true 11:22 35:14 42:25
  68:6,7 88:3 104:11

104:21
truly 103:15
truth 3:25 32:22
try 24:12 26:5 82:7,10
  99:22 100:2
trying 19:4 22:10 39:23
  55:10,21 56:3,5
  71:21,22,23,25 72:1
  72:14,17 75:3 100:8
turn 27:13,16 54:14
  56:15,22
turned 61:7
turning 51:9
twelve 11:2 16:4
twice 38:6
two 7:24 14:18 16:7
  31:14,16,20 32:23
  33:2,3 39:13 43:7
  51:6 53:19 54:16
  55:9 56:4 57:8,9
  70:25 79:4 95:20
  98:24 99:4,5,5,16
type 14:13 15:4 17:14
  24:6 27:1,7 37:22
  46:20 53:24
typed 101:16
types 52:3

_____ U _____

unavailable 96:7
uncontested 78:18
understand 5:4,6,12
  24:25 25:6,14,24
  26:3,14,15 27:19
  32:24 40:2,19 59:17
  59:21 62:25 65:3,6
  70:14,16 71:22 75:2
  75:4 79:7,12 89:16
  89:25 90:16
understanding 38:16
  81:24
understands 40:5
understood 70:13
  74:25 82:2,12
Union 48:4
University 34:23
upset 22:5 58:3,5 96:4
  98:17 99:24
Upstate 7:10
use 3:3 13:11,18 26:17
  28:18 29:1 40:19,22
  42:25 51:12 52:5,21
  53:1,9 79:6 86:21
Usual 44:12
U.S 42:15 74:14

_____ V _____

vacation 99:15
vague 40:5

Vaio 4:7
Verizon 53:4
virus 45:10
vision 68:12
voice 24:22
volume 24:24 27:5,13
vs 1:4 103:4

_____ W _____

wait 15:6 74:21 96:9
waited 62:11 99:5
waive 103:8,13,20
walk 61:5 68:22 87:1
  87:18 88:5
walked 54:23 61:7
walking 61:9 87:17,23
wallet 58:23 61:22 63:2
  63:5,9,15 64:11
  65:25 66:2,5,7,7,9
  67:17 72:21 74:22
want 4:14 12:17 26:8
  26:11 39:23 40:13
  41:21 43:4,6,25 65:4
  65:11,12,13 84:19
  88:7 97:2,8,22
  101:17,20
wanted 18:17,24 46:12
  49:4 75:10 81:14,15
  84:15 85:16 93:14
  96:12 97:5,9,16 98:4
  98:7
wasn't 10:23 22:3 45:4
  47:14 53:15 54:25
  55:25 56:4 69:24
  88:1
waste 97:3,8,10,17,18
watched 59:15
way 4:13 27:16,17 57:3
  57:6 77:2 81:13
  83:25 86:23 87:1
  90:12,15
wear 26:19 27:2,7,11
  34:11,14 36:10,12
  37:10,13
wearing 26:22 28:12
  34:8,12 57:18
web 17:8,17 18:25
  19:22 20:2,10 22:9
website 17:17 18:2,23
week 49:24 99:21
weekday 44:13
weekend 44:13,14
weeks 95:20 98:24 99:4
  99:5,6,16
went 6:24 12:4,7 13:23
  15:16 29:23,25 30:17
  31:22 33:17,19 34:22
  34:22 37:2,23 38:2,7
  38:13,23,24 39:6

44:9 45:15,16,18,25
  46:10,11,16,17,18,20
  48:9,21 49:2,3 50:22
  51:2,4 53:23 54:24
  55:2 62:21 63:23
  68:23 70:20 73:22
  79:6 80:24 83:5 85:1
  96:10
weren't 45:6 87:5
  98:22
west 8:23 9:9 14:6
  54:19 56:18,20,21
  57:14 74:11,13
we'll 5:9 93:23 95:16
  97:12 101:12
wife 79:17
wish 103:13
witness 2:2 3:1,18,18
  43:20 44:3 53:19
  95:2 102:6 103:22
  104:9,12
words 4:7,10 24:22
  25:3,7,23 27:19,23
  40:10
work 7:17,18 10:23,24
  11:12,12 14:13,16,19
  15:4,13 17:12 19:1
  23:4 24:11,13
worked 10:16,20 11:1
  15:9
working 15:3 18:1
works 7:22 74:4
World 42:15
worn 36:21 37:15
worry 85:13
wouldn't 54:20 81:15
  96:12 98:17
write 88:25 91:19
wrong 26:8 88:8
wrongfully 82:1,24
  84:10

_____ X _____

X 2:1
x-ray 86:9,19 87:9
x-rays 87:25

_____ Y _____

yeah 16:20 32:19 43:16
  47:3 64:4 68:1 75:11
year 6:11,12,13 8:16
  13:8 15:7 33:25 34:1
  76:12 97:3
years 7:24 11:3 14:16
  14:18 15:2 16:4
  25:12 30:22 31:14,16
  31:21 32:15,18,19,23
  33:2,3 36:1,23 40:21
  52:11 53:20 54:16

63:17,18 64:18,20,23
  64:24 70:25 77:13,14
  79:24 80:4
**yellow** 85:21
**York** 6:24 7:10,12
**young** 28:10 29:25 30:9
  38:6,21

**Z**

**zillion** 85:23

**$**

**$10,000** 20:20,21
**$2,500** 93:15
**$35,000** 13:8
**$5,000** 81:15 84:15

**0**

**02-18132** 1:5 103:5
**04** 1:5

**1**

**1-104** 104:10
**1:00** 43:16 46:6 47:2
**10121** 5:17
**1021** 3:11
**11th** 1:1 3:7
**12** 70:10
**12th** 70:24
**12/26/63** 8:9
**12:00** 46:6 47:2
**12:45** 101:23
**13th** 81:10
**15** 64:17 73:19 79:24
  80:4
**17** 1:11 38:21,22 39:1
  93:24 103:7
**17th** 3:13 95:15
**18** 16:8
**1984** 8:18
**1986** 8:7 11:9
**1991** 10:16,18 79:1
**1993** 5:20
**1998** 11:9,11,20,24
  12:4
**1999** 11:11,25 16:23
  17:9

**2**

**2:00** 44:18
**2:58** 67:24
**20** 16:8 18:20
**2000** 6:11,12 17:10
  18:20
**2001** 9:22,23 10:19
  18:20 22:12 23:5
  35:15,17,22 37:21
  43:14 44:8 47:20
  48:1,6 50:2 63:6 67:7

**67:12,21** 75:23 77:20
  93:24
**2003** 1:11 3:14 102:10
  103:1,7 104:22
**21** 103:1
**21st** 5:17 104:22
**214** 3:12
**25** 15:2

**3**

**3** 2:3 3:11
**3:00** 44:18
**3:30** 67:21
**30** 23:21 60:19 83:23
  92:10 93:5 98:25
  99:1,10,12 100:5,11
  103:12
**33133** 103:3
**33301** 103:18
**35** 25:12 30:22
**37** 60:16
**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** 8:11
**39** 25:12

**4**

**4:30** 103:10
**4161** 103:2
**436-1054** 53:8

**6**

**600** 103:18
**64** 2:6

**7**

**7** 35:15,17,22 37:21
  44:8 50:2 63:5 67:7
  67:12,21 75:23 77:20
**7th** 43:14 67:24 78:7
**72** 2:6
**75** 50:22 51:10 53:21
  55:11,18,22,24 82:22
**77th** 68:4

**8**

**82** 2:7 15:8
**84** 8:19
**86** 15:10,11
**895-7400** 53:6

**9**

**9:00** 45:22 103:10
**9:30** 1:12 3:14
**90** 24:20 91:13
**90's** 10:19
**91** 78:11
**94** 2:7 8:17
**95** 2:8,8
**954-331-4400** 103:19
**99** 57:17

# EXHIBITS

Marked at the

Deposition of

## STEVEN BIRCOLL

Taken on

JULY 17   2003

### Exhibit  A,B,D,E,F,



ESQUIRE™

DEPOSITION SERVICES

A HOBART WEST COMPANY

LINKING TESTIMONY, TRADITION AND TECHNOLOGY

5410 N.W. 33RD Avenue #100 Fort Lauderdale, FL  33309

JOB: #531175

07/21/2003   09:15   9547670358                    LEWBALABAN                         PAGE   02



**DRIVER'S RIGHTS CARD**
**NOTICE TO OFFICER AT ROADSIDE STOP**

As required by Florida law, I am tendering my driver's license, registra-
tion and proof of insurance. They are in proper order and I have commit-
ted no crime or traffic violation. I therefore request that all my documents
(including my license) be returned to me and that I be permitted to leave
immediately. If you have any doubt about my ability to operate my vehicle,
I will be glad to leave my car here and have a cab pick me up. Unless you
return these items to me and advise me that I can leave with my license
and other documents and in my vehicle, I must assume this is more than
a brief investigatory stop, that my liberty is restrained, that I am under
arrest, and that I must obey your orders without resistance, but I do so
under protest.

I do not wish to answer any questions or make any statements at this
time. I am exercising *my right to remain silent* and to not give evidence
against myself. (U.S. Const., 5th Amendment; Florida Constitution Art. 1,
Section 9.) I am exercising my right to counsel. (U.S. Const., 6th
Amendment; Florida Constitution Art. 1, Section 16 (a).) I request that my
attorney be present during any questioning or proceedings against me and
that I be permitted to contact my attorney at the earliest possible time, as
permitted by Florida and Federal law. I have the name and phone number
with me at this time and would like to call immediately.

Florida law does not require me to submit to any verbal or non-verbal
field sobriety tests including reciting the alphabet, the horizontal gaze nys-
tagmus test, walk-and-turn, one leg stand or other such tests. I, therefore,
choose not to participate in any such so-called field sobriety tests, unless
my attorney is present, and expressly direct me to take such voluntary
tests. If you ignore my Constitutional and statutory rights under this card
and verbally coerce me into taking any such tests, I am not performing any
such tests willfully and voluntarily, but am doing so to avoid a confronta-
tion with you, an armed law enforcement officer.

In compliance with the requirements of Florida's Implied Consent Law, I
will consent to submit to tests of my breath, urine, blood or other bod-
ily substances which you may designate, provided the test I am offered is
properly done and has been properly approved by the Florida Department
of Law Enforcement. In compliance with all regulations and rules validly
established under the Florida Administrative Procedure Act, Chapter 120
of Florida Statutes and the Implied Consent Regulations, Florida
Administrative Code 11D-8.001 et seq. However, since I maintain that you
do not have probable cause to make this request for a chemical test, my
consent is given under protest and is in no way voluntary. Furthermore, I
do not waive any deficiencies in the advisements you are giving me, or in
the procedures that you follow. Any consent by me to take a chemical test
is given only for testing devices which are properly approved and where
my consent is **NOT** voluntary given.

I request that I be provided [under Florida State 316.1932 (1) (f) 4.] with
full information concerning your test including a written copy of any report
of the results of your test. If it is used, I wish to view any digital or numer-
ical readout on the breath machine while the test is conducted, pursuant

**(SEE REVERSE SIDE)**

07/21/2003  09:15   9547678358              LEWBALABAN                         PAGE   03

*MD FORM HAS* HANDED TO DEFENDANT TO READ
ALONG WITH. AND WAS ALSO ADVISED I WOULD

# MIAMI-DADE POLICE DEPARTMENT

READ SO HE COULD ~~READ THE~~ UNDERSTAND.
" I WONT SIGN ANYTHING " ~~STATED~~      SEE OTHER IMPLIED CON.
Form

## Implied Consent Law - Ley del Consentimento Implicito

| MDPD Case Number: | Citation Number: | Other Department Case Number: |
|---|---|---|

### English/Ingles

You are under arrest for driving under the influence of alcohol and/or a chemical substance and/or a controlled substance. You will be offered a Breath Test for determining the alcohol content of your breath and/or a Urine Test for detecting the presence of a chemical and/or controlled substance. Should you refuse to take either of the tests, the Department of Highway Safety and Motor Vehicles will suspend your privilege to operate a motor vehicle for a period of twelve (12) months, or for a period of eighteen (18) months, if it was previously suspended for your refusal to submit to a Breath and/or Urine Test. Your refusal to submit to a breath and/or urine test upon request of a law enforcement official shall be admissible into evidence in any criminal proceeding. You may, at your own expense, have other Chemical or Physical Tests performed to determine the alcohol content of your blood or breath, or to detect the presence of a chemical and/or controlled substance.

Will you take the test? ☐ Yes ☐ No  If the subject's response is negative, ask the question below:

Do you understand that refusing to take the breath and/or urine test will cause the suspension of your driving privilege for a minimum of twelve (12) months?  ☐ Yes ☐ No

Do you still refuse to take the test? ☐ Yes ☐ No

| Date: 4-7-2001 | Time: 438 AM | Signature of Advising Officer: EVERSIT THOMSON  3792 |
|---|---|---|
| Name of Subject (Print): REGISTER | | Signature of Subject: Refused |
| Name of Witness (Print): TRASK | | Signature of Witness: C. Trask  4/7/01 |

### Espanol/Spanish

Usted ha sido arrestado por manejar bajo la influencia de alcohol y/o una sustancia quimica y/o una sustancia controlada. Se le ofrecerá un análisis de aliento para determinar el contenido de alcohol en su aliento y/o un análisis de orina para detectar la presencia de una sustancia quimica y/o controlada. Si usted se niega a someterse a estos análisis, el Departamento de Seguridad de Carreteras y Vehiculos Motorizados le suspenderá su privilegio de operar un vehiculo motorizado por un periodo de doce (12) meses, o por un periodo de dieciocho (18) meses, si ya fue suspendido anteriormente por rehusar a someterse a un análisis de aliento y/o de orina. Su negativa a someterse a un análisis de aliento y/o de orina cuando un agente de la ley se lo pida, será admisible como evidencia en cualquier procedimiento criminal en contra suya. Usted podrá, a custo propio, hacerse otras pruebas quimicas o fisicas para determinar el contenido de alcohol en su sangre o aliento, o para detectar la presencia de alguna sustancia quimica y/o sustancia controlada.

¿Esta usted dispuesto a someterse al analisis? ☐ Si ☐ No  Si la repuesta del sujeto es negativa, pregunte lo siguiente:

¿Entiende usted que el rehusar a someterse al analisis de aliento y/o orina resultará en la suspensión de su privilego de manejar por un minimo de doce (12) meses? ☐ Si ☐ No

¿Persiste usted en rehusar a tomar la prueba? ☐ Si ☐ No

| Fecha: | Hora: | Firma del Oficial |
|---|---|---|
| Sujeto (Escriba): | | Sujeto (Firma): |
| Testigo (Escriba): | | Testigo (Firma): |

Def's B
7/17/03
B

07/21/2003  09:15    954 /0358                          LEWBALABAN

                                                                              PAGE   04

Florida Department of Highway Safety & Motor Vehicles
Division of Driver Licenses

TEMPORARY DRIVING PERMIT

DL #: B624793634660              License Type: E

Name:  STEVEN , MITCHELL, BIRCOLL

DOB:  12/26/1963    Sex: M

Addr:  10121 N W 21 ST CT

City:  PMBK PINES      FL     33026 - 1803

Height: 6-1

Issued: 05/07/2001      Expires: 05/29/2001      Period: 12

Motorcycle:  Also      Restrictions: BC      Endorsements:

Remarks:
O=BUSINE  PURPOSES  ONLY

BY THE AUTHORITY OF:              ISSUED BY:

                                 VE. Cecceb S708
SANDRA C. LAMBERT, DIRECTOR       DRIVER LICENSE OFFICE  S50
DIVISION OF DRIVER LICENSES       2515 West Flagler Street
                                  Miami, FL  33135- 1422



        (Driver's Signature)

PHOTOCOPIES ARE NOT VALID.  MUST HAVE ORIGINAL SIGNATURES

                http://www.state.fl.us/hsmv

07/21/2003  09:15   9547670358                    LEWBALABAN                              PAGE  05



Law Offices of
# LEIFERT
# &LEIFERT
A Partnership of Professional Associations

Brian S. Leifert, Esquire
Douglas L. Leifert, Esquire

April 23, 2001

Mr. Steven Bircoll
10121 Northwest 21ˢᵗ Court
Pembroke Pines, Florida 3309

*Deft. D
7/17/03
2/3*

Cornerstone Building
1200 South Pine Island Road
Suite 220
Plantation, Florida 33324

954-523-9600
Fax 954-424-2200
Toll Free 1-877-973-3313

        Re:    State of Florida vs. Steven Bircoll

Dear Mr. Bircoll:

        The Department of Motor Vehicles has set you Formal
Review Hearing for Thursday May 17, 2001 @ 2:00 P.M. at 2515
West Flagler Street, Miami, Florida.  Your appearance at this hearing
is required.

        Enclosed is your temporary driving permit.  This permit will
become effective upon expiration of your 30 day permit issued at the
time of your arrest.  Please note that the permit expires on May 29,
2001.  For an explanation of the driving restrictions please see the
"Note" section of the DMV's letter.

        Enclosed please find the notice of hearing.

        Please feel free to contact my office if you have any
questions or concerns regarding this matter.

Sincerely,

**BRIAN S. LEIFERT, P.A.**

By: _____
        Brian S. Leifert, Esq.

Other Offices In:
FORT LAUDERDALE
BOCA RATON
WEST PALM BEACH

07/21/2003  09:15    9547670358                    LEWBALABAN                                    PAGE  06



Law Offices of

# LEIFERT
# &LEIFERT
A Partnership of Professional Associations





Brian S. Leifert, Esquire
Douglas I. Leifert, Esquire

Cornerstone Building
1200 South Pine Island Road
Suite 220
Plantation,  Florida 33324

954-523-9600
Fax 954-424-2200
Toll Free 1-877-973-3313

April 17, 2001

Mr. Steven Bircoll
10121 Northwest 21st Court
Pembroke Pines, Florida 3309

Re:    State of Florida vs. Steven Bircoll

Dear Mr. Bircoll:

It was a pleasure seeing you today and I am very honored to have you as a client.   You will not have to appear in Court unless and until I inform you otherwise.

As I begin working on your case, please remember that you must not speak to anyone regarding any matter pertaining to it.  You have an absolute right to remain silent through every step of your case and I advise you to exercise that right.  If anyone attempts to speak with you about your case, you should refer them to me.  .

I will contact you at all significant and important stages of your case.  If you do not hear from me for a significant length of time, be assured that your case is being prepared with due diligence. If there is any pleading or any correspondence filed on your behalf, I will always send you a copy so you can monitor the progress on your case.  Please do not ever hesitate to contact me should you have any questions.  I may not be able to take your call immediately, but I will call you back at the earliest opportunity.

Take confidence that you have hired a competent and experienced attorney who is working his hardest to obtain the best possible result in your case.

Sincerely,
**BRIAN S. LEIFERT, P.A.**

By: _____
      Brian S. Leifert, Esq.

Other Offices In:
FORT LAUDERDALE
BOCA RATON
WEST PALM BEACH

07/21/2003  09:15   9547670358                     LEWBALABAN                              PAGE  07







## Law Offices of
# LEIFERT
# &LEIFERT
A Partnership of Professional Associations

Cornerstone Building
1200 South Pine Island Road
Suite 220
Plantation, Florida 33324

954-523-9600
Fax 954-424-2200
Toll Free 1-877-973-3313

Brian S. Leifert, Esquire
Douglas L Leifert, Esquire

June 13, 2001

Mr. Steven Bircoll
10121 Northwest 21ˢᵗ Court
Pembroke Pines, Florida 3309

      Re:    State of Florida vs. Steven Bircoll
              Case No.: 574996X: 6595ASV: 6596ASV

Dear Mr. Bircoll:

    Your next scheduled court date is set for July 3, 2001 @ 9:30 A.M for a Calendar Call at the Dade County Justice Building, Room 01-04 before the Honorable Luise Krieger-Martin at 1351 Northwest 12ᵗʰ Street, Miami, Florida.  Your appearance at this hearing is required.

    Please feel free to contact my office if you have any questions or concerns regarding this matter.

Sincerely,

**BRIAN S. LEIFERT, P.A.**

By: _____
       Brian S. Leifert, Esq.

Other Offices In:
FORT LAUDERDALE
BOCA RATON
WEST PALM BEACH

Should said amount(s) remain unpaid, the undersigned law firm reserves the right to withdraw from representation on the listed matters in this Agreement.

**INTEREST WILL BE CHARGED ON ALL UNPAID FEES AND COSTS AT A RATE OF  12  % PER ANNUM FOR ALL BALANCES OVER 30 DAYS PAST DUE.**

## C O S T S

I hereby agree to pay for any costs of investigation, fines and/or court costs. I will be responsible for paying all costs, including but not limited to: court costs, photocopying, costs of transcripts, witness fees and expenses, travel costs, filing fees and other costs in connection with this matter. Costs will be billed as incurred, approximately monthly. Costs are due upon billing.

* The form does not acknowledge receipt of a cost retainer at this time. Before depositions are to be conducted in the above representation on the criminal charge of driving under the influence, an additional cost retainer is required to be on deposit.

## LIMITATION OF SERVICES

It is agreed and understood that this employment applies to all representation necessary to negotiate a final settlement and trial if applicable. If at any time before or after trial an appeal of any issue is necessary, a separate and distinct agreement will be made between my (our) attorneys and myself (ourselves) regarding attorney fees for said additional representation.

## TERMINATION OF SERVICES

Should the undersigned client(s) fail to make any payment when due, the undersigned law firm reserves the right to immediately withdraw from any and all representation of the client(s) in the above-listed matters. Should the law firm be forced to withdraw, any and all fees or monies paid to the law firm will be considered **fees earned** and **non-refundable**. In addition, for legal services to be rendered under this Agreement, and as collateral and security to insure payment of fees and expenses which will be incurred, I, (We) the undersigned client(s), do hereby acknowledge and grant to LEIFERT & LEIFERT an attorney's lien on all my (our) assets in the event I (We) have failed to pay the legal fees and costs, as they are each explained and enumerated herein, when due.

Any failure of the firm to immediately enforce its rights as set forth in this Agreement shall not be construed as a waiver if its rights to so act thereafter. The firm further retains its rights to withdraw from representation of the client(s), with or without cause, at any time, upon written notice to the client(s) at the last known address provided by the client(s). It is also understood that either the undersigned attorney and the law firm of LEIFERT & LEIFERT, or the client(s) may terminate this attorney/client relationship at any time, with or without cause, upon written notice to the other party, as above, whereupon we will cooperate to settle our accounts and terminate the relationship. Unless otherwise specified, legal services here contracted for shall automatically terminate upon entry of a final judgment, order or other act, document or agreement serving to end and conclude the above-identified matter.

2

## COLLECTION OF DEBTS DUE

Should it become necessary for my (our) attorneys to collect any sums owed them by me (us) through an attorney or other legal process, I (We) further agree to pay all costs of such collection, including reasonable attorney fees, including appellate costs and attorney fees.  In the event the court orders another party to pay my (our) attorney fees, said order shall in no way affect this agreement, but the undersigned client shall be credited with or reimbursed any and all monies received pursuant thereto.

## VENUE, JURISDICTION AND CHOICE OF LAWS

The primary place of performance of this contract shall be Plantation, Broward County, Florida.  All payments are due in Plantation, Broward County, Florida.  Venue and jurisdiction of any dispute arising from this contract shall be in the state courts located in Plantation, Broward County, Florida.  The laws of Florida shall govern the construction and application of the terms of this contract.

DATED this _13_ day of _APRIL_, 20 _01_, at _PLANTATION_ _Broward_ _FLORIDA_____ County, _FLORIDA_____.

CLIENT:

_____ (Sign)      _J Steve Bircoll_ (Print)
Steve Bircoll                Steve Bircoll

The above employment is hereby accepted upon the terms stated herein this _13_ day of _April_, 20 _01_.

LEIFERT & LEIFERT
1200 S. Pine Island Road, #220
Plantation, Florida 33324
Telephone: (954) 523-9600
Facsimile: (954) 424-2200

By: _____
Brian Starr Leifert, ESQUIRE

3

07/21/2003  09:15    9547670350                    LEWBALABAN                          PAGE   10

(FROM REVERSE SIDE)

to my Constitutional rights to confront witnesses and evidence against me. I also desire to have an immediate independent analysis made of any chemical tests taken by the State of my blood, breath or urine, and pursuant to Florida State 316.1932 (1) (f) 3., demand that a sufficient sample be collected and properly sealed, refrigerated or preserved to permit reanalysis to be accomplished at a later date.

If, after the administration of your test, you decide to charge me with any DUI offense under Florida Statute 316.193, then I request that I immediately be transported to the nearest available private medical facility which will conduct independent testing. If feasible, I will select and utilize my own physician or medical provider to administer my independent test(s). I will make my own financial arrangements upon arrival at the selected facility, will select the type of test I want. I specifically request immediate access to a phone and phone directory to arrange this. This request should not be considered to be with drawn or waived even if I take one or more additional breath tests.

I object (and do not consent) to a search of my person, my motor vehicle or any of my other property. Unless I give you written authority to search my vehicle (for "inventory" or any other purpose) and arrange for impound of my vehicle, I wish for my vehicle to remain at its present location, locked, with a note explaining that it will be removed as soon as possible, and I will arrange for a private tow of the vehicle as soon as I am provided access to a phone though your instructions. I hereby release and indemnify your police department from all liability resulting from leaving the vehicle at this location at my request.

I also do not consent to being video taped or audio taped at any time without my written consent, as such unauthorized taping would constitute a violation of my right of privacy under the Florida Constitute Article I, Section 22 and the U.S. Constitution.

This document constitutes an official notification which should be retained for your law enforcement records in this case. DESTRUCTION OF THIS CARD IS A THIRD DEGREE FELONY UNDER FLORIDA STATUTE 918.13 (a).

_____
Signature



## METRO-DADE
## POLICE DEPARTMENT
## DUI TEST REPORT

| | |
|---|---|
| ARREST DATE: 4-7-01 | ARREST TIME: 0.33C |
| ARREST LOCATION: _Miami Lakes Drive + Fairway Dr_ | |
| METRO-DADE CASE NUMBER: 19.740 E | |
| CITATION NUMBER: 574996 X | |
| OTHER DEPT. CASE NUMBER: N/A | |

☒ DUI   ☐ DRE                                    Page 1 of 2

| Arrestee's Name (Last, First, MI): Driscoll, Steven Mitchell | Age: 37 | DOB: 12/26/63 | Sex: M | Race: W | Weight: 235 |
|---|---|---|---|---|---|

| Arresting Officer (Name, Badge, Agency): Trask, C 1613 MDPD | Arrest Test Site: Miami Lakes Dr + Fairway Dr |
|---|---|

| OBSERVATIONS: | Breath Test Site: Miami Lakes (Stan) |
|---|---|

**CLOTHING** —

Describe: (Type & Color) Beige Knit Shirt, Blue Jeans, Black Pointed Toe Cowboy Boots

Condition: ☐ DISORDERLY  ☐ DISARRANGED  ☐ SOILED  ☐ MUSSED  ☒ ORDERLY
(DESCRIBE)

**BREATH**

Odor of Breath: Alcoholic Beverage  ☒ PRESENT  ☐ NOT PRESENT
☐ OTHER

**ATTITUDE**

☐ EXCITED  ☐ HILARIOUS  ☐ TALKATIVE  ☐ CAREFREE  ☐ SLEEPY  ☐ PROFANITY
☐ COOPERATIVE ☒ UNCOOPERATIVE  ☐ INDIFFERENT  ☐ INSULTING  ☐ COCKY  ☐ POLITE

**COLOR OF FACE**

☐ PALE  ☐ FLUSHED  ☒ NORMAL  ☐ OTHER

**EYES**

☒ BLOODSHOT ☒ WATERY ☐ NORMAL   Corrective Lenses: ☐ None  ☐ Glasses
RT EYE                                          ☒ Contacts, If so ☐ Hard  ☐ Soft

**UNUSUAL ACTIONS**

☐ HICCOUGHING  ☐ BELCHING  ☐ VOMITING  ☐ FIGHTING  ☐ CRYING  ☐ LAUGHING ☒ NONE

**SPEECH**

☐ NOT UNDERSTANDABLE  ☐ MUMBLED  ☐ SLURRED  ☐ MUSH MOUTHED  ☐ CONFUSED
☐ THICK TONGUED  ☐ STUTTERED  ☐ ACCENT  ☐ LOW  ☐ RASPY ☒ FAIR  ☐ GOOD  > HEARING

**PUPILS**

☐ NOT EQUAL SIZE  ☐ CONSTRICTED  ☐ DILATED ☒ NORMAL

**PSYCHOPHYSICAL EVALUATIONS/PERFORMANCE TESTS:**  Performed at scene? ☒ YES  ☐ NO  By: SGT TRASK

### HORIZONTAL GAZE NYSTAGMUS
(only if certified to use)

**LEFT**
☐ 1. Cannot smoothly follow a moving object.
☐ 2. Distinct nystagmus at Maximum Deviation.
☐ 3. Onset occurs before 45° degrees.

**RIGHT**
☐ 1. Cannot smoothly follow a moving object.
☐ 2. Distinct nystagmus at Maximum Deviation.
☐ 3. Onset occurs before 45° degrees.

### ROMBERG BALANCE
(Time Estimation)

☐ 1. Does not maintain eyes closed.
☒ 2. Sways in any direction or manner.
☒ 3. Uses arm(s) for balance.
☐ 4. Time estimation: 34 for 30 seconds.
☐ 5. Cannot do test.

### WALK AND TURN TEST

☐ 1. Loses balance during instructions.
☒ 2. Starts before told to do so. 3 X
☐ 3. Stops walking or pauses to regain balance.
☐ 4. Doesn't touch heel to toe.  (Leaves more than ½ inch space)
☐ 5. Steps off line one or two times (count this only once).
☒ 6. Raises one or both arms six or more inches to maintain balance.
☒ 7. Does not turn correctly or loses balance during turn.
☐ 8. Takes more or less than nine steps in each direction.
☐ 9. Cannot do test.  (Steps off line three or more times or is in danger of falling and cannot do test.)

### ONE LEG STAND

**L R**
☐ ☒ 1. Sways while balancing on one leg.
☒ ☐ 2. Raises arm(s) more than six inches to maintain balance.
☐ ☐ 3. Hops on one leg to maintain balance.
☒ ☐ 4. Puts foot down one or two times during 30 sec. period.
☐ ☐ 5. Cannot do test.  (Puts foot down three or more times, or loses balance nearly falling.)

### FINGER TO NOSE TEST

☒ 1. Does not maintain eyes closed.
☒ 2. Misses tip of nose with tip of index finger.
☒ 3. Uses wrong hand when directed.
☐ 4. Does not remove finger.
☐ 5. Cannot do test.

EXHIBIT C

Page 2 of 2

**TIMES:**

Transporting Officer(s): _C. Task_    Transportation Time: _4c5 Am_ Arrival Time _4:10 am_

Time Of First Observation: _410 Am_  Time DRE/DART Notified: _N/A_    Time Of Completed Examination: _____

If DRE/DART Not Notified, Why?: _____ _N/A_

**INTERVIEW** (Quote Answers): _No INVOKED LIGHTS by CARS HE PRODUCED TO OFFICER_ _Drivers? /_

Subject Advised Of Miranda Warnings: Date: _____ Time: _____ By: _____

Are you ill? ☐ YES ☐ NO  Nature of illness? _____ Taking medicine? ☐ YES ☐ NO  What kind? _____

Last taken? _____ Taking illegal drugs? ☐ YES ☐ NO  What kind? _____  Are you injured? ☐ YES ☐ NO

Last taken? _____ Any physical disabilities? ☐ YES ☐ NO  What kind? _____

Type of injury? _____    Do you have false teeth? ☐ YES ☐ NO  A glass eye? ☐ YES ☐ NO

Artificial limb? ☐ YES ☐ NO  Under the care of a Doctor or Dentist? ☐ YES ☐ NO  Name: _____

Are you diabetic or epileptic? ☐ YES ☐ NO  Take insulin? ☐ YES ☐ NO  Are there signs of physical injury? ☐ YES ☐ NO

Type: _____  Any previous head injury? ☐ YES ☐ NO  When? _____  Allergies? ☐ YES ☐ NO

Type: _____  MEDIC ALERT present? ☐ YES ☐ NO  Type: _____

Time of last meal? _____ What was eaten? _____ When did you last sleep? _____

How long? _____ What were you doing in the three hours prior to your arrest? _____

Have you been drinking? ☐ YES ☐ NO  What? _____ How much? _____ Size of drink? _____

Time started? _____ Time finished last drink? _____ Time now? _____ Actual Time: _____

Where were you drinking? _____ Last three to four hours before that? _____

Were you operating a vehicle (or vessel) at the time of the stop (accident)? ☐ YES ☐ NO  Coming from? _____

Going to? _____ Were you involved in an accident today? ☐ YES ☐ NO  Where? _____

Do you feel the effects of the alcohol? ☐ YES ☐ NO  Drugs? ☐ YES ☐ NO  At the time you were driving? ☐ YES ☐ NO

If yes, how did it affect you? _____ Do you feel impaired, high, or buzzed? ☐ YES ☐ NO

Describe this feeling? _____ Have you had anything to eat or drink since the arrest (accident)? ☐ YES ☐ NO

If yes, what? _____ When? _____ How much? _____

**SPECIMEN COLLECTED:** Breath ☐ Time: ____/____ Breath ☐ Time: ____/____ Breath ☐ Time: ____/____

Blood ☐ Time: _____ Blood ☐ Time: _____ Urine ☐ Time: _____ Unable ☐ YES  Explain: _____

Refusal:  Breath ☒ YES ☐ NO ☐ N/A   Urine ☐ YES ☐ NO ☐ N/A   Blood ☐ YES ☐ NO ☐ N/A

Reason for refusal:  Breath _I Dont know the law_   Urine _____   Blood _____

PM Date: ____/____/____  Instrument S/N: _____  Operator: _____  Badge #: _____

**PASSENGERS IN VEHICLE:**

| NAME | ADDRESS | PHONE | CONDITION |
|---|---|---|---|
| _NONE_ | | | |
| | | | |
| | | | |

Did the subject request an independant blood test, as outlined in the Implied Consent? ☐ YES ☒ NO

If yes, what arrangements were made for the subject to obtain the independant test? _____

**REMARKS:** _I HAD blood shot eyes, Flushed Face, strong odor of Alcoholic beverage_
_About breath, when I told I could smell this; A stated it was mouthwash._

**CONCLUSION:** _A impaired by Alcoholic beverage_

**EXAMINER'S NAME** (Print): _Everett Townsend_    SIGNATURE: _____

ID or BADGE NUMBER: _3797_  DATE OF EXAMINATION: _4 17 12:--1_

Rev 05/96

19274C E

30

BIRELL, STEVEN MITCHELL   12 26 1963  M W   6-1 225 BLU GRN

10121 NW 21 COURT                    436-1054

Same

UNEMPLOYED   DETROIT

B624-793-63-466C FL    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  N/V

04 07 2001   330   MIAMI LAKES DR FAIRWAY DR

N/A   N/A   N/A   1

CHARGES | | STATUTE | | VIOLATION OF SECT.

| | ACTIVE | TYPE | COUNTS | | | | |
|---|---|---|---|---|---|---|---|
| A U I | | N W | 1 | 316.193 | | | 21-81c |
| | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | OF THE CODE OF |
| | | | | | | | DADE Co. |

On the  07  day of  APRIL  2001 , 2 5 8  PM  NW 7700 BLOCK OF NW
77 COURT TO MIAMI LAKES D
AND FAIRWAY DR.

Δ WAS OPERATING A 1999 CHRYSLER SEBRING CONVERTIBLE
BLACK / GREEN , FL TAG TE4 ZEG, 2001 EXP . I FIRST
OBSERVED Δ VEH EXITING THE ROYAL OAKS SHOPPING CENTER
IN THE NW 7700 BLOCK OF NW 77 COURT . Δ VEH TURNED
RIGHT AND DID NOT STOP . APPROX SPEED 5-10 MPH .

PAGE 1 OF 4

C. TRASK

C. Trask

MDPD  1613      M3/13

7
APRIL          2001
McClout

COMPLAINT/ARREST AFFIDAVIT
CONTINUATION

| | | | |
|---|---|---|---|
| DEFT. NUMBER | | 𝒵 | 19274c.Z |
| IDS NO | Agent Code | | |
| | 3c | | |
| DEFENDANT'S NAME | Birrell, Steven Mitchell | | 12/26/1963 |

△ VEH THEN DROVE TO THE INTERSECTION OF NW 77 Court
AND MIAMI LAKES DRIVE AND STOPPED FOR THE RED FLASH-
SIGNAL WITH ABOUT 3 TO 5 FEET OF THE FRONT END OF
△VEH INTO THE INTERSECTION. △ VEH THEN BACKED OUT OF
THE INTERSECTION FOR AN ONCOMING CAR. I PULLED IN
BEHIND △ VEH AT MIAMI LAKES DRIVE AT THE ENTRANCE ~~TO~~
(SOUTHBOUND) TO S.R. 826 AND FOLLOWED TO THE S.R.
826 OVERPASS WHERE I TURNED ON OVERHEAD LIGHTS.
△ VEH PULLED INTO THE LEFT TURN LANE FOR FAIRWAY
DRIVE AND STOPPED. I APPROACHED △VEH ON THE LEFT
SIDE AND GREETED THE DRIVER, WHO WAS THE ONLY
OCCUPANT OF △ VEH. △ ADVISES ME THAT HE IS
HARD OF HEARING AND COULD NOT UNDERSTAND ME.
I ASKED HIM AND MOTIONED FOR HIM TO GET OUT OF
△ VEHICLE, SO WE COULD COMMUNICATE FACE TO FACE.
OFFICER JEAN FAUSTIN PULLED UP AT THIS POINT AND I
ASKED HIM TO STANDBY, FOR THE REMAINDER OF THE
CONTACT WITH △. I MADE EYE CONTACT AND

PAGE 2 of 4

COMPLAINT/ARREST AFFIDAVIT
CONTINUATION

192740 Z

30

DEFENDANT'S NAME
BIRCOLL, STEVEN MITCHELL          12-26-1963

SPOKE LOUDLY. I OFFERED TO FINGER SPELL AND Δ
STATED THAT HE DOES NOT UNDERSTAND THIS. I
ADVISED Δ THAT I WANTED HIM TO PERFORM ROADSIDE
SOBRIETY EXERCISE SO I COULD DETERMINE IF HE WAS
TOO IMPAIRED TO DRIVE. Δ WANTED TO KNOW WHY AND
I EXPLAINED TO HIM THAT HIS EYES ARE WATERY + RED
AND THAT HIS BREATH SMELLS OF AN ALCOHOLIC BEVERAGE.
Δ DID NOT PERFORM WALK + TURN, FINGER TO NOSE, AND
ONE LEG STAND TO STANDARDS. Δ ARRESTED +
TRANSPORTED TO STATION #1 FOR PROCESSING. OFFICER
G. TOWNSEND READ IMPLIED CONSENT FORM TO Δ AND
GAVE Δ A COPY OF THE FORM TO FOLLOW ALONG. Δ
CLAIMED THAT HE DID NOT UNDERSTAND, AND OFC.
TOWNSEND PERSISTED UNTIL IT WAS QUITE CLEAR THAT
Δ DID UNDERSTAND. Δ STATES THAT HE UNDERSTOOD
THE WORDS BUT HE DID NOT UNDERSTAND THE LAW.
WHILE BEING TRANSPORTED TO STATION #1, Δ STATED THAT
I DON'T HAVE A CASE, BECAUSE HE DID NOT          PAGE 3 of 4

Agency

Chief or Commanding

C. Clark

C. Hall

MDPD   1613  (M3)/L3

COURT COPY

COMPLAINT/ARREST AFFIDAVIT
CONTINUATION

192740 E

38

BIRRELL, STEVEN MITCHELL          12-26-1963

UNDERSTAND MY INSTRUCTIONS

△ REFUSED TO PROVIDE A BREATH SAMPLE.

PAGE 4 OF 4

C. KAEL

C. KAEL

MPD 1613 M3/13

STATE OF FLORIDA
DEPARTMENT OF HIGHWAY SAFETY & MOTOR VEHICLES

## AFFIDAVIT OF
## REFUSAL TO SUBMIT TO BREATH, URINE, OR BLOOD TEST

STATE OF FLORIDA )
COUNTY OF _Mia. Dade_ )
CITY OF _Unine_ )

Before me personally appeared _Elliott Townsend_ , who, being duly sworn, says I am a duly certified Law Enforcement Officer or Correctional Officer

and a member of _Miami Dade Police Dept_
(NAME OF ENFORCEMENT AGENCY)

That on or about the _7_ day of _April_ , 19 _2001_ , at _330 AM/PM_

NAME _Steven_ _Mitchell_ _Birosel_
(TYPE OR PRINT)   FIRST   MIDDLE OR MAIDEN   LAST

was placed under lawful arrest for the offense of _D U I_

Citation # _574996K_ Location of offense _Main Levis Drive Fairtal Drive_

DATE OF BIRTH _12_ _26_ _63_ RACE _W_ SEX _M_
MONTH   DAY   YEAR

HEIGHT _6'1"_ WEIGHT _225_ COLOR EYES _Gen_ COLOR HAIR _Blond_

ADDRESS _10121 NW 21 CT Pembroke Pines FL 72026_
STREET   CITY   STATE

_B624 793 63 466_ _O R_ _T842EG_ _FL_
DRIVER LICENSE NO.   STATE   REGISTRATION NUMBER   STATE

_Chry_ _Sebring_ _1999_
VEHICLE MAKE   MODEL   YEAR

That on or about the _07_ day of _April_ , 19 _2001_ at _438 AM/PM_

in _Miami Dade_ County, I did request said person to submit to a breath, urine, or blood test to determine the content of alcohol in his blood or the presence of chemical or controlled substances therein. I did inform said person that his refusal to submit to such tests will result in the suspension of his privilege to operate a motor vehicle for a period of 1 year for a first refusal, or for a period of 18 months if the driving privilege of such person had been suspended previously for refusing to submit to such test or tests. In the case of a Commercial Motor Vehicle, I did inform the driver that this refusal will result in the disqualification of the driver's Commercial Driver's License / privilege for a period of one year in the case of a first refusal or permanently for a second refusal in a commercial motor vehicle.

Said person did at that time and place refuse to submit to such test or tests.

_____
SIGNATURE OF LAW ENFORCEMENT OFFICER
OR CORRECTION OFFICER

THIS AFFIDAVIT MUST BE NOTARIZED OR ATTESTED TO
F.S. 117.10?

(AFFIX SEAL)

The foregoing instrument was acknowledged before me this

_____ day of _____ , 19 ____

by _____ who is personally known to me

or who has produced _____ as identification.

_____
SIGNATURE OF ATTESTING OFFICER

TITLE _Police Sgt_

DATE _4-7-2001_

NOTARY PUBLIC _____

NOTE: Mail or hand deliver to the designated Bureau of Driver Improvement office, Department of Highway Safety & Motor Vehicles, with the driver's license, the appropriate copy of the UTC, and the probable cause affidavit. If no DUI arrest is made attach HSMV 72005 (Notice of Commercial Driver's License/Privilege Disqualification).

HSMV 72054  (REV. 7/93) S



# Florida Department of Law Enforcement
# Alcohol Testing Program

## OPERATIONAL PROCEDURES CHECKLIST

SUBJECT NAME: _STEVEN MITCHELL BRODIE_     DATE OF TEST: 4-7-2001

[The instrument is programmed to automatically display model number, date, and time when in "ready" status. Record all results in three digits. The two breath samples will be taken no more than 15 minutes apart. If mouth alcohol is detected, restart the 20 minute observation period and complete another checklist.]

✓ 1.   Check the LED display for correct time and date. If different, record actual time and date: _____

✓ 2.   LED displays flashing message, "PUSH START TEST BUTTON". Push Start Test Button to start test.

✓ 3.   When LED displays flashing message, "INSERT CARD", insert print card.

N/A 4.   If optional keyboard is used, answer user questions.

✓ 5.   Automatically runs "AIR BLANK".

✓ 6.   When LED displays flashing message, "PLEASE BLOW" or "PLEASE BLOW/R", have the subject blow into the breath tube through the mouthpiece until the tone stops.

_____ 7.   When LED displays "SUBJECT TEST .###" result, record the result _____

_____ 8.   Automatically runs "AIR BLANK".

_____ 9.   When LED displays flashing message, "PLEASE BLOW" or "PLEASE BLOW/R", have the subject blow into the breath tube through the mouthpiece until the tone stops.

_____ 10.   When LED displays "SUBJECT TEST .###" result, record the result _____

_____ 11.   Automatically runs "AIR BLANK".

✓ 12.   When LED displays "TEST COMPLETE" attach PRINTOUT to checklist. NOTE: If there is no 0.020 agreement between 1st and 2nd sample of breath the instrument will automatically request a 3rd breath sample. If the instrument does not automatically request a 3rd breath sample, begin another test sequence.

_____ 13.   When LED displays flashing message, "PLEASE BLOW" or "PLEASE BLOW/R", have the subject blow into the breath tube through the mouthpiece until the tone stops.

_____ 14.   When LED displays "SUBJECT TEST .###" result, record the result _____

_____ 15.   Automatically runs "AIR BLANK".

_____ 16.   When LED displays "TEST COMPLETE" attach PRINTOUT to checklist.

Operator Name _EVERETT TOWNSEND_     Date 4-7-2001

Signature _____

NOTE: If Control Test Mode is used, the instrument will run a "Control Test" between the first and second sample, followed by an "Air Blank". The Control test result must be within .095 - .105 g/210L or the instrument will end the test sequence.

FDLE/ATP Form 23 - January, 1997

# Florida Department of Law Enforcement
# Alcohol Testing Program

## BREATH TEST RESULT AFFIDAVIT

I, _____EVERETT TOWNSEND_____ , do hereby swear or affirm that

(Breath Test Operator)

I hold a valid Florida Department of Law Enforcement permit to conduct breath alcohol testing and that I administered a

breath test to _____STEVEN MITCHELL BIRTCOLL_____ , using the procedures described in

(Subject)

Sections 11D-8.007(3) and (4), Florida Administrative Code, and contained on the reverse side of this affidavit. for the

Intoxilyzer 5000 Series Instrument Serial No. _66-004701_. The first breath sample was collected

on _4-7-20-1_ at _555_ and the result was 0._REFUSAL_ grams of alcohol per 210 liters of breath (g/210L).

(Date)          (Time)

The second breath sample was collected on _____ at _____ and the result was 0._____ g/210L.

(Date)          (Time)

A third sample, required only if the results of the first or second samples were more than 0.020 g/210L apart, was collect:

on _____ at _____ and the result was 0. _____ g/210L.  A review of the

(Date)          (Time)

breath test log reflects that the date of the last agency inspection is _3-30-2001_ .

_____
Signature of Breath Test Operator

## THE AFFIDAVIT MUST BE NOTARIZED

STATE OF FLORIDA, COUNTY OF _MIAMI DADE_

Sworn to (or affirmed) and subscribed before me this _7_ day of _APRIL_ , _2001_ , by

(Month)          (Year)

_____EVERETT TOWNSEND_____

Name of Breath Test Operator making statement (Please Print)

_____        _____C. TASK_____
Signature of Notary Public - State of Florida          (Print, Type or Stamp Commissioned Name of Notary Public)

Personally known _____ OR Produced identification _____ Type of identification produced _____

NOTE:   Pursuant to Chapter 117.10, F.S., law enforcement officers, corrections officers, traffic accident investigation officers and traffic infraction enforcement
officers are notaries public when engaged in the performance of official duties.

## SEE REVERSE

*To be used in accordance with Section 316.1934(5), F.S., and may also be used in administrative proceedings pursuant to 322.261*

:ERATIONAL PROCEDURES

I1D-8.007(3) The breath test operator, agency inspector, arresting officer, or person designated by the permit holder :ll reasonably insure that the subject has not taken anything by mouth or has not regurgitated for at least twenty (20) :utes before administering the test. This provision shall not be construed to otherwise require an additional twenty ) minute observation period before the administering of a subsequent sample.

I1D-8.007(4) A breath test operator shall conduct a breath test in accordance with the operational procedures :cklist FDLE/ATP Form 23 - January, 1997 which is approved by the Department and is incorporated by reference.

'ERATIONAL PROCEDURES CHECKLIST (FDLE/ATP Form 23 - January, 1997)

he instrument is programmed to automatically display model number, date, and time when in "ready" status. Record results in three digits. The two breath samples will be taken no more than 15 minutes apart. If mouth alcohol is :tected, restart the 20 minute observation period and complete another checklist.]

   Check the LED display for correct time and date. If different, record actual time and date.
   LED displays flashing message, "PUSH START TEST BUTTON". Push Start Test Button to start test.
   When LED displays flashing message, "INSERT CARD", insert print card.
   If optional keyboard is used, answer user questions.
   Automatically runs "AIR BLANK".
   When LED displays flashing message, "PLEASE BLOW" or "PLEASE BLOW/R", have the subject blow into the breath tube through the mouthpiece until the tone stops.
   When LED displays "SUBJECT TEST".###" result, record the result.
   Automatically runs "AIR BLANK".
   When LED displays flashing message, "PLEASE BLOW" or "PLEASE BLOW/R", have the subject blow into the breath tube through the mouthpiece until the tone stops.
0.  When LED displays "SUBJECT TEST.###" result, record the result.
1.  Automatically runs "AIR BLANK".
2.  When LED displays "TEST COMPLETE" attach PRINTOUT to checklist. NOTE: If there is no 0.020 agreement between 1st and 2nd sample of breath the instrument will automatically request a 3rd breath sample. If the instrument does not automatically request a 3rd breath sample, begin another test sequence.
13.  When LED displays flashing message, "PLEASE BLOW" or "PLEASE BLOW/R", have the subject blow into the breath tube through the mouthpiece until the tone stops.
14.  When LED displays "SUBJECT TEST.###" result, record the result.
15.  Automatically runs "AIR BLANK".
16.  When LED displays "TEST COMPLETE" attach PRINTOUT to checklist.

NOTE: If Control Test Mode is used, the instrument will run a "Control Test" between the first and second sample, followed by an "Air Blank". The Control test result must be within .095 - .105 g/210L or the instrument will end the test sequence.

To be used in accordance with Section 316.1934(5), F.S. and may also be used in administrative proceedings pursuant to 322.2615, F.S. To be forwarded within 5 days to the local Bureau of Driver Improvement Office, Division of Driver Licenses, Department of Highway Safety and Motor Vehicles.

_Jeff 4-7-2001_

WAS SHOWN AND HE READ TO ME THIS SECTION

MAYEN HIS CONSENT WAS NOT VOLUNTARY

I AM NOT CONSENTING TO ANYTHING

## DRIVER'S RIGHTS CARD
### NOTICE TO OFFICER AT ROADSIDE STOP

As required by Florida law, I am tendering my driver's license, registration and proof of insurance. They are in proper order and I have committed no crime or traffic violation. I therefore request that all my documents be returned to me and that I be permitted to leave immediately. If you have any doubt about my safety or your own, I will be glad to leave my car here and have a cab pick me up. Unless you return these items to me and advise me that I can leave with my license and other documents and in my vehicle, I must assume this is more than a brief investigatory stop, that my liberty is restrained, that I am under arrest, and that I must obey your orders without resistance, but I do so under protest.

I do not wish to answer any questions or make any statements at this time. I am exercising my right to remain silent and not give evidence against myself. (U.S. Const., 5th Amendment; Florida Constitution Article I, Section 9.) I am exercising my right to counsel. (U.S. Const., 6th Amendment; Florida Constitution Art. 1, Section 16 (a).) I request that my attorney be present during any questioning or proceeding. Further, I want the attorney to contact my attorney of the earliest possible time, and I the continued detention and questioning of me if I have not been permitted by Florida and Federal law. I have the name and phone number of my attorney with me at this time and would like to call immediately.

Florida law does not require me to submit to any verbal or non-verbal field sobriety tests including reciting the alphabet, the horizontal gaze, one leg stand, turn, one leg stand or other such tests. I therefore choose not to participate in any such so-called field sobriety tests, or in any such test. If you ignore my Constitutional rights under this, my attorney is present, and expressly directs me to take such voluntarily. I am not performing and voluntarily coerce me into taking any such tests, I am not performing such tests verbally and voluntarily, but am doing so to avoid such confrontation with you, an armed law enforcement officer.

I will consent to submit to tests of my breath, urine, blood or other bodily substance which you may designate, provided the test I am offered property done and I have been properly advised of all regulations and rules of Law Enforcement in compliance with all regulations and rules established under the Florida Administrative Procedure Act, Chapter of Florida Statutes and the Implied Consent Regulations, Florida Administrative Code 11D-8.001 et seq. However, since I maintain that I do not have probable cause to make this request for a chemical test, I do not give my consent to the taking of any chemical. Further, consent is given under protest, to avoid the adverse consequence which the procedures that you believe, Any consent by me to take a chemical is given only for testing device which are properly approved and the results of your test. If it is used, I wish to view any digital or my consent is NOT voluntary given.

I request that I be provided (under Florida State 316.1932 (1) (f) 4.) full information concerning your test including a written copy of any or all of the results of your test. If it is used, I wish to view any digital or numerical readout on the breath machine while the test is conducted, particular readout on the breath machine while the test is conducted, particular

**(SEE REVERSE SIDE)**

**(FROM REVERSE SIDE)**

to my Constitutional rights to confront witnesses and evidence against me. I also desire to have an immediate independent analysis made of any chemical tests taken by the State of my blood, breath or urine, and pursuant to Florida State 316.1932 (l) (f) 3., demand that a sufficient sample be collected and properly sealed, refrigerated or preserved to permit reanalysis to be accomplished at a later date.

If, after the administration of your test, you decide to charge me with my DUI offense under Florida Statute 316.193, then I request that I immediately be transported to the nearest available private medical facility which will conduct independent testing, if feasible, I will select and utilize my own physician or medical provider to administer my independent test(s). I will make my own financial arrangements upon arrival at the selected facility. I will select the type of test I want. I specifically request immediate access to a phone and phone directory to arrange this. This request should not be considered to be with drawn or waived even if I take one or more additional breath tests.

I object (and do not consent to a search of my person, my motor vehicle or any of my other property). Unless I give you written authority to search my vehicle (for "inventory" or any other purpose) and arrange to impound my vehicle, I wish for my vehicle to remain at its present location, locked, with a note explaining that it will be removed as soon as possible, and I will arrange for a private tow of the vehicle as soon as I am provided access to a phone though your instructions. I hereby release and indemnify your police department from all liability resulting from leaving the vehicle at this location at my request.

I also do not consent to being video taped or audio taped at any time without my written consent, as such unauthorized taping would constitute a violation of my right of privacy under the Florida Constitute, Article I, Section 23 and the U.S. Constitution.

This document constitutes an official notification which should be retained for your law enforcement records in this case. DESTRUCTION OF THIS CARD IS A THIRD DEGREE FELONY UNDER FLORIDA STATUTE 918.13 (a).

Signature

*INVOKED RIGHTS By CARD Officers From HIS WALLET WHICH HE Handed ME AND TOLD ME TO READ.*

# MIAMI-DADE POLICE DEPARTMENT



## Miranda Warning
## Derechos Miranda

| MDPD Case Number: | Citation Number: | Other Department Case Number: |
|---|---|---|

### English/Ingles

| Before you are asked any questions, you must understand the following rights: | YES | NO |
|---|---|---|
| 1. You have the right to remain silent and you do not have to talk to me if you do not wish to do so. You do not have to answer any of my questions. **Do you understand that right?** | | |
| 2. Should you talk to me, anything which you might say may be introduced into evidence in court against you. **Do you understand that right?** | | |
| 3. If you want a lawyer to be present during questioning, at this time or any time hereafter, you are entitled to have the lawyer present. **Do you understand that right?** | | |
| 4. If you cannot afford to hire a lawyer, one will be provided for you at no cost if you want one. **Do you understand that right?** | | |
| Knowing these rights, are you now willing to answer my questions without having a lawyer present? | | |
| This statement is signed of my own free will without any threats or promises having been made to me. | | |

| Subject (Print): | Signature: | | Date: | Time: |
|---|---|---|---|---|
| Advising Officer (Print): | Signature: | Badge: | Date: | Time: |
| Witness (Print): | Signature: | Badge: | Date: | Time: |

### Espanol/Spanish

| Antes de que se le haga cualquier pregunta, usted debera comprender los siguientes derechos: | SI | NO |
|---|---|---|
| 1. Usted tiene el derecho de permanecer en silencio y no tiene que hablar conmigo si usted no quiere. Usted no tiene que contestar ningunas de mis preguntas. **?Comprende este derecho?** | | |
| 2. Si usted habla conmigo, cualquier cosa que usted pudiera decir puedra ser presentado como evidencia en corte en contra suya. **?Comprende este derecho?** | | |
| 3. Si usted desea que un abogado este presente, en este momento o de aqui en adelante, usted tiene el derecho de tener un abogado presente. **?Comprende este derecho?** | | |
| 4. Si usted no tiene los medios para pagar por un abogado, uno le sera provisto sin costo a usted, si quiere uno. **?Comprende este derecho?** | | |
| ?Con conocimientos de estos derechos, esta usted dispuesto a contestar mis preguntas sin tener un abogado presente? | | |
| Esta declaracion esta firmada por mi voluntariamente, sin que se me hayan hecho amenazas o promesas algunas. | | |

| Sujeto (Escriba): | Firma: | | Fecha: | Hora: |
|---|---|---|---|---|
| Official (Escriba): | Firma: | Badge: | Fecha: | Hora: |
| Testigo (Escriba): | Firma: | Badge: | Fecha: | Hora: |



*my copy I seed from* ~~~ *3???*

# MIAMI-DADE POLICE DEPARTMENT

## Implied Consent Law - Ley del Consentimento Implicito

| MDPD Case Number: | Citation Number: | Other Department Case Number: |
|---|---|---|

### English/Ingles

You are under arrest for driving under the influence of alcohol and/or a chemical substance and/or a controlled substance. You will be offered a Breath Test for determining the alcohol content of you breath and/or a Urine Test for detecting the presence of a chemical and/or controlled substance. Should you refuse to take either of the tests, the Department of Highway Safety and Motor Vehicles will suspend your privilege to operate a motor vehicle for a period of twelve (12) months, or for a period of eighteen (18) months, if it was previously suspended for your refusal to submit to a Breath and/or Urine Test. Your refusal to submit to a breath and/or urine test upon request of a law enforcement official shall be admissible into evidence in any criminal proceeding. You may, at you own expense, have other Chemical or Physical Tests performed to determine the alcohol content of your blood or breath, or to detect the presence of a chemical and/or controlled substance.

Will you take the test? ☐ Yes  ☐ No  If the subject's response is negative, ask the question below:

Do you understand that refusing to take the breath and/or urine test will cause the suspension of your driving privilege for a minimum of twelve (12) months?  ☐ Yes ☐ No

Do you still refuse to take the test?  ☐ Yes ☐ No

| Date: | Time: | Signature of Advising Officer: | Badge: |
|---|---|---|---|
| Name of Subject (Print): | | Signature of Subject: | |
| Name of Witness (Print): | | Signature of Witness: | |

### Espanol/Spanish

Usted ha sido arrestado por manejar bajo la influencia de alcohol y/o una sustancia química y/o una sustancia controlada. Se le ofrecerá un análisis de aliento para determinar el contenido de alcohol en su aliento y/o un análisis de orina para detectar la presencia de una sustancia química o controlada. Si usted se niega a someterse a estos análisis, el Departamento de Seguridad de Carreteras y Vehículos Motorizados le suspenderá su privilegio de operar un vehículo motorizado por un período de doce (12) meses, o por un período de dieciocho (18) meses, si ya fue suspendido anteriormente por rehusar a someterse a un análisis de aliento y/o de orina. Su negativa a someterse a un análisis de aliento y/o de orina cuando un agente de la ley se lo pida, será admisible como evidencia en cualquier procedimiento criminal en contra suya. Usted podrá, a costo propio, hacerse otras pruebas químicas o físicas para determinar el contenido de alcohol en su sangre o aliento, o para detectar la presencia de alguna sustancia química y/o sustancia controlada.

¿Esta usted dispuesto a someterse al analisis? ☐ Si ☐ No  Si la repuestra del sujeto es negativa, pregunte lo siguiente:

¿Entiende usted que el rehusar a someterse al analisis de aliento y/o orina resultará en la suspensión de su privilego de manejar por un minimo de doce (12) meses?  ☐ Si ☐ No

¿Persiste usted en rehusar a tomar la prueba? ☐ Si ☐ No

| Fecha: | Hora: | Firma del Official |
|---|---|---|
| Sujeto (Escriba): | | Sujeto (Firma): |
| Testigo (Escriba): | | Testigo (Firma): |

I UNDERSTAND I am HERE FOR
ALLEGEDLY DRIVING UNDER THE INFLUENCE

Δ STATED "I WONT TAKE ANY THING"

Δ WAS READ IMPLIED CONSENT.
PRIOR TO READING Δ WAS ASKED IF HE READS ENGLISH STATED YES
Δ WAS GIVEN IMPLIED CONSENT FORM
STARTED TO READ WITH OFFICER (ME)

"STATED" "I'M NOT GOING TO CONSENT TO ANYTHING"
OPENED HIS WALLET
HANDED THIS OFFICER A CARD
AND ASKED ME TO READ IT.
I DID I MADE A COPY AND GAVE IT BACK TO
Δ.

Δ STATED "I AM NOT TRYING TO
BE DIFFICULT BUT YOU
WOULD DO THE SAME THING."

Δ WAS EXPLAIND AGAIN THAT HAS HE WAS ARRESTED
FOR DUI AND REFUSING TO TAKE THE BREATH TEST
WOULD SUSPEND HIS LICENSE FOR A PERIOD OF 12 MONTHS
OR 18 MONTHS IF IT WAS PREVIOUSLY SUSPENDED FOR REFUSAL
TO SUBMIT TO A BREATH TEST Δ STATED "I UNDERSTAND
WHAT YOU READ BUT I DONT UNDER STAND THE LAW"
Δ WAS EXPLAINED THAT WHEN HE SIGNED HIS LICENSE

Sobriety test required by Law. Δ stated no one told me that when I got my license?

Δ was advised simply that if he did not take the breath test his license would be suspended for a period of 12 months. "I understand what you said but I don't understand the law."

Δ then stated "I'm not going to consent to anything"

Δ was asked how far he got in school. Δ stated high school but special classes. Finished 12th grade.

*[handwritten top:]* THIS FORM WAS HANDED TO DEFENDANT, TO READ ALONG WITH. AND WAS ALSO ADVISED I WOULD

# MIAMI-DADE POLICE DEPARTMENT

*[handwritten:]* READ O HE COULD READ my LIPS AFTER WORDS. "I WON'T SIGN ANYTHING" Δ STATED    SEE OTHER IMPLIED CON. FORM.

## Implied Consent Law - Ley del Consentimento Implicito

| MDPD Case Number: | Citation Number: | Other Department Case Number: |
|---|---|---|

### English/Ingles

You are under arrest for driving under the influence of alcohol and/or a chemical substance and/or a controlled substance. You will be offered a Breath Test for determining the alcohol content of you breath and/or a Urine Test for detecting the presence of a chemical and/or controlled substance. Should you refuse to take either of the tests, the Department of Highway Safety and Motor Vehicles will suspend your privilege to operate a motor vehicle for a period of twelve (12) months, or for a period of eighteen (18) months, if it was previously suspended for your refusal to submit to a Breath and/or Urine Test. Your refusal to submit to a breath and/or urine test upon request of a law enforcement official shall be admissible into evidence in any criminal proceeding. You may, at you own expense, have other Chemical or Physical Tests performed to determine the alcohol content of your blood or breath, or to detect the presence of a chemical and/or controlled substance.

Will you take the test? ☐ Yes ☐ No   If the subject's response is negative, ask the question below:

Do you understand that refusing to take the breath and/or urine test will cause the suspension of your driving privilege for a minimum of twelve (12) months? ☐ Yes ☐ No

Do you still refuse to take the test? ☐ Yes ☐ No

| Date: 4-7-2001 | Time: 433 Am | Signature of Advising Officer: EVERETT THOMPSON  3752 |
|---|---|---|
| Name of Subject (Print): REFUSED | | Signature of Subject: Refuse |
| Name of Witness (Print): C. ICASK | | Signature of Witness: C. Izask 4/7/c1 |

### Espanol/Spanish

Usted ha sido arrestado por manejar bajo la influencia de alcohol y/o una sustancia quimica y/o una sustancia controlada. Se le ofrecerá un análisis de aliento para determinar el contenido de alcohol en su aliento y/o un análisis de orina para detectar la presencia de una sustancia quimica y/o controlada. Si usted se niega a someterse a estos análisis, el Departamento de Seguridad de Carreteras y Vehiculos Motorizados le suspenderá su privilegio de operar un vehiculo motorizado por un periodo de doce (12) meses, o por un periodo de dieciocho (18) meses, si ya fue suspendido anteriormente por rehusar a someterse a un análisis de aliento y/o de orina. Su negativa a un análisis de aliento y/o de orina cuando un agente de la ley se lo pida, será admisible como evidencia en cualquier procedimiento criminal en contra suya. Usted podrá, a custo propio, hacerse otras pruebas quimicas o fisicas para determinar el contenido de alcohol en su sangre o aliento, o para detectar la presencia de alguna sustancia quimica y/o sustancia controlada.

¿Esta usted dispuesto a someterse al analisis? ☐ Si ☐ No  Si la repuesta del sujeto es negativa, pregunte lo siguiente:

¿Entiende usted que el rehusar a someterse al analisis de aliento y/o orina resultará en la suspensión de su privilego de manejar por un minimo de doce (12) meses? ☐ Si ☐ No

¿Persiste usted en rehusar a tomar la prueba? ☐ Si ☐ No

| Fecha: | Hora: | Firma del Official: |
|---|---|---|
| Sujeto (Escriba): | | Sujeto (Firma): |
| Testigo (Escriba): | | Testigo (Firma): |

**FLORIDA UNIFORM TRAFFIC CITATION**    6595-ASV  5

COUNTY: *Miami - Dade*
CITY: *Miami Lakes*   *MDPD*   AGENCY *30*

AT *04*  *07*  *2001*  *2:58 PM*

*Steven Mitchell Birrell*
*10121 NW 21 Court*
*Pembroke Pines   FL   33026*

DATE OF BIRTH: *12 26 63*  M  6-1

DRIVER LICENSE NUMBER: *B624 - 793 - 63 - 4660*
*FL   E   O   CA*

*1999   Valix Sebring Blue/Gray*
*L54766   FL*

*NW 77CO Block of NW 77CT*

**DID UNLAWFULLY COMMIT THE FOLLOWING OFFENSE**

☐ CARELESS DRIVING
☑ VIOLATION OF TRAFFIC CONTROL DEVICE
☐ VIOLATION OF RIGHT-OF-WAY
☐ IMPROPER CHANGE OF LANE OR COURSE
☐ IMPROPER PASSING
☐ CHILD RESTRAINT
☐ SAFETY BELT VIOLATION
☐ IMPROPER OR UNSAFE EQUIPMENT
☐ EXPIRED TAG
☐ SIX (6) MONTHS OR LESS
☐ MORE THAN SIX (6) MONTHS
☐ NO PROOF OF INSURANCE
☐ EXPIRED DRIVER LICENSE
☐ FOUR (4) MONTHS OR LESS
☐ MORE THAN FOUR (4) MONTHS
☐ NO VALID DRIVER LICENSE
☐ DRIVING WHILE LICENSE SUSPENDED OR REVOKED

*Ran Stop Sign — Turning Right*

IN VIOLATION OF STATE STATUTE: *316.123(2)(c)*

6595-ASV  5

COURT INFORMATION: *To Be Set*

BADGE NO: *1613*   TROOP: *M3300*

---

**FLORIDA UNIFORM TRAFFIC CITATION**    6596-ASV  6

COUNTY: *Miami - Dade*
CITY: *Miami Lakes*   *MAPS*   AGENCY *30*

AT *April*  *07*  *2001*  *2:58 PM*

*Steven Mitchell Birrell*
*10121 NW 21 Court*
*Pembroke Pines   FL   33026*

DATE OF BIRTH: *12 26 63*  M  6-1

DRIVER LICENSE NUMBER: *B624 - 793 - 63 - 4660*
*FL   E   O   CA*

*1999   Gary Van Blue/Gray*
*T54766   FL 01*

*NW 77 Court at Miami Lakes Drive*

**DID UNLAWFULLY COMMIT THE FOLLOWING OFFENSE**

☐ CARELESS DRIVING
☑ VIOLATION OF TRAFFIC CONTROL DEVICE
☐ VIOLATION OF RIGHT-OF-WAY
☐ IMPROPER CHANGE OF LANE OR COURSE
☐ IMPROPER PASSING
☐ CHILD RESTRAINT
☐ SAFETY BELT VIOLATION
☐ IMPROPER OR UNSAFE EQUIPMENT
☐ EXPIRED TAG
☐ SIX (6) MONTHS OR LESS
☐ MORE THAN SIX (6) MONTHS
☐ NO PROOF OF INSURANCE
☐ EXPIRED DRIVER LICENSE
☐ FOUR (4) MONTHS OR LESS
☐ MORE THAN FOUR (4) MONTHS
☐ NO VALID DRIVER LICENSE
☐ DRIVING WHILE LICENSE SUSPENDED OR REVOKED

*Entered Intersection with Flashing Red Light without first stopping*

IN VIOLATION OF STATE STATUTE: *316.076 (1)(a)*

6596-ASV  6

COURT INFORMATION: *To Be Set*

BADGE NO: *1613*   TROOP: *M3300*

# FLORIDA DUI UNIFORM TRAFFIC CITATION   574996-X  5

**COMPLAINT**

COUNTY: Miami-Dade
CITY: Miami-Dade   AGENCY: MDPS   30

Name: STEVEN MITCHELL BREEN
1001 NW 21 COURT
POMPANO BEACH   FL   33060
DL: B624-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
WM 6-1

Date: OFF   07   01 25a

1999 CHEVY CAV   BLU/GRY   FL
847-Z-E2   EXP 07

MIAMI LAKES DRIVE/PLG to Foxhunter Dr

273-5885

THIS IS A CRIMINAL VIOLATION, COURT APPEARANCE REQUIRED, AS INDICATED BELOW.

DID UNLAWFULLY COMMIT THE OFFENSE OF DRIVING UNDER THE INFLUENCE OF ALCOHOLIC BEVERAGES, CHEMICAL OR CONTROLLED SUBSTANCES; DRIVING/ACTUAL PHYSICAL CONTROL WHILE IMPAIRED, OR DRIVING/ACTUAL PHYSICAL CONTROL WITH UNLAWFUL BLOOD ALCOHOL LEVEL OF .08 PERCENT OR ABOVE; OR UNLAWFUL ALCOHOL LEVEL

COURT DATE: 2/16   /23

TO A8@ PST

TO A8@ PST

EFFECTIVE TO DATE OF ARREST YOUR DRIVING PRIVILEGE IS SUSPENDED/DISQUALIFIED FOR:

☐ DRIVING WITH AN UNLAWFUL BLOOD ALCOHOL LEVEL. THIS SUSPENSION/DISQUALIFICATION IS FOR A PERIOD OF SIX MONTHS IF THIS IS THE FIRST VIOLATION OF DRIVING WITH UNLAWFUL BLOOD ALCOHOL LEVEL OR ONE YEAR IF PREVIOUSLY SUSPENDED OR DISQUALIFIED FOR DRIVING WITH AN UNLAWFUL BLOOD ALCOHOL LEVEL. WHEN OPERATING A CMV, YOUR COMMERCIAL DRIVER'S LICENSE/PRIVILEGE WILL ALSO BE DISQUALIFIED FOR THE SAME PERIOD OF TIME AS THE SUSPENSION.

☐ REFUSAL TO SUBMIT TO LAWFUL BREATH, BLOOD OR URINE TEST. F.S. 322.2615. THIS SUSPENSION IS FOR A PERIOD OF ONE YEAR IF THIS IS FIRST REFUSAL OR 18 MONTHS IF PREVIOUSLY SUSPENDED FOR THIS OFFENSE. WHEN OPERATING A CMV, YOUR COMMERCIAL DRIVER'S LICENSE/PRIVILEGE WILL ALSO BE DISQUALIFIED FOR A PERIOD OF ONE YEAR FOR A FIRST REFUSAL OR PERMANENTLY FOR A SECOND REFUSAL WHILE OPERATING A CMV.

LICENSE SURRENDERED?  ☐ YES   ☐ NO   REASON: _____
ELIGIBLE FOR PERMIT?  ☐ YES   ☐ NO

AT THE: _____
YOU MAY REQUEST, WITHIN 10 DAYS AFTER DATE OF ARREST, A REVIEW OF SUSPENSION AT THE DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES. 21 RIVER SIDE DRIVE   DRIVER IMPROVEMENT HEARING OFFICE

UNLESS INELIGIBLE, THIS CITATION SHALL SERVE AS A TEMPORARY DRIVER LICENSE AND WILL EXPIRE AT MIDNIGHT ON THE 7TH DAY FOLLOWING THE DATE OF ARREST

1613   M.Rico

574996-X  5

08/14/01  TUE 17:53 FAX                                                        Ø002

## METRO-DADE POLICE DEPARTMENT          VEHICLE STORAGE RECEIPT          DADE COUNTY, FLORIDA

OTHER DEPT.
CASE NO.  *N/A*                                                    CASE NO.  19 2740 Z

| YEAR | MAKE | MODEL | COLOR | BODY TYPE | TAG NO. | YR. | STATE | DECAL NO. | YR. |
|------|------|-------|-------|-----------|---------|-----|-------|-----------|-----|
| 99 | *Chry* | *Sebring* | *Blu Grn* | *Conv* | T84ZEG | 01 | FL | | |

LOCATION VEHICLE TOWED FROM *Miami Lakes Dr. & Fairway Dr.*

VEHICLE IDENTIFICATION NUMBER  *3C3EL45H9XT546896*

NAME AND ADDRESS OF GARAGE TAKEN TO  *D+R 2375 Ali Baba*

REGISTERED OWNER (NAME & ADDRESS) *Steven M. Birrell 10121 NW 21st Ct Pmbr Pines, FL*

DATE AND TIME TOWED *4/7/01 3⁵⁵ AM*   REASON *Arrest*

OPERATOR:   INCARCERATED ☒ YES ☐ NO
NAME: *S/A Owner*   ADDRESS   PHONE

HOLD FOR: (INDIVIDUAL AUTHORIZING HOLD)

INDIVIDUAL REQUESTING PROCESS:

DATE AND TIME CONTACTED
*N/A*

REASON FOR HOLD:
*N/A*

VEHICLE TO BE PROCESSED BY: (BUREAU/SECTION/UNIT)
*N/A*

### JOINT PROPERTY INVENTORY TAKEN BY OFFICERS AND TOW DRIVER (CHECK APPROPRIATE ITEMS)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| RADIO ☒ | SPARE TIRE ☒ | FOG LIGHTS ☐ | AIR CONDITIONER ☒ | KEY IN IGNITION | YES | NO |
| TAPE DECK ☒ | HUB CAPS ☒ | MAG WHEELS ☒ | | TRUNK LOCKED | YES | NO |
| MIRRORS ☒ | ☐ | HEATER ☐ | | REGISTRATION PAPERS | YES | NO |

MISCELLANEOUS PROPERTY IN VEHICLE (TOOLS, CLOTHES, ETC.)
*Small container of hand tools in trunk*
*Cell phone Binoco Knife + Sheath Glasses in*
*head rest Sunglasses Digital control seats*

MESSAGE CENTER INFORMATION
OPERATOR *White*
TIME *0703*
NCIC RESULTS: _____
FCIC RESULTS: _____

PROPERTY RECEIPT   YES / NO / (CIRCLE) *Lifting Bolt*
(ENTER NUMBER OF ITEMS VISUALLY DAMAGED AND/OR MISSING)

| STANDARD PARTS | MISSING DAMAGED | | MISSING DAMAGED | | | MISSING DAMAGED |
|---|---|---|---|---|---|---|
| WHEELS | | TRANSMISSION | | ENGINE | | |
| HEATER | | HOOD | | FR. END | | |
| LIGHTS | | DOOR(S) | | WINDOW(S) *scratched* | | |
| GENERATOR | | SEAT(S) *misc* | | FENDER(S) | | |
| BATTERY | | TIRE(S) | | OTHER | | |

SIGNATURE OF OWNER AND/OR DRIVER IF RELEASED AT SCENE

WE, THE UNDERSIGNED OFFICER(S) AND TOW TRUCK DRIVER, HEREBY CERTIFY THAT THE ABOVE LISTED JOINT PROPERTY INVENTORY IS CORRECT TO THE BEST OF OUR KNOWLEDGE.

Signature *Fred Soul*   *C. Wahl*
TOW TRUCK DRIVER
*16 13*   IMPOUNDING OFFICER(S)
BADGE NO.(S)   *MPD* DEPT.   DISTRICT *#1*

TIME   DATE   RELEASED TO (ENTER NAME)
DRIVER LICENSE NO.

## GENERAL INSTRUCTIONS TO GARAGES AND VEHICLE OWNERS

1. Vehicles <u>without</u> HOLD ORDERS become the responsibility of the garage at time of tow-in and may be released without Metro-Dade Police Department authorization.

2. Vehicles <u>with</u> HOLD ORDERS must have written authorization from the Metro-Dade Police Department. Release may be authorized by:

(INVESTIGATING UNIT)   Telephone _____

3. Documents required for release are:
   a. Valid Driver's License <u>and</u>
   b. Vehicle Title <u>or</u>
   c. Current Registration <u>or</u>
   d. Other proof of right to possession.
4. Release will be facilitated by presentation of this Vehicle Storage Receipt.

| BOAT INFORMATION | | | |
|---|---|---|---|
| YEAR | MAKE | REGISTRATION NO. | SIZE |
| | | | |
| SERIAL NO. | | | COLOR |

3203 05-19 Rev 4/81          THE VEHICLE STORAGE RECEIPT